**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
**WOLTERS KLUWER FINANCIAL SERVICES**
**INC.,**

                **Plaintiff,**                         **07 CV 2352 (HB)**

                                                   **<u>AMENDED</u>**
                                                   **<u>OPINION &</u>**
       -against-                                 **<u>ORDER</u>**

**SCIVANTAGE, ADNANE CHARCHOUR,**
**SANJEEV DOSS, CAMERON ROUTH AND**
**GREGORY ALVES,**
                    **Defendants.**
-----------------------------------------------------------------x
**Hon. Harold Baer, Jr., District Judge:**


## I.      INTRODUCTION

      To fulfill its promise of providing the fair and ordered administration of justice, our legal system depends upon lawyers and law firms following ethical guidelines.  To be sure, zealous advocacy by attorneys is not only expected, it is commendable.  Nonetheless, there is a line beyond which such aggressive representation gives way to misconduct.

      While frequently under fire, attorney behavior remains largely self-regulating.  Lawyers are entrusted with ensuring that both their own conduct and that of their colleagues fall within the bounds of the rules of professional responsibility.  Occasionally, as here, this responsibility leads lawyers to bring questionable conduct to the attention of the court.  Often, though, to avoid public criticism, lawyers settle amongst themselves without court involvement.  And to a large extent, courts—even when aware of the misconduct—are satisfied to allow such self-governance among lawyers.

      However, the expectation that lawyers can and will resolve questions of attorney behavior without the intervention of the courts—and thus without the threat of official oversight—is hardly a license for lawyers to sweep transgressions under the proverbial rug by settling out of court.  From time to time, a lawyer's misconduct is so grave and so blatant as to demand more.  When such lapses occur in the federal courts, it is not only

our prerogative but our responsibility to address them and, where appropriate, impose sanctions.[1]  Indeed, as Canon 3B(3) of the Code of Conduct for U.S. Judges makes clear: "A judge should initiate appropriate action when the judge becomes aware of reliable evidence indicating the likelihood of unprofessional conduct by a…lawyer."[2]

The instant case, unfortunately, has been marked by a myriad of just such "reliable evidence" of attorney misconduct serious enough that this Court felt compelled to act.  Sadly, the nub of the problem may not be just the behavior of one or two attorneys or law firms, but a much broader problem that has affected the practice of law generally over the last twenty or thirty years and has in the eyes of many turned what was once a profession into more of a business.

This distinction between the legal profession and a business was eloquently explained over thirty years ago by the Honorable Charles D. Breitel, while Chief Judge of the New York Court of Appeals:

> A profession is not a business.  It is distinguished by the requirements of extensive formal training and learning, admission to practice by qualifying licensure, a code of ethics imposing standards qualitatively and extensively beyond those that prevail or are tolerated in the marketplace, a system for discipline of its members for violation of the code of ethics, a duty to subordinate financial reward to social responsibility, and, notably, an obligation on its own members, even in nonprofessional matters, to conduct themselves as members of a learned, disciplined, and honorable occupation.  Matter of Freeman, 34 N.Y.2d 1, 7 (1974).

Chief Judge Breitel's assessment echoes that of former Harvard Law School Dean Roscoe Pound, who had earlier defined a profession as "a group…pursuing a learned art as a common calling in the spirit of public service—no less a public service because it may incidentally be a means of livelihood."[3]

More recently, the New York Committee on the Profession and the Courts more frequently referred to as the "Craco Report" after its Chair Louis Craco observed, the rising number of lawyers and the de-localization of practice have "heightened the commercialization" of the practice of law.[4]  Gone are the days where the ambit of a

---

[1] The judicial power to impose sanctions derives from a number of sources: federal statutes, the Federal Rules of Civil Procedure, and the inherent power of the courts.
[2] Code of Conduct for U.S. Judges, available at http://www.uscourts.gov/guide/vol2/ch1.html#3.
[3] Roscoe Pound, The Lawyer from Antiquity to Modern Times 5 (1953).
[4] Committee on the Profession and the Courts, Final Report to the Chief Judge 1 (November 1995).  The

lawyer's practice extended only so far as the county court house on the town square. Today, firms are expanding in size and number, and how often boast national, even international, reach; likewise, clients and their legal needs have become ever more numerous and complex, with the stakes continually rising—not only in terms of the issues and amounts in controversy, but in the fees that attorneys earn. The legal profession has seen a transformation wherein the naked competition and singular economic focus of the marketplace have begun to infiltrate the practice of the law, subordinating high standards of service, collegiality, and professionalism as a result. As the Committee further observed: "[t]he rise in the mobility of lawyers weakened the ties to firms, institutions, and communities in which professional standards traditionally had been articulated and enforced…kept in check by the cultural mores of the relatively small legal community."[5]

Thus, a dismaying erosion of civility in practice has often accompanied the expansion of our legal profession. Such incivility "commonly manifests itself as rudeness, refusal to accommodate a colleague's schedule, judge baiting, or harassment during depositions….[A]lso included under the umbrella are sharp practice tactics such as misrepresenting facts to the court or an adversary and including false information in unsworn documents."[6] However, while the idealized notion of the small-town lawyer is an anachronism, the idea that civility among lawyers is incompatible with full and effective representation should not be. Indeed, while Rule 7-101 of the Lawyer's Code of Professional Responsibility obligates a lawyer to provide zealous representation, it provides at the same time that "[a] lawyer does not violate [this responsibility] by acceding to reasonable requests of opposing counsel which do not prejudice the rights of the client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process."[7]

[underlined material was originally omitted from Opinion dated November 29, 2007]

report was commissioned to respond to the increasingly low esteem of the profession in the eyes of the public, and makes a number of recommendations to the profession as to how the legal profession can work to improve itself from within.
[5] Craco Report at 1, 29.
[6] Craco Report at 30, citing to New York State Bar Association, Membership Survey, 143 (1993).
[7] New York Lawyer's Code of Professional Responsibility, Disciplinary Rule 7-101.

So, while our system is by its very nature adversarial, it goes without saying that such a system expects—indeed, requires—a measure of civility. Nor will our system long survive as it is if we tolerate the use of misleading or downright false statements by lawyers—to opposing parties or to the Court itself—in an attempt to secure a favorable outcome for their clients and themselves.

These and other examples of ethical misconduct are quite simply unacceptable. Such conduct is a drain on valuable judicial resources: when, for example, a litigant misleads the Court, it necessarily takes more time for the Court to try and sift through the facts and separate truth from falsehood. As important, incivility and contentiousness tend to undermine public confidence in the efficacy of the legal system. Finally, when a lawyer deviates from ethical norms he or she acts to the serious detriment of the very individuals that have sought his or her counsel with the expectation of competent, acceptable methods of representation.

Let me begin the story of the present case with the underlying sanctions motion. On April 24, 2007, Defendants Scivantage, Adnane Charchour ("Charchour"), Cameron Routh ("Routh"), Gregory Alves ("Alves"), and Sanjeev Doss ("Doss") (collectively, "Defendants") moved for sanctions pursuant to Fed. R. Civ. P. 37, Fed. R. Civ. P. 16(f), 28 USC § 1927 and the inherent powers of the court, and for civil contempt, against Plaintiff Wolters Kluwer Financial Services Inc. ("Plaintiff" or "Wolters Kluwer"), as well as Plaintiff's then-counsel, Dorsey & Whitney ("Dorsey"), and Dorsey's then-lead counsel on this litigation, Kristan Peters ("Ms. Peters" or "Peters") for a variety of wrongs.

While that motion was withdrawn after a settlement had been reached, my concern was that without more the public and the profession would be deprived of their right to know. The parties sought to seal all the papers surrounding all the motions and, with respect to the hearing, that I seal the courtroom and the transcript. While I acceded to these requests it was with the reservation that depending on the testimony some or all of the sealed material would, on notice to the parties, be unsealed. The issues raised by the motion were troubling.[8] The sealing and the caveat were to insure that, if proven, the

---

[8] It is axiomatic that courts have the authority to impose sanctions *sua sponte* under the various sources of the sanctioning power—i.e. federal statutes, the Federal Rules of Civil Procedure, and the inherent power

wrongs would see the light of day and, conversely, if unproven, the reputation of those accused would remain unscathed. I scheduled an evidentiary hearing which began on July 23, 2007. That hearing turned out to embrace five days over nearly two months, concluding on September 12, 2007. The following finding of fact come primarily from that proceeding.[9]

## II.    FINDINGS OF FACT

### A. Plaintiff's Activities Prior to Initiation of Action

In or about mid-February 2007, Brian Longe ("Longe"), the president of Wolters Kluwer Financial Services (Plaintiff's parent organization), became aware that three former employees of Plaintiff's "Gainskeeper" business unit who had resigned in June 2006 – i.e., Defendants Cameron Routh, Gregory Alves, and Sanjeev Doss – were now working for a competing software company, Scivantage, that was bidding against Wolters Kluwer for a contract to provide software for tax lot accounting services. 9/4/07 Tr. 40:7-15; Declaration of Deidra D. Gold, July 10, 2007 ("Gold Decl.") ¶ 1, 6. Longe contacted Deidra Gold ("Gold"), General Counsel for Wolters Kluwer North American Financial Services, as well as Steven Isaacson ("Isaacson") and Hubert "Chip" Zyvoloski ("Zyvoloski"), other Wolters Kluwer in-house counsel, and passed along that information. Gold Decl. ¶ 1, 6; 9/4/07 Tr. 40:7-15, 40:21-41:1. Ms. Gold approved the retention of outside counsel to investigate the matter and determine whether litigation was appropriate. Gold Decl. ¶ 7. Gold recommended Kristan Peters, a partner at Dorsey & Whitney in New York.[10] Id.

---

of the courts. When taking such action, though, courts should provide to the affected parties notice and an opportunity to be heard. All of that said, the situation before this Court is slightly different from one in which sanctions are imposed sua sponte. Here, Defendants moved for sanctions and when that motion was later withdrawn the Court elected to continue with a hearing on the same issues raised by Defendants. Clearly, if a party files a motion for sanctions, such motion is sufficient notice to the potentially sanctioned party. And because it was specifically reiterated at the beginning of the hearings that the Court was only considering the same issues raised by Defendants' sanctions motion, withdrawal of that motion will not negate notice to the parties.

[9] It was my view that, taking a leaf from Lord Macauley in his Political Georgices, "men are never so likely to settle a question as when they discuss it freely".

[10] Gold and Steven Isaacson, Gold's direct subordinate, both stated that others had commented favorably on Ms. Peters' work. See Gold Decl. ¶ 7; Declaration of Steven C. Isaacson, July 10, 2007 ("Isaacson Decl.") ¶ 5.

Ms. Peters, although she had only recently joined Dorsey as a partner in January 2007, had a longstanding relationship with the Wolters Kluwer companies spanning approximately nine years.[11]  9/11/07 Tr. 152:1-5.

In February and March 2007, Wolters Kluwer, assisted by Ms. Peters, commenced their investigation.  Initially, Chip Zyvoloski was assigned to directly supervise the investigation, although he transferred his supervisory role to Steven Isaacson around mid-March.  7/23/07 Tr. 61:15-18; 8/15/07 Tr. 14:9-19.

From Wolters Kluwer's perspective, their allegations against the individual Defendants were largely based on the theory that the three individual Defendants took their knowledge of complicated tax lot accounting transactions and their conceptual knowledge of how Gainskeeper's software tracked those transactions (including their knowledge of certain algorithms), and their knowledge of the tax software business generally, and gave that knowledge to Scivantage (and that Defendants' knowledge constituted protectible "trade secrets").[12]  Wolters Kluwer did not have evidence that the three Defendants took actual programming code and gave it to Scivantage, or that they even had access to the code.[13]  See 7/23/07 Tr. 111:17-20 (Zyvoloski testimony); 8/15/07

---

[11] Prior to the nine years during which she represented Wolters Kluwer, Ms. Peters had an additional four years of private practice, and six years of experience as an Assistant U.S. Attorney in Washington, D.C.  See 9/11/07 Tr. 150:16-21.  Ms. Peters averred that she had done "quite a lot" of trade secret work, including three prior trade secret cases for Wolters Kluwer.  9/11/07 Tr. 152:9-15, 314:22-315:3.
Ms. Peters had also defended Wolters Kluwer in employment litigation.  See 9/11/07 Tr. 152:9-15.  Interestingly, in one of those cases, a federal court noted Ms. Peters' "unrelenting use of discovery and motion practice," and stated that the "case was highly contentious, but more so because of the demeanor of counsel than because of the merits …"  See Jordan v. CCH, Inc., 230 F. Supp. 2d 603, 607 (E.D. Pa. 2002).  Gold, for her part, was not affiliated with CCH or any other Wolters Kluwer entity at the time Ms. Peters litigated the Jordan action, and neither she nor her law firm appear to have had any awareness of the Jordan Court's comments.  Gold Decl. ¶ 8; 7/23/07 Tr. 23:19-23.

[12] See Exhibit WKFS 1 (Email of Chuck Ross to Kristan Peters, Chip Zyvoloski, Joseph Honor, and David Stephens, 2/27/07, entitled "Description of [Gainskeeper] Secret Sauce," in which Ross describes the knowledge that Routh, Alves, and Doss allegedly took with them to Scivantage.  Ross states at one point, "[Defendants] have a general understanding of these implementation concepts.  They would not be able to provide technical details, but they could provide general guidance to a savvy technology team which could attempt to mimic our technical approach."); see also 8/15/07 Tr. 183:23-185:13 (Ross testimony as to nature of "secret sauce"); 8/15/07 Tr. 16:7-15 (Isaacson testified that "…[W]e believed that [Defendants] had taken confidential information or trade secrets from us and had gone to a competitor to build a product…" and stated that those trade secrets "consist[ed] of… business rules and the mathematical algorithms that are based on those business rules.").

[13] Zyvoloski stated generally that he believed that Defendants had access to higher-level information than programming code, although he, and other Wolters Kluwer employees, characterized that information in variously different terms in relation to the "code."  See 7/23/07 Tr. 85:19-21("I believe that they were all exposed to requirements and bits and pieces of code and understanding the logic that's one step away from

Tr. 199:13-19, 202:10-14 (Honor testimony). Indeed, the three individual Defendants were management-level employees, not programmers.[14] Wolters Kluwer Vice President David Stephens ("Stephens") did, at one point, inform in-house counsel that Defendants had access to the programming code, although that information turned out to be inaccurate.[15] See 7/23/07 Tr. 90:1-5, 91:20-92:5; see also 8/15/07 Tr. 51:22-52:6.

During this time, Wolters Kluwer conducted a forensic investigation of Defendants' computers still in its possession to ascertain whether Defendants did, indeed, steal trade secrets, or have access to password-protected information. See Tr. 88:13-89:11 (Zyvoloski testimony). Zyvoloski stated that there was no evidence that Defendants misappropriated trade secrets. See Tr. 89:2-7 (Zyvoloski testimony),[16] and none was presented to the Court with Plaintiff's complaint.

During this time, Ms. Peters and Chip Zyvoloski assisted Wolters Kluwer employees to draft Declarations to be attached to the Complaint. Ms. Peters' March 15, 2007 draft of the Declaration of Charles Ross ("Ross"), the General Manager of Gainskeeper, included a reference to the named Defendants being part of the team that had access to the programming code, but Mr. Ross, in his March 16 revision, excised this language.[17] Ross testified that it was "not [his] intention" to convey through his

---

[14] the actual coding that's the programming."); see also Tr. 90:6-15 ("…they were exposed to pseudo-code…"); see also Tr. 110:2-5 (Alves and Doss were involved in developing "algorithms… embedded in the code"); see also Tr. 125:5-7 (Ms. Peters, as counsel: "[S]o the algorithms embedded in the code are part of the code[?]" Zyvoloski: "…[I]n a manner of speaking, yes.").

[14] Alves was a co-founder and the Vice President of Operations at Gainskeeper; Routh, who possesses an MBA, was a co-founder and oversaw marketing and business development at Gainskeeper; and Doss, who possesses a J.D., was the Tax Director of Gainskeeper. See Complaint, Mar. 20, 2007 ("Pl. Compl.") ¶¶ 20-22;[14] see also Declaration of Greg Alves, Mar. 27, 2007 ¶ 7; Declaration of Cameron Routh, Mar. 27, 2007, ¶ 14; Declaration of Sanjeev Doss, Mar. 27, 2007 ¶¶ 17-18.

[15] Stephens, for his part, stated at one point that the Defendants had access to the software code because "they were senior people at Gainskeeper and they had access to everything," but later clarified his testimony to state that "they could have had access to it if they wanted it," and subsequently clarified further, "I don't have evidence that they have access to the code." See 8/15/07 Tr. 111:24-112:24, 113:10-15.

[16] Isaacson, on his part, recalled that there was some forensic evidence that one of the Defendants had downloaded files from his computer in his last days with Wolters Kluwer, although Isaacson did not state what that file contained. See 8/15/07 Tr. 51:6-14.

Stephens, for his part, stated that what was "more important than the code itself was how [the code] started," and that "that's what these guys had access to and I still believe they used inappropriately but I have no evidence for that." 8/15/07 Tr. 115:21-25.

[17] Ms. Peters' initial draft included the language "When changes are required to be made to the Code, our development team, consisting of [blank] and formerly consisting of [blank] (Chuck? – any named defendants?) are required to use software to gain remote access to the Code in order to effect changes."

declaration that the individual defendants had misappropriated the software code.  See 8/15/07 Tr. 156:25-157:3.[18]

During the drafting of the Complaint, Zyvoloski, and Joseph Honor, the technology manager for Gainskeeper, expressed to Dorsey or Peters their discomfort with Paragraph ¶ 39 of the Complaint, because that paragraph suggested that Wolters Kluwer knew that Defendants had taken software code.  See 7/23/07 Tr. 122:3-7, 123:1-5, 124:1-8 (Zyvoloski testimony); 8/15/07 Tr. 204:5-20, 205:4-9 (Honor testified, "I did not feel that it was likely that they would have stolen our software code").  Ms. Peters generally advised Zyvoloski that the "complaint…contained…facts as well as advocacy," and that that paragraph was "advocacy… and within the legal bounds of pleading."  See 7/23/07 Tr. 122:2-5.  Wolters Kluwer ultimately approved the language Peters proposed in Paragraph ¶ 39.  See 8/15/07 Tr. 18:17-19:7 (Isaacson testimony).

B.  Plaintiff's Initiation of Action

On Wednesday, March 21, Plaintiff, through their counsel Ms. Peters, applied to this Court ex parte for a Temporary Restraining Order and emergency discovery.[19]  Ms. Peters attached six Declarations by Wolters Kluwer employees to Plaintiff's Complaint and initial application.[20]  Ms. Peters advised Wolters Kluwer to seek a TRO.[21]  Wolters

---

See Peters Ex. I, ¶ 6. Ross, in his revised draft, crossed out Ms. Peters' note reading "(Chuck? – any named defendants?)" and did not insert any named Defendants.  See Peters Ex. J, ¶ 6.  Plaintiff's complaint, however, still contained this language detailing the manner by which Wolters Kluwer employees gained access to the code.  See Pl. Compl. ¶ 16.

[18] See also 190:13-20 (Ms. Peters, as counsel: "…[Y]ou described what it is that was taken and what the intellectual property was, correct?" Ross: "I didn't describe what was taken, and I don't think in my declaration I said that they took the code.").

[19] Plaintiff first applied to this Court while I was assigned to Part I "emergency motions" duty. Subsequently, by random selection, this action was assigned to my regular docket.

[20] These declarations comprised the declaration of Ross, see Declaration of Charles Ross, Mar. 20, 2007; Joseph Honor, see Declaration of Joseph Honor, Mar. 19, 2007, ¶ 2; Jennifer Davis, a "Human Resource Consultant" for Gainskeeper, see Declaration of Jennifer Davis, Mar. 19, 2007, at ¶ 2; Brian Dalia, a "sales executive for Gainskeeper," see Declaration of Brian Dalia, Mar. 18, 2007 at ¶ 2; William Burnett, a "securities sales manager" for Gainskeeper, see Declaration of William Burnett, Mar. 19, 2007 at ¶ 2; Bruce Lenz, the "Executive Vice President, Head of Mergers & Acquisitions" of Plaintiff's parent company, and a corporate secretary of Plaintiff, see Declaration of Bruce Lenz, Mar. 16, 2007, at ¶ 2; and Roger Eriksson, the controller and "director of finance" of Plaintiff, see Declaration of Roger Eriksson, Mar. 20, 2007, at ¶ 2.

Plaintiff's complaint and moving papers adopt several paragraphs verbatim from the declarations, particularly Ross' declaration.  Compare, e.g., Pl. Compl. ¶¶ 14-22 and Pl. Mem. of Law. ¶¶ 5-13 with Ross Decl. ¶¶ 6-14.

[21] See Tr. 86:3-12 (Zyvoloski testified that Plaintiff sought a TRO based on outside counsel's advice); 8/15/07 Tr. 15:13-15 (Isaacson testified that Wolters Kluwer asked Ms. Peters for her opinion as to whether

8

Kluwer reviewed the papers beforehand and authorized the filing of the complaint as well as the seeking of the TRO and expedited discovery.[22]

Plaintiff, in its complaint, alleged nine state law claims, e.g. misappropriation of trade secrets (and aiding and abetting the same), unfair competition (and aiding and abetting the same), breach of fiduciary duty (and aiding and abetting the same), conversion, unjust enrichment, and breach of contract (and aiding and abetting the same), and one federal claim, i.e. violations of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4), (a)(2)(C). Plaintiff premised federal supplemental jurisdiction on the Computer Fraud and Abuse Act claim.[23] Plaintiff's allegations centered around the allegation that the three individual Defendants had helped Scivantage produce their software by stealing trade secrets from Plaintiff and passing them along to Defendants, despite the fact that they were bound by nondisclosure agreements, which Plaintiff alleged prohibited disclosure of trade secrets.[24] Plaintiff, citing "irreparable harm" to its interests, requested a TRO against Defendants.

Plaintiff's initial application stated that its "work product is in the form of software code," and focused on the confidential nature of that software code.[25] See Plaintiff's Memorandum of Law in Support of Order to Show Cause, Mar. 20, 2007 ¶ 6; Pl. Compl. at ¶ 15. Plaintiff described over the course of four paragraphs how its code was password-protected and located in a secure data center to which only certain employees had access. See Pl. Compl. ¶¶ 15-18, Pl. Mem. Law. Mar. 20, 2007 ¶¶ 6-9

---

to seek a TRO); 9/4/07 Tr. 41:14-21 (Longe testified that he "was aware" of a decision to apply for a TRO, and that counsel had advised him that "we had enough to go forward").

[22] See 7/23/07 Tr. 25:15-19 (Gold understood that Plaintiff was moving for a TRO); Tr. 92:12-18 (Zyvoloski reviewed complaint and authorized filing of complaint and motion papers); 8/15/07 Tr. 15-8-19 (Isaacson reviewed and approved TRO papers before filing); 8/15/07 Tr. 27:14-28:4 (Isaacson approved seeking of emergency discovery).

Gold avers that she did not personally authorize the seeking of ex parte relief. 7/23/07 Tr. 24:17-25:12. It is unclear whether Isaacson did so.

[23] Peters needed a federal claim to get into federal court and Zyvoloski testified that premising federal supplemental jurisdiction on the Computer Fraud and Abuse Act was Ms. Peters' idea. See 7/23/07 Tr. 98:5-14.

[24] The individual Defendants were not bound by non-compete agreements – only non-disclosure agreements.

[25] Stephens stated that although he did not review the TRO papers before they were filed, he "though [the TRO] might have had more evidence – would have had more focus on business logic and other forms of [intellectual property], but it is what it was." See 8/15/07 Tr. 116:2-9.

(similar), Declaration of Charles Ross, Mar. 20, 2007, ¶¶ 7-10 (similar).[26] Paragraph 39 of the Complaint, which Plaintiff's in-house counsel Zyvoloski had expressed discomfort with, stated that "Defendants have been able to jump start their further penetration of the market by using plaintiffs protected and proprietary methods, [and] software code…" Pl. Compl. ¶ 39.[27] Stephens testified that when he later read the initial application, he agreed it was "misleading to focus on all the code stuff." 8/15/07 Tr. 141:24-142:3.

Ms. Peters, along with Charles Ross, personally visited Chambers to make the application.[28] See Declaration of Charles Ross, Mar. 20, 2007, ¶ 2; Tr. 157:17-158:5.

Based on Ms. Peters' *ex parte* representations, I issued a TRO on March 21, drafted by Plaintiff and modified slightly by the Court, which restrained Defendants from, inter alia, marketing their Maxit product, contacting Plaintiff's current customers, or contacting Plaintiff's employees, pending a hearing which I originally set for Friday, March 23, 2007.[29] I struck the portions of Plaintiff's proposed order that provided for restraints upon Defendants' contact with Plaintiff's potential customers.[30] The order also

---

[26] These four paragraphs substantively echoed, with some changes, the four paragraphs describing the code that Ms. Peters had drafted and proposed to Ross on March 15. See Peters Ex. I.
On March 13, Ms. Peters had informed Zyvoloski, Honor, and Ross by email that she had drafted the TRO and expedited discovery order. Peters Ex. 37. She asked Ross and Honor to review the TRO and "make sure from the technical side there is not anything extraneous in there." Id. Notably, however, Ms. Peters referred only to the TRO itself and not the Complaint or underlying Declarations of Ross or Honor on which the Complaint was based. See 8/15/07 Tr. 188:22-189:1 (Ms. Peters, as counsel: "…[Y]ou did attest and swear to the accuracy of the facts that I included in the TRO, correct?" Ross: "…[T]o be honest with you, I don't recall, but I remember being very focused on my declaration, less focused on the TRO.").

[27] Plaintiff's complaint and moving papers are broadly worded, and include allegations of activity on the part of Defendants that appear to have nothing to do with trade secrets. See, e.g., Pl. Compl. at ¶ 20 ("Routh led product managemement, and he leveraged Gainskeeper infrastructure to gain deep insight into how customers use the product… He also gained access to influential politicians and government executives who are currently lobbying for legislation…") In any event, Plaintiff's original application, after variously referencing "processes," "methodologies," and "methods," summarizes bluntly, "[Plaintiff's] work product is in the form of software code." See, e.g., Pl. Compl. at ¶ 14-15, Pl. Mem. of Law, Mar. 20, 2007 at ¶ 5-6 ("Gainskeeper has unique processes and methodologies… Because its processes are unique and valuable, [Gainskeeper] treats its work product and methods as confidential and proprietary… [Plaintiff's] work product is in the form of software code.")

[28] Because Ms. Peters has put in issue *ex parte* and/or untranscribed conversations with myself or my law clerk by seeking the testimony of myself or my law clerk regarding those conversations in connection with her motion for my recusal, I will not rely on any independent recollection of myself or my law clerk as to the arguments Ms. Peters made in Chambers at this time.

[29] Plaintiff's proposed order stated that Plaintiff's complaint was "verified." As Plaintiff's complaint was not verified, in the signed order I struck the reference to a "verified" complaint.

[30] I requested that Ms. Peters provide the Court with a list of Plaintiff's current and potential customers. Ross emailed to Ms. Peters, at 1:10 P.M. on Wednesday, March 21, a list of 133 current and potential customers, with a delineation of "yes" or "no" marking whether a company was a current or potential

provided at Plaintiff's behest for voluminous discovery, depositions, "imaging" of Defendants' computers, and Plaintiff's access to Defendants' computers.

### C. Defendants' Appearance in Action

Defendants, represented by Akin Gump Strauss Hauer & Feld LLP, wrote the Court the next day, Thursday, March 22, and stated that "plaintiff's claims clearly lack merit – and indeed seem calculated to mislead the Court." See Letter of Richard J. Rabin, Mar. 22, 2007.[31]

After a conference call between the parties that day, I adjourned the TRO hearing to March 28, 2007 and gave several verbal orders.[32] After Ms. Peters disagreed with Defendants' written memorialization of the Court's verbal orders, and requested revision of at least one order, I memorialized my Orders on March 23, 2007.[33] I ordered

---

customer of Gainskeeper. See WKFS Ex. 6. Ms. Peters subsequently provided the Court at 2:08 P.M. with a Declaration of Charles Ross and attached a list of 131 of Plaintiff's current and potential customers, combined together, without any delineation as to which companies were current customers as compared to potential customers. See Declaration of Charles Ross, Mar. 21, 2007. I reiterated and clarified my request for one list of current customers, and one separate list of potential customers. Ms. Peters subsequently provided at 3:12 P.M. two separate lists, one showing 19 current customers, and one showing 114 potential customers. As noted, I declined at this time to restrain Defendant from contacting Plaintiff's potential customers.

Later, at the TRO hearing, Plaintiff's counsel described this list of potential customers as "hot leads." See Transcript of Mar. 28, 2007 at 14 ("That is the list that we were asking for protection of.")

[31] Defendants also noted that Plaintiff, despite my order, had failed to serve a copy of the Temporary Restraining Order and Plaintiff's moving papers on Defendants by hand by the close of business on March 21, even though the offices are a few blocks apart. Defendants also complained that when finally served it was an incomplete and redacted version of the moving papers.

In Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction, filed March 27, 2007, Defendants complained that Plaintiff still had not provided a full set of the moving papers, and indeed, that Plaintiff's redactions obfuscated Plaintiff's central claims of the case. For example, in Plaintiff's Declaration of Charles Ross, Ross, in the only bolded text of the Declaration, stated that "I firmly believe that no client could have reached the conclusion of "mirrored functionality" in the time span of 7 months unless these individuals shared [Gainskeeper's] proprietary and confidential information and trade secrets in violation of their nondisclosure agreements." See Ross Decl. at ¶ 20. However, the redacted version of Ross' Declaration—the one provided to Defendants—read, "I firmly believe that XXXXXXXXXXXXX in the time span of 7 months…" See Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction, filed March 27, 2007, at 10 n.3. After the TRO hearing at which it became clear that Defendants did not possess access to the software code, Plaintiff's contention that Defendants' software possessed "mirrored functionality" emerged as a primary underlying basis for Plaintiff's allegation of Defendants' theft of trade secrets which Peters focused on.

Ms. Peters avers that the papers were "lightly redacted." See, e.g., Peters Decl. ¶ 62.

[32] I take responsibility for not having realized even at that early moment in the litigation that Lewis Carroll had a point: "the 'horror of that moment' the King went on 'I shall never NEVER forget! You will though' the Queen stated, 'if you don't make a memorandum of it.'" LEWIS CARROLL, THROUGH THE LOOKING-GLASS AND WHAT ALICE FOUND THERE 20 (Elibron Classics 2006) (1904). I should have taken the Queen's advice.

[33] The March 23, 2007 written order substantively echoed Defendants' written memorialization of my

Defendants "beginning Monday, March 26, 2007" to arrange for the imaging of the computers of the individual Defendants Doss, Alves, and Routh under the supervision of a "neutral third party," but otherwise excused Defendants from complying with "any" of the remaining discovery or disclosure obligations in my March 21, 2007 Order.[34] Defendants remained generally restrained from marketing to Plaintiff's current customers pending the TRO hearing. Additionally, I restrained, at Plaintiff's request, the three individual Defendants Doss, Routh, and Alves from marketing to Plaintiff's potential customers, to the extent those three Defendants knew those entities to be potential customers of the plaintiff.[35]

Defendants submitted, on March 27, 2007, a Memorandum of Law in opposition and several Declarations by the Defendants.

Prior to the TRO hearing on March 28, 2007, David Stephens expressed his opinion to Ms. Peters and Mr. Isaacson that the "previous focus on code itself was misdirected," and advised Ms. Peters to modify her arguments accordingly. See 8/15/07 Tr. 114:18-115:25, 132:32-133:16.

D. TRO Hearing

At the TRO hearing on March 28, 2007, Defendants generally averred that Plaintiff's lawsuit was bereft of evidence and could only be intended to deliberately mislead the Court, that it was an "abuse of judicial process," and that Plaintiff's real intention was to disrupt its competitor's business.[36] See generally 3/27/07 Defendants'

---

verbal orders. One can't help thinking that at this early stage of the litigation and for the balance thereof heeding the above colloquy from Lewis Carroll's Through the Looking-Glass would have been a good idea.

[34] Ms. Peters wrote the Court on March 23, 2007 at 12:02 P.M., stating that "the Court made it clear that the Emergency Discovery Order would remain in place." In my written Order of March 23, I reiterated and clarified my verbal orders of March 22 and made it clear that, aside from imaging, pending the TRO hearing, the Emergency Discovery Order of March 21 was stayed. Ms. Peters also stated in this letter that "the Court wanted the imaging done now." As noted above, in my written Order of March 23, I reiterated and clarified my verbal orders of March 22 and made it clear that, in fact, the Court wanted the imaging to begin Monday, March 26. I also made clear, upon Defendants' written objection, that the "images were to be kept in the custody of the third party until further Order," and not produced directly to Plaintiff, as Plaintiff requested.

[35] Following the March 22 conference call, Plaintiff wrote the Court at 7:03 PM that night to request again that all of Defendants' employees, not just the three individual defendants, be prohibited from marketing to Plaintiff's potential customers, and attached proposed Orders reflecting same. As I had done twice before, I declined to grant such relief.

[36] David Stephens and Joseph Honor were present at the hearing. See Chou Decl. at ¶ 6, 8/15/07 Tr.

Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction ("Def. Mem."), at 1-2. Defendants noted, inter alia, that although Plaintiff's complaint mentioned that Plaintiff's software code was protected by password and other, more stringent, means, none of the Defendants had the password for the code while in Plaintiff's employ. Defendants further noted, and Plaintiff did not dispute, that Plaintiff had previously conducted two forensic investigations of its own computers, and did not present evidence of those investigations to the Court. Def. Mem. at 2. Defendants argued, "It is clear why plaintiff proceeded *ex parte*… [H]ad the plaintiff contacted the Scivantage Parties, and had the court been provided the full truth… this TRO never would have been issued." Def. Mem. at 4.

I began the hearing by asking about Defendants' access to the code.[37] Ms. Peters conceded, eventually, that Defendants had no access to source code.[38] (That said, at one point, she stated, "Mr. Doss does write code." See Tr. at 6:7-9.)[39] She now argued that even though Defendants had no access to source code, the information and knowledge Defendants brought with them to Scivantage constituted "a peculiar combination of these methodologies, know-how, and formulae," and thus constituted a trade secret. See Tr. at 8:20-24. Defendants averred that Defendants' information and knowledge was of IRS public tax regulations and general business practices, and was not a "trade secret." See, e.g., Transcript of Oral Argument, March 28, 2007 ("Tr."), at 35.

---

132:22-23.

[37] I asked Ms. Peters, "I can't seem to find a connection between these three individual defendants and their access to the code, which I presume is the trade secret." See Transcript of Mar. 28, 2007, at 4.

[38] Ms. Peters' answers to the Court's questions regarding whether the Defendants had access to the software code were equivocal, shifting, and evasive. After my initial question, Ms. Peters handed to me, without handing to her opponent, a new list of eight "functionalities" that she now averred constituted the "trade secret" at issue in the case. The document began, "Defendants stole our functionality, which is a peculiar combination of these methodologies, know-how, and formulae…" See Defendants' Opposition to Plaintiff's Motion to Reinstate Temporary Restraining Order, Apr. 9, 2007, Ex. 1. I repeated my question multiple times. See Transcript at 4-5 ("Maybe you should answer my question first… Is there anything in your papers that says there is or was access to the code... I don't think you have yet answered my question.") Eventually, Ms. Peters stated, "They were not a group of the people that had access to the password of the code, but the trade secrets in this case… are not just code. The trade secret is the thing I just handed you." Tr. at 6:12-14.

[39] "Mr. Doss does write code… These individuals wrote the algorithms that are embedded in the code." See Tr. at 6.

Following the hearing, on March 29, 2007, I dissolved the TRO by written Order, but provided for discovery, in accordance with orders given at the TRO hearing.[40] I ordered that the "imaging" of up to fifteen of Defendants' computers would "occur" on March 29;[41] that Defendants would provide emails and other documents to Plaintiffs by Friday, March 30; and that Defendants could fax objections to the Court by March 29, at 3:00 P.M. After an extensive plea by Plaintiff as to their urgency,[42] I also ordered depositions to be expedited and that the four individual Defendants in this action – Sanjeev Doss, Cameron Routh, Gregory Alves, and Adnane Charchour – be deposed on April 2 and April 3, 2007. I set April 6 as a date for hearing, in part to accommodate both Plaintiff's lead counsel's personal vacation schedule, and her request for expedited relief.[43]

E.  Defendants' Discovery Objections and Requests

Defendants timely provided objections to Plaintiff's discovery requests by letter on March 29 at 2:56 P.M.[44] Defendants, inter alia, represented that production of all

---

[40] At the TRO hearing, despite my prior rejection of Ms. Peters' contention that my March 22 Order demanded imaging immediately, Ms. Peters repeatedly characterized my March 23 Order that "beginning Monday, March 26, 2007, Defendants arrange for the imaging…" "and concluding as soon as conveniently possible thereafter…" "with images to be kept in the custody of the third party…" as an Order requiring Defendants to provide the imaging to Plaintiff on or about Monday, March 26. I corrected her on each occasion. See, e.g., Tr. at 26-27 (Ms. Peters: "…I was supposed to get it on Monday or Tuesday…" Court: "Actually, I ordered it to begin only on Monday."); Tr. at 45-46 (Ms. Peters: "You ordered him to get this done on Monday." Court: "All I asked is that he instigate or begin getting ahold of [a third party] and starting Monday"); Tr. at 48 (Ms. Peters: "Your Honor, you didn't say get it started, you said have the computers imaged on Monday." Court: "No.").

Subsequently, when Defendants' counsel noted that Ms. Peters had refused to consent to one day of extra time for Defendants to file responsive papers, Ms. Peters characterized my corrections of her characterizations as an "extension of time." See Tr. at 51 (Ms. Peters: "You got an extension of time on everything. You got an extension of time… to do the imaging on Monday.")

[41] Ms. Peters also offered at the TRO hearing that it could provide an independent expert, Stroz, who could complete the imaging more quickly. Tr. at 45-46 Defendants objected that Ms. Peters' "independent" expert was Plaintiff's hired expert for this action, as opposed to a "neutral third party," as my March 23 Order specified. Tr. at 46-47

[42] Ms. Peters, at the TRO hearing, repeatedly asked for faster production of discovery by Defendants so as to prepare more adequately for the depositions to take place on Monday and Tuesday, April 2 and 3 at her behest and extraordinarily soon after the action had commenced, and obviously with little or no time for production—to say nothing of the review—of the discovery. See, e.g., Tr. at 65-66 (Ms. Peters: "I need to equip myself with some documentation… I can't take a deposition without having the documents and the information.")

[43] Originally, at the TRO hearing, I proposed April 16 as a date for hearing. Ms. Peters represented that she had scheduled a personal vacation from April 13 to April 21. Accordingly, I set April 6 as the date. Neither Ms. Peters nor Defendants' counsel objected at that time. Tr. at 67

[44] Prior to that, Ms. Peters faxed a letter to the Court at 1:35 P.M. and requested, inter alia, that its

documents requested by Plaintiff could not humanly be completed by the next day,

March 30.[45]  Defendants noted that as "imaging" immobilizes a computer while it is

_____

"independent" expert Stroz be ordered to image Defendants' computers.  Letter of Kristan Peters, Mar. 29, 2007, 1:35 P.M.

[45] Defendants, in their letter of 2:56 P.M. on March 29, noted that Plaintiff had not yet served discovery requests upon Defendants, and objected to the discovery set forth in the original TRO Order.  Defendants' counsel requested discovery by a letter to the Plaintiff time-stamped 4:54 P.M. that same day.  Ms. Peters then wrote the Court at 5:20 P.M, complained that Plaintiff had been "hobbled in our ability to prepare for the depositions on Monday," and attached a proposed draft Order for the Court, requesting that her requested discovery be Ordered to be produced by 5 P.M. the next day.  The requested discovery called for:

"1.  Defendants to collect, preserve and produce to Plaintiff all documents, software, security buttons, computer disks, servers, computer hard drives, emails, training materials, applications, processes, platforms, techniques, telephone records, mobile telephone records, correspondence, contracts, bids, and all other things containing information derived from or relating to materials created or generated by Plaintiff or relating to any information regarding transfer of information about Plaintiff's processes, know-how, functionalities, analyses, applications, customer proprietary information, confidential information, etc., and all documents and things evidencing any communications between any of the individually named defendants and Scivantage since January 2006.

2.  Defendants to produce to Plaintiff, all documents, files, data, methods, trade secrets, proprietary information, processes, applications, functionalities, know-how, customer information or email and things that Defendants, or other removed, transferred, developed, built upon or caused to be removed, transferred or developed during or after their employment at plaintiff;

3.  Defendants to image all personal and business computers used by Doss, Routh, Charchour and Alves and the work computers of the individuals on the attached list;

4.  Identification and production of all emails, back-up of emails and hard drives of or used by, Doss, Routh and Alves during the last eight months;

5.  Production of all copies and back-up files of any 2006 and 2007 email correspondence between any employee, consultant or officer of Scivantage on the one hand, and Routh, Doss or Alves on the other.

6.  Production within five (5) days of all income tax information and documentation of any kind relating to the 2006 income year by Alves, Routh and Doss.

7.  Identification of all Massachusetts-based offices of Scivantage and its consultants during the 2006 and 2007 time period and production of all lease or rent information and agreements related thereto.

8.  Defendants to produce all of the information they stole or otherwise took, transferred, copied or induced others to take from Plaintiff, information transferred during the employment of Doss, Routh and Alves with plaintiff, and thereafter, identifying the employees of Plaintiff that they have contacted for the purpose of inducing them to compete with Plaintiff or to assist them in any way in defendants' competition with Plaintiff, further identifying or specifying every way in which they used, took or transferred Plaintiff's information, and providing a list of Plaintiff's customers whose files, contact information or other information have been transferred by Alves, Routh and or Doss to Defendant Scivantage's servers, employees, officers, computers, files, or to any of the defendants, or elsewhere.

9.  Defendants to produce to plaintiff and to file an accounting and information about all customers or potential customers it has contacted about its product Maxit, and all monies earned relating to its product Maxit, and all contracts signed with customers relating to Maxit.

10.  Defendants to produce to plaintiff and file an accounting of all information, help, assistance, guidance, recommendations input provided by Doss, Routh and Alves in any way to the development, improvement and marketing of Maxit, with specification of the timing and dates of all such help, assistance, guidance, reconnections, and input.

11.  All emails, correspondence, memoranda authored by or provided or copied to Doss, Routh and Alves.

12.  Production of the July 2006 Request for Proposal sent out regarding the tax software product later named Maxit;

"imaged," Defendants could not produce material from computers until the imaging had been completed.[46] Defendants also represented that they wished to review the produced material for privilege, confidentiality, and relevance before producing it to Plaintiff. Defendants also provided more specific objections to Plaintiff's discovery requests. Defendants requested reciprocal expedited discovery in a letter of 11:21 AM, and proposed an Order, at 5:53 P.M., that requested depositions of four of Plaintiff's witnesses prior to the upcoming hearing, and reciprocal document discovery, including emails regarding "plaintiff's purposes in bringing this action."

At the close of business, March 29, 2007, I faxed a letter to the parties wherein I ordered that because of the "volume of documents and emails along with the fact that the imaging and the production of emails cannot be done simultaneously," as well as in an effort to accommodate Plaintiff's stated requests to receive discovery before conducting depositions,[47] the hearing was adjourned to April 26. Although I ordered "material

---

13. Production of a copy of the all versions and iterations of the business requirements and sample transactional customer data provided by Scivantage to Bhawan CyberTek ("BCT")and/or Balaji Sundaram and all other correspondence between Defendants and BCT and/or Sundaram

14. Production of all the files that Sanjeev Doss has on his lap top computer

15. Production of a declaration from each of the three former employees, Doss, Alves and Routh listing each and every Gainskeeper ("GK"), Wolters Kluwer ("WK") or CCH file or document by name, description and date that they have in their possession or control

16. Production of all GK, WK and CCH files, papers, discs, documents they still have at home or in their offices,

17. Production of a copy of the customer and contact lists that Cameron Routh referred to in his declaration,

18. Production of a copy of plaintiff's files that Alves admitted in his declaration to have still on his personal computer.

19. Production of the copy of the Wash Sales – Business Rules Document that Greg Alves authored on January 10, 2002, version 1.3."

Plaintiff also again requested, for the second time in writing to the Court that day, that its "independent" expert, Stroz, be ordered to image Defendants' computers.

[46] Defendants also requested costs for the imaging, as they represented (as they had at the TRO hearing) that the expedited nature of the imaging requested by Plaintiff entailed additional costs.

[47] "This adjournment is intended to allow for more adequate and complete production and more knowledgeable depositions. The plaintiff will have the documents and the time to examine them before the depositions." See Letter of Harold Baer, Jr., March 29, 2007, at 1. See also, e.g., Transcript of Oral Argument, March 28, 2007 ("Tr."), at 65-66 (Plaintiff: "I need to equip myself with some documentation… I can't take a deposition without having the documents and the information."); see also Letter of Kristan Peters to Hon. Harold Baer, March 29, 2007, 5:20 P.M., stating that Plaintiff "has been hobbled in our ability to prepare for the depositions on Monday," and attaching a proposed "Emergency Discovery Order," that requested the Court to order extensive discovery to be produced by 5 P.M., the following day, March 30, 2007.

turned over on a rolling basis," I ordered "completion" by April 5, 2007, with privileged material produced with a privilege log to the Court on that date.[48] I stated that "[o]bviously this will require that the depositions be scheduled for later dates… [but] that's plaintiff's choice to make." I granted that reciprocal "depositions and other discovery may be scheduled," and requested a schedule agreed to by the parties with dates of all depositions by April 5. I also addressed several of Defendants' specific objections, overruling some and sustaining others.

Ms. Peters, within an hour and a half of receiving my letter,[49] wrote and emailed the Court requesting an immediate conference.[50] See Letter of Kristan Peters, Mar. 29, 2007, 7:28 P.M. Ms. Peters stated that the "Court's Order has no dates as to when this discovery [presumably Plaintiffs'] must be produced." (Indeed, that was true, as my letter envisioned that the parties would meet and confer and present a schedule to the Court by April 5). Ms. Peters requested "firm deadlines [to] be set by which Defendants have to abide and produce discovery," despite my letter which set April 5 as Defendants' deadline to produce discovery. Ms. Peters stated that "no imaging has been done yet, in defiance of the Court's order," despite my letter which stated that Defendants would now produce "images of hard drives" by April 5. Ms. Peters also requested an immediate conference to address "my other discovery requests…" "which [Defendants] chose to ignore and did not address," despite the fact that indeed, Defendants had not objected to those requests (and that Defendants' deadline to produce discovery pursuant to those requests had now been extended).

On Friday, March 30, after Ms. Peters emailed her intention to seek emergency relief from the Part I emergency motions judge regarding imaging,[51] I subsequently

---

[48] Regarding imaging, I stated, in response to a specific discovery request, that Defendants shall produce "emails and images of hard drives… according to the new timeline in this letter," i.e. April 5.

[49] My March 29 letter also contained an order to "[s]end no more letters without an invitation to do so." As is evident, this order was not adhered to over the course of this litigation, and required future reiteration, as did other orders (particularly in response to Plaintiff's characterizations of, or requests to set aside, my Orders), as noted below.

[50] This represented the fourth letter that Ms. Peters faxed to the Court that day.

[51] See Email of Kristan Peters, Mar. 30, 2007, 10:24 A.M. Ms. Peters stated that "the computers were not imaged yesterday as ordered." Ms. Peters, once again, represented that her "independent" expert could image the computers that day.

By way of background, I was away from Chambers on Friday, March 30, Monday, April 2, and part of Tuesday, April 3.

reiterated and clarified, via an email, that "all discovery requested by Plaintiff, including imaging, was addressed" in my March 29 letter and, "as stated," was now due on April 5.[52]  See Email of Mark Noferi, Law Clerk to Judge Baer, 12:16 P.M., Mar. 30, 2007.

F. Plaintiff's Motion to the Part I Emergency Motions Judge to Compel Depositions

Defendants' counsel, at 2:08 A.M. on March 29, 2007, had proposed by email a confidentiality order to Plaintiff to govern discovery in this action, which provided for designations of material as "confidential" or "attorneys' eyes only."[53]  Defendants' counsel avers that its proposed confidentiality agreement was "standard."  See Declaration of James Chou, Apr. 24, 2007 ("Chou Decl.") ¶ 3.  Defendants lead counsel Richard Rabin avers that he did not receive a response with any proposed modifications until Ms. Peters called him, late in the day of March 30, with the Court's law clerk on the line.  See Reply Declaration of Richard J. Rabin, May 31, 2007 ("Rabin Reply Decl.") at ¶ 9.[54]

Subsequently, after the close of business on Friday, March 30, 2007, Plaintiff moved the Part I emergency motions judge, the Honorable Kevin Castel, to compel the depositions to go forward on April 2 and 3.[55]  Rabin Decl. ¶ 15; Peters Decl. ¶ 67.

---

[52] Before Ms. Peters expressed her intention on March 30 to seek Part I emergency relief regarding Defendants "defiance" of the Court's March 29 Order, Defendants' counsel represented to Plaintiff and the Court at 10:47 A.M. that imaging did, indeed, proceed on March 29 "at added expense" and "deep into the night."  Defendants also represented that Ms. Peters failed to inquire as to the status of the imaging before writing the Court and stating that "no imaging has been done yet."  At 11:35 A.M., Ms. Peters disputed, without specification, that she failed to inquire.  Ms. Peters then asked Defendants whether they had "completed" the imaging.  (As noted above, my March 29 Order ordered that imaging would "occur" on March 29; in any event, by the time of Plaintiff's request, my March 30 letter had further provided that Defendants shall produce "images" by April 5.)

[53] See Declaration of Richard Rabin, Apr. 23, 2007 ("Rabin Decl."), Ex. 6.

[54] Ms. Peters disputes Mr. Rabin's assertion, but provides conflicting factual assertions in support.  At one point, Ms. Peters does not directly dispute Mr. Rabin's account, and merely says, "[W]hen I called on March 30 to ask whether any terms were negotiable, Mr. Rabin refused to negotiate a single term."  See Peters Decl. ¶ 112.  It appears that Ms. Peters' statement refers to the conversation that Mr. Rabin mentions with the Court's law clerk on March 30.

At another point, Ms. Peters states that "Rabin waited until 5:15 P.M. on the Friday of Passover weekend [March 30] to present Plaintiff with a 15-pg confidentiality order."  See Def. Mem. Opp. at 9.  This is plainly false.  As noted above, Defendants co-counsel James Chou emailed Ms. Peters a proposed confidentiality order (and copied Mr. Rabin) on March 29.

[55] Because Ms. Peters has put in issue untranscribed conversations with this Court and/or Judge Castel, I will not rely on any independent recollection by Judge Castel as to this conversation.

Gold generally stated that she was not involved in the decision to seek relief before Judge Castel.  See 7/23/07 Tr. 32:9-17.

18

Ms. Peters subsequently represented to this Court by email that "Judge Castel ordered that the deposition of the four witnesses Monday and Tuesday will be on an attorneys' eyes only basis until such time as the parties can work out a confidentiality agreement to present to Judge Baer for his approval."[56] E-mail of Kristan Peters, 5:51 P.M., Mar. 30, 2007. Defendants then represented to this Court that Judge Castel also ordered that the confidentiality order Defendants had previously provided to Plaintiffs on March 29 would apply to this action under further agreement between the parties or further order of this Court. E-mail of Richard Rabin, 2:08 P.M., Apr. 1, 2007. (Defendants' proposed confidentiality order, as discussed infra, prohibited in-house counsel from viewing "attorneys' eyes only" information.)[57] Ms. Peters responded, "Judge Castel never saw the agreement and did not comment on its contents one way or another." Email of Kristan Peters, 5:51 P.M. at Rabin Reply Decl. Ex. 6. Ms. Peters confirmed that ""[Judge Castel] said that everything at the Monday and Tuesday depositions would for attorneys' eyes only and there would be no one but the deponent and the attorneys in the depositions until we could come to terms about a confidentiality agreement." Id. Ms. Peters remarked, "I would hope you and I could first get through these depositions…" Id.

G. Depositions of Defendants

---

[56] Subsequent to this representation, Ms. Peters has variously argued that Judge Castel's order "expired," that Judge Castel's order only applied to Doss' deposition on Monday, April 2, or that Judge Castel's order only applied to the Monday depositions, but not the Tuesday depositions. Most notably, in Ms. Peters' response to Defendants' motion for sanctions, she argues that Judge Castel's order only applied to Monday's depositions. See Peters Decl. at ¶ 72, 75 ("Judge Castel's only order was that the deposition transcripts on Monday would be 'attorneys' eyes only'… For the Tuesday, April 3 deposition and thereafter, the parties had to present to Judge Baer a confidentiality agreement if they wanted one in place for Tuesday.") In Ms. Peters' Declaration, it may be, although hard to believe, she subtly changed the punctuation of an email she wrote on April 4 by adding a semicolon to support her assertion that Judge Castel's order "expired" after Monday. See Peters Decl. at ¶ 79 ("The judge ruled that 'attorneys eyes only' applied to depositions scheduled for Monday; and Tuesday and thereafter the parties had to agree to a confidentiality agreement…") Her original email does not contain the semicolon. See Peters Decl., Ex. 21. Ms. Peters conceded during testimony that the addition of the semicolon changes the meaning of the sentence "to some extent." 9/11/07 Tr. 307:1-16.

Ms. Peters' contentions that Judge Castel's order either "expired," or only applied to depositions on Monday, are contradicted by her own more contemporaneous recounting of Judge Castel's order. In any event, it appears clear from both Ms. Peters and Mr. Rabin's contemporaneous accounts that Judge Castel's order of "attorneys' eyes only" applied, as both lawyers initially stated, until the parties could negotiate a confidentiality agreement and present it to this Court.

[57] Ms. Peters had previously signaled her willingness to adhere to "attorneys' eyes only" restrictions, at least regarding the viewing of Defendants' images. See Tr. at 54 ("I am an officer of the Court. I am not going to share that information with anybody. I will agree to a protective order and I will agree to an attorneys' eyes only review.")

Defendants produced the four individual Defendants (e.g., Doss, Routh, Alves, and Charchour) for depositions as ordered on Monday, April 2 and Tuesday, April 3. (Defendants also, as noted infra, on Monday, April 2, noticed depositions of Plaintiff's witnesses, and provided document requests to Plaintiff. See Rabin Decl. Ex. 18.)

### a. Alves' Deposition

The deposition of Gregory Alves took place on Monday, April 2, 2007, at Dorsey & Whitney's New York offices, starting at 9:25 A.M. It is undisputed that the deposition was "attorneys' eyes only." Notwithstanding this understanding, before the deposition, Ms. Peters introduced Defendants' counsel, James Chou, to two representatives of her client who were present in Dorsey's offices that day – Joseph Honor, the Gainskeeper "technology manager," and Stevie Conlon, a tax attorney who replaced defendant Doss at Gainskeeper.[58] See Chou Decl. ¶ 13; 8/15/07 Tr. 205:15-22.

Joseph Honor testified that generally during the course of these two days of depositions, Ms. Peters, during breaks, disclosed to him and Stevie Conlon the deponents' "general response to some of the answers to her questions in the deposition."[59] 8/15/07 Tr. 207:1-8, 208:6-12; 9/4/07 Tr. 15:5-10 (Court: "…[D]id she go over questions that had been asked or answers that had been given?" Honor: "To some questions, yes.").[60] Honor testified that Ms. Peters, in the course of disclosing information, "asked us to assist her in developing questions." See 9/4/07 Tr. 14:21-15:10.[61]

At one point, Alves testified regarding the tracking of "wash sales" at the "sublot" level. Ms. Peters asked for a brief recess.[62] Ms. Peters left the room, returned with a list

---

[58] Ms. Peters later averred generally that when Defendant's counsel asked her why her clients were observed at Plaintiff's counsel's offices, Plaintiff's counsel responded that "they [were] working with the associates on preparing the case." See 4/6/06 Plaintiff's Motion to Compel Depositions and Discovery Previously Ordered by the Court and For a Finding of Contempt and For Sanctions ("Pl. Contempt Mot."), at 4.

[59] Although Honor testified that Ms. Peters generally disclosed information during these depositions, the one specific example of disclosure that Honor provided related to the second day of depositions (i.e. Routh's deposition, discussed infra).

[60] Honor testified, when his testimony continued for a second day, three weeks later, that "[s]he didn't share any technical information with us, just kind of general comments about the depositions." 9/4/07 Tr. 15:3-4.

[61] Honor testified that he thought the "attorneys' eyes only" order meant only that he couldn't be in the room during depositions, rather than that he couldn't discuss the deposition testimony. 9/4/07 Tr. 21:1-6.

[62] See Deposition of Gregory Alves, at 170-71 (Plaintiff: "Brief indulgence.")

of examples relating to the tracking of "wash sales" at the "sublot" level, and began questioning Alves again.  <u>See</u> Chou Decl. ¶ 14.[63]  Defendants' counsel Mr. Chou asked Ms. Peters on the record whether she was sharing "attorneys' eyes only" deposition information with her clients.  <u>See</u> Alves Depo. at 171-72.  Mr. Chou avers that Ms. Peters was "evasive, appeared uneasy, and would not give a straight answer."  <u>See</u> Chou Decl. ¶ 15.  The deposition transcript bears out Mr. Chou's assertion, although Ms. Peters eventually responded "No" to Mr. Chou's question.[64]

Ms. Peters alleged towards the end of the deposition that the witness Alves, during his deposition, took unduly long cigarette breaks.  Mr. Chou avers, and the record supports, that Ms. Peters attempted to create a false record, as Alves took two short cigarette breaks of ten and six minutes, and that on each occasion Mr. Chou and Alves were waiting for Ms. Peters for several minutes to begin the deposition anew.[65]  See Chou Decl. at ¶ 18.  Ms. Peters does not directly dispute Mr. Chou's factual assertions.

---

[63] Honor testified that he talked with Ms. Peters about "the concept" of Alves' testimony about tracking wash sales at the sub lot level, but that he didn't recall exactly if they discussed it during the deposition. 8/15/07 Tr. 207: 21-208:2.  Honor did recall providing Ms. Peters with examples of questions she could ask (although he did not state the time when he did so).  8/15/07 Tr. 208:3-5.

[64] <u>See</u> Deposition of Gregory Alves, at 171-72 (Ms. Peters: "I would like you to look at Example 1." Defendant: "…[I]s this the example that Mr. Alves gave before… regarding tracking of sublot wash sales?" Plaintiff: "This relates to tracking of wash sales of the sublot."  Defendant: "Is it the same example he gave earlier in testimony?" Ms. Peters: "I don't recall."  Defendant: "So the record is clear, I want to make sure counsel for Plaintiff isn't sharing any information that's elicited in this deposition with her clients who are in the other room." Ms. Peters: "No. I didn't even remember the example he gave. I wouldn't have been-" Defendant: "Not just the example. I want to make sure no information elicited in this deposition is being shared with your clients."  Ms. Peters: "This has nothing to do with any testimony that he gave me that I provided to-" Defendant: "That's not my question. My question is whether you've been sharing any information… elicited in this deposition with your clients."  Ms. Peters: "No. No. This relates to a document that was prepared last night.")

Ms. Peters then apparently refused to share the list with opposing counsel.  <u>See</u> Alves Depo at 173:1-5 (Defendant: "Excuse me. Do you have a copy for counsel?" Peters: "My copy is marked up. If you could share that with each other.")

[65] <u>See</u> Alves Depo. at 92 (Ms. Peters asks, "Can we make it a two-minute break," and begins deposition anew without objection); <u>id</u>. at 163-64 (Court reporter notes that five-minute break was taken from 12:49 to 12:54; Ms. Peters states misleadingly, "Back on a couple of minutes to 1 [PM].")

Later in the deposition, Ms. Peters mischaracterized the length of both breaks.  <u>See</u> <u>id</u>. at 242-43 (Ms. Peters: "You took a 15-minute break the first time, a 10-minute break the second time." Defendant: "We are happy to add that time.").

Unfortunately, Ms. Peters' antagonistic approach throughout the various depositions is not only unsurprising when considered alongside her conduct throughout this case, but also is indicative of larger concerns about abusive conduct during depositions that in recent years has garnered increasing attention.  One report observes that depositions "have often become theaters for posturing and maneuvering," and "that improper deposition conduct is rampant."  Federal Bar Council, <u>A Report on the Conduct of</u>

Ms. Peters also attempted to create a record that would show that Alves took an unduly long time to answer questions. See, e.g., Alves Depo. at 240-41.[66]

Ms. Peters stopped the deposition of her own accord at 2:45 P.M to begin Doss' deposition. See Alves Depo. at 254. Citing her prior allegations of dilatory conduct by Alves, Ms. Peters asserted the ability to redepose Alves again, and (incorrectly) challenged Defendant's counsel's assertion that the Federal Rules of Evidence provide for a deposition of seven hours on one day.[67] Ms. Peters also asserted, despite my Order adjourning the deadline for discovery to April 5, and her subsequent decision to compel depositions regardless, that she should re-depose Alves again because Defendants had "failed" to produce written discovery.[68]

Defendants offered to produce Alves at the end of the day, after Doss' deposition, for the rest of his seven hours. Ms. Peters suggested that was acceptable. At 5:55 P.M., at the end of Doss' deposition, Ms. Peters requested to continue with Alves. Defendants' counsel represented that they would go get him at Akin Gump's offices and bring him back. See Doss Tr. at 131-32. Defendants' counsel represented that they returned with

---

Depositions, 131 F.R.D. 613, 621 (1990). Standards of civility demand that "[a]ttorneys should never be rude or discourteous toward one another, the witness, or anyone else present. Such behavior ought not to occur in normal daily life; it is far less acceptable in a deposition, which, though it may occur in an anonymous conference room, is part of the workings of our system of justice and thus should reflect the dignity and seriousness of that system." HAROLD BAER, JR. AND ROBERT C. MEADE, JR., DEPOSITIONS: PRACTICE AND PROCEDURE IN FEDERAL AND NEW YORK STATE COURTS 81 (2005). As one court has noted of depositions: "counsel are expected to rise above their roles as advocates for a particular party, and, acting as officers of the court, resolve their differences on the spot without outside intervention. As difficult as it is to do, and recognizing…that reasonable minds can differ in good faith about many discovery issues, it is nonetheless required that counsel behave appropriately during deposition discovery." Boyd v. Univ. of Md. Med. Sys., 173 F.R.D. 143, 144 (D. Md. 1997).

[66] See id. at 241-43 (Ms. Peters: "Are you familiar with the Gainskeeper wash sales approach to IRS Publication 550 that you authored on September 19, 2001?"… Alves: "I recognize the document." Ms. Peters: " Do you see how that document refers to, in various places, what the IRS Code says and then refers to how GK is going to implement that in a unique way?" Defendant: "Objection. I ask that the witness be given an opportunity to review the entire document." Ms. Peters: "Well, if he needs it, the longer he takes to review it, the longer he's going to be here. I would like to note for the record that the witness is taking extremely long pauses during this questioning, and it's gone very, very slowly because there have been long periods of time when he's not answering and just thinking about it. It has prolonged the deposition unduly." Defendant: "I disagree entirely with that mischaracterization… Let the record show it's a six-page document, single spaced.")

[67] See Alves Depo. at 247 (Defendant: "[U]nder Federal Rule… 30(d)(2) you're limited to one day. That's seven hours within that one day." Ms. Peters: "Seven hours is the suggested limitation. You can leave for more." Defendant: "Within a day." Ms. Peters: "No. Not within a day.")

[68] See Alves Depo. at 248 ("Particularly when he ordered you to provide discovery and you failed to provide any written discovery to me to date."); id. at 251 ("You did not deliver any documents to me last week, like the Court ordered.").

Alves to Dorsey's conference room in 25 minutes, but that nobody was there. Doss' counsel represented that the court reporter was instead in Ms. Peters' office. Chou Decl. ¶¶ 22-24. Exactly 25 minutes after Defendants left, Ms. Peters put on the record that "opposing counsel" hasn't returned and "we'll have to reconvene on another date." See Doss Tr. at 132.[69] Ms. Peters also stated on the record that the court reporter "said that she's got a train to catch." Doss. Tr. at 131. However, Defendants' counsel saw the court reporter leaving Dorsey's building two hours later. The court reporter stated that she had been visiting a friend inside the building. Chou Decl. ¶ 26.

### b. *Doss' Deposition*

Prior to Doss' deposition on Monday, April 2, Doss retracted parts of his Declaration submitted with Defendants' opposition to the TRO. Opp'n. to Pl.'s Mot. to Reinstate TRO Ex. 3. At his deposition, Doss admitted that after the initiation of this lawsuit, he had retained possession of certain files, and subsequently deleted them, and that his prior Declaration was inaccurate in this respect. Doss Depo. at 112:40-114:00. For example, Doss admitted that he had retained a copy of a published scholarly article on tax loss accounting that he had authored while at Gainskeeper. Doss Depo. at 115:20-116:10.

While deletion of documents after the onset of litigation is not to be condoned, it was, and is, unclear how consequential those deleted files were to Plaintiff's underlying contentions in this litigation (namely, that Defendants had stolen protectible trade secrets from Plaintiff or breached their nondisclosure agreements). In any event, those deletions, and Doss' lack of truthfulness about them, formed the basis for Ms. Peters' subsequent averments of "spoliation," and essentially all of her future motions against Defendants for sanctions, contempt, and compulsion of evidence. Isaacson, for his part, recalled regarding Doss' March 30 statement that retracted a portion of his Declaration that he "didn't really come to any conclusion" that Doss admitted to perjury. 8/15/07 Tr. 73:4-12.

---

[69] Ms. Peters stated subsequently in her motion for contempt, and states now, that Defendants returned in "45 minutes." See Pl. Mot. for Contempt at 3; Peters Decl. ¶ 20. However, according to the transcript record that she cites to, Ms. Peters dismissed the court reporter exactly 25 minutes after Defendants left. See Doss. Tr. at 131-32. Accordingly, Ms. Peters' Declaration regarding this point is inaccurate.

After the depositions on April 2, clearly denominated "attorneys eyes only," Ms. Peters emailed transcripts of the depositions in ASCII form to Isaacson. Isaacson Decl. ¶ 13; see also WKFS Exhibit 9 (Email of Kristan Peters, Apr. 2, 2007 10:39 P.M.).[70] Isaacson read portions of the transcripts and forwarded them to Gold. Isaacson Decl. ¶ 13; 8/15/07 Tr. 16:16-21; Gold Decl. ¶ 14. Gold did not review them at this time (or ever, as it turned out). Gold Decl. ¶ 14. Gold did not forward the transcripts to anyone else at Wolters Kluwer besides her secretary. Id.

### c. Routh's Deposition

Routh was deposed at Dorsey's offices beginning at 10:07 A.M. on Tuesday, April 3.[71] Four Wolters Kluwer employees were present in Dorsey's offices that day – David Stephens, Brian Longe, Joseph Honor, and Stevie Conlon. See 8/15/07 Tr. 117:25-119:25 (Stephens testimony).[72]

At the beginning of the deposition, Defendants' counsel Mr. Chou stated that the deposition was "attorneys' eyes only," which did not include in-house counsel. See Routh Depo. at 7. Ms. Peters disagreed, and volunteered that she had shared the contents of the depositions with "in-house counsel in Minnesota."[73] Id. at 8. As Mr. Chou was about to call Mr. Rabin for clarification of the call with Judge Castel, Ms. Peters offered to proceed under "attorneys' eyes only," not including in-house counsel, for the deposition. See id. at 10.

---

[70] Isaacson, noting that Defendants had proposed a confidentiality order, first asked Ms. Peters whether in-house counsel was permitted to see the transcripts, and Ms. Peters responded affirmatively. WKFS Exhibit 9; 8/15/07 Tr. 16:22-17:2.

[71] Defendants' counsel were late and immediately offered to extend depositions by an hour. See Chou Decl. ¶ 28, Ex. 2.

[72] Defendants' counsel Mr. Chou saw three of Plaintiff's employees at Dorsey's offices during the deposition – David Stephens, Executive Vice President for Securities and Insurance, Joseph Honor, and Brian Longe, the President and COO of Plaintiff. Chou Decl. ¶ 30.

[73] Ms. Peters stated that the issues that were discussed were "Gainskeeper issues" and "principally," the "four paragraphs" of Doss' deposition that were "perjurious." Id. at 9. Ms. Peters stated that in-house counsel "is not sharing it with any witnesses." Id. at 8.

Isaacson confirmed that late on April 2, he received a rough draft ASCII copy of the April 2 deposition transcripts, and forwarded it to Deidra Gold. Isaacson Decl. ¶ 13; Gold Decl. ¶ 14. On April 3, Isaacson learned that Scivantage counsel objected to his review of the transcripts. Isaacson Decl. ¶ 14. Isaacson states that he has not reviewed any transcripts since. Id. Gold states that she learned of Scivantage's objection before she had a chance to review the transcripts, and thus never reviewed any transcripts. Gold Decl. ¶ 14.

Despite this accord, Chou and Defendants' co-counsel, Peter Guirguis, saw Ms. Peters confer with the Wolters Kluwer employees during a break. Chou Decl. ¶ 30. Honor testified that during this second day of depositions, Ms. Peters again disclosed "generally what was happening in the deposition." 8/15/07 Tr. 208:13-20. Honor described the content that was disclosed as "a lot."[74] 8/15/07 Tr. 208:21-25. For example, Honor testified that "we had asked [Routh] a question about ... if he could recall anyone on the list of the client list that we had, and she had told us that he couldn't recall anybody on that list..." 8/15/07 208:25-209:5.[75] There is no evidence that Honor would have received information about questions asked in this "attorneys' eyes only" deposition from any source except Ms. Peters.[76]

During a particular break at 2:32 P.M., David Stephens emailed Cameron Routh's salary information to Ms. Peters and her secretary, Eileen Brennan. See Chou Decl. ¶ 31, Ex. 3. The "To" and "From" line of the email are blacked out, so that Stephens' name and the recipient are not visible. See Chou Decl., Ex. 3. Stephens testified that he did not know who blacked out that information, nor why. 8/15/07 Tr. 121:6-21. Ms. Peters used a hard copy of this email to ask Routh questions.[77] See Routh Depo. at 285-88.

Upon the completion of Routh's deposition for the full seven hours, Ms. Peters asserted her purported right to continue the deposition after Defendants provided her with written discovery.[78] Defendants' counsel noted (again) that Ms. Peters chose to move

---

[74] Brian Longe, for his part, testified that he did not consult with Ms. Peters during breaks in the depositions, and that Ms. Peters did not disclose to his knowledge any of the substance of the testimony that was given that day. See 9/4/07 Tr. 45:2-4, 45:16-19.

[75] Stephens, for his part, avers that Ms. Peters relayed "high level" information about the conduct but "nothing" about the material. See 8/15/07 Tr. 121:1-2. In Stephens' words, she "gave us insight... that the testimony was proceeding well, [that] the people had a lot of bad memories," and that in the words of "Sergeant Schultz, I remember nothing." See 8/15/07 Tr. 120:19-25.
When Honor testified on his second day of testimony at the hearing, on September 4, and was asked what other questions and answers were disclosed by Ms. Peters, he testified that he did not recall, as it was "a while ago." 9/4/07 Tr. 16:5-12.

[76] As noted supra note 56, Ms. Peters, in her opposition to this sanctions motion, subsequently argued that Judge Castel's order only applied to Monday's depositions, not Tuesday's, and in recounting her prior email to Mr. Rabin, allowed as how she had changed the punctuation of that email in a way that supported her argument. At the evidentiary hearing, as it turned out, the only specific instance of disclosure by Ms. Peters that Honor testified to (and that was corroborated by Stephens) occurred on Tuesday.

[77] Ms. Peters avers that she did not receive the email during the specific line of questioning. See Peters Decl. ¶ 95-96. Defendants aver nonetheless that Ms. Peters received the email during a break before that specific line of questioning. See Chou Reply Decl. ¶ 17.

[78] See Routh Depo. at 434 (Plaintiff: "We can take a recess until such time as I receive documents that I can

forward with depositions without documents.[79]  Regarding Defendants' noticed depositions, Ms. Peters stated, "I have priority in terms of finishing depositions. And I don't have to present anyone for depositions until I finish my depositions."[80]  See Routh Depo. at 435.  Routh's deposition concluded at 6:40 P.M.  Id.

### d. *Charchour's Deposition*

Charchour's deposition was originally scheduled for 2 P.M. on Tuesday, April 3, in accordance with Plaintiff's notice.  Chou Decl. ¶ 32.  As noted,  because Defendants' counsel was an hour late for Routh's deposition that day, he offered to continue for an extra hour with Charchour.  See Chou Decl. ¶ 28, Ex. 2.  During Routh's deposition on Tuesday, April 3, Ms. Peters approached Defendants' counsel Mr. Chou off-record during a break, indicated that she needed the full seven hours to depose Routh, and requested to move Charchour's deposition to another day.  See Chou Decl. ¶ 28, Ex. 2. Later, on the record, Defendants' counsel Mr. Chou represented that Charchour was available on Thursday, April 5.  See Routh Depo. at 435.  Ms. Peters indicated that she preferred to take Charchour's deposition the following week, after receiving document production from Defendants.  Defendants' counsel did not object.[81]

On Wednesday, April 4, at 3:14 P.M., Ms. Peters instead requested of Defendants' counsel to take Charchour's deposition on Friday, April 6, and threatened

---

use to review with him in his deposition.").  While the Federal Rules do contemplate extensions of depositions, it is clear that the appropriate—and certainly less antagonistic—means by which to extend is to make a Rule 30(d)(2) motion to the court.  That rule provides: "Unless otherwise authorized by the court or stipulated by the parties, a deposition is limited to one day of seven hours.  The court must allow additional time…if needed for a fair examination of the deponent or if the deponent or another person, or other circumstance, impedes or delays the examination."  Fed. R. Civ. P. 30(d)(2).  Certainly, an instance where documents germane to a deposition are unavailable could warrant an extension.  See Advisory Committee Note to 2000 Amendment to Rule 30(d); however, such circumstances would still have required Ms. Peters to submit a motion for extension, which she did not do, as well as show good cause for the request.  See, e.g., Pace v. City of Palmetto 2007 WL 470477 (M.D.Fla., Feb. 13, 2007)(discussing good cause requirement).

[79] See Routh Depo. at 434 ("You had the opportunity to wait to schedule this deposition as contemplated by the Court's Order.  It was your choice to move forward.")

[80] It is unclear on what basis Ms. Peters' rested either this claimed "priority" nor her apparent belief that she could refuse to present deponents until she had finished conducting her own depositions.  Note, though, that Rule 30(d)(3) provides that if the court finds that "any impediment, delay, or other conduct has frustrated" a deposition, the court may impose sanctions on the responsible party.  Fed. R. Civ. P. 30(d)(3).

[81] See Routh Depo. at 435 (Plaintiff: "So if I'm not going to be getting documents until Friday [April 6], I probably want to take his deposition next week."  Defendant: "That's up to you.")

sanctions if Defendants did not comply.[82]  See Rabin Decl., Ex. 7.  Mr. Rabin responded by email on Thursday, April 5 at 7:19 P.M. that "we are not available" for the following day, April 6, and requested Ms. Peters to provide him with alternate dates.[83]  See Plaintiff's Motion to Compel Depositions…, Apr. 6, 2007, at Ex. F.

On Friday, April 6, 2007, at 9:42 A.M., Ms. Peters put on the record with a court reporter that Defendants' counsel "hasn't shown for a duly noticed deposition," and that the deposition was "put over… because opposing counsel showed an hour and ten minutes late for the deposition on Tuesday."  See Transcript of Charchour Depo., Apr. 6, 2007, at 3.  The original copy of this transcript later provided to the Court has handwriting on it that reads, "Move for sanctions failed to show."  At 12:05 P.M. that day, Mr. Rabin responded and again requested that Ms. Peters provide alternative dates.  See Rabin Decl. Ex. 31.  At the close of business that day, as discussed infra, Ms. Peters instead filed a motion to, inter alia, compel Charchour's deposition.[84]  See Plaintiff's Motion to Compel Depositions…, Apr. 6, 2007.  Subsequently, Ms. Peters proposed April 11 as an alternative date.  See Rabin Decl. Ex. 31.

Defendants' counsel rescheduled Charchour's deposition for April 11, 2007.  The deposition began at 10:23 A.M.[85]  See Chou Decl. ¶ 36.  Notwithstanding my April 6 email (see infra) to the parties that explicitly stated that depositions would proceed on an "attorneys eyes only" basis, which did not include in-house counsel, Ms. Peters stated that she agreed to this condition "under protest."  See Charchour Depo. at 9.[86]

At the end of Charchour's deposition, notwithstanding my April 6 email (see infra) to the parties that explicitly stated that depositions would be limited to one day and

---

[82] See Rabin Decl., Ex. 7.  Ms. Peters also represented that a deposition notice was "forthcoming."  Id.  It is not clear that Defendants were, in fact, noticed.

[83] It appears that counsel for the parties engaged in a conference call on Thursday, April 5 regarding depositions.  See Rabin Reply Decl. ¶ 16.

[84] Ms. Peters, referring to Alves', Doss', and Charchour's depositions, stated that "Although the Court ordered that such depositions occur when plaintiff's counsel requested, defense counsel has either shown late or belatedly cancelled the above depositions."  See Plaintiff's Motion to Compel Depositions…, Apr. 6, 2007, at 5.

[85] Ms. Peters showed up approximately 20 minutes late.  Mr. Chou avers that Ms. Peters indicated that the reason the deposition was delayed was that Ms. Peters was waiting for Doss' counsel, Mr. Richardson, to arrive.  See Chou Decl. at ¶ 37.  However, Mr. Richardson had emailed Ms. Peters and Mr. Chou that morning at 8:54 A.M. telling counsel to start without him.  See Chou Decl. Ex. 4.

[86] Ms. Peters also alleged that Defendants had "obstructed discovery," and strangely, that Defendants "refused to produce their clients."  See Charchour Depo. at 9.

seven hours absent further order of the Court, Ms. Peters again stated her intention to re-depose Charchour after receiving documents from Defendants.  See Charchour Depo. at 325.[87]  Ms. Peters repeatedly threatened further sanctions motions if Defendants did not agree, stating, inter alia, "My client is happy to litigate the matter… If you don't want to produce Mr. Charchour willingly… we'll waste more of his money and his fees…"[88]  See id. at 329, 334.

### e.  Ms. Peters' Conduct at Depositions, Generally

At various times during these depositions, Ms. Peters either refused to show witnesses documents from which she quoted, showed documents to witnesses from across the table, or refused to provide copies of documents to counsel.[89]  Ms. Peters also generally refused to allow witnesses, or counsel, to take breaks.[90]  During Doss'

---

[87] See also Charchour Depo. at 328-29 (Ms. Peters: "I really have been put in a Scylla and Charybdis situation here where I have to choose between having no discovery from you and proceeding in a bit hobbled manner by taking depositions blindly…. I'm quite confident when the Court considers my sanctions motion and… contempt motion it will require Mr. Charchour to arrive again for a deposition because of your studied failure to comply with the Court's orders.").

[88] See, e.g., Charchour Depo. at 329 (Ms. Peters: "…[I]f we have to litigate this, it's just more attorneys' fees and we will do so…. My client is happy to litigate the matter and file a Motion to Compel and for Sanctions and another motion for Contempt."); see id. at 334 (Ms. Peters: "If you don't want to produce Mr. Charchour willingly… we'll waste more of his money and his fees… We'll have an unnecessary motion practice.  I will move the Court to compel.  I will move the Court for sanctions.  I will win.")

[89] Regarding refusal to share documents with counsel, see, e.g., Alves Depo. at 240-41 (Defendant: "Counsel, I would like a copy of the documents you've been using today…"  Ms. Peters: "When it's only marked for identification, you're not entitled to have a copy."  Defendant: "I am requesting that it be marked and entered into the record…"  Ms. Peters: "I will consider your request."); Routh Depo. at 327 (similar); Routh Depo. at 386 (Defendant: "Is there a copy for counsel?" Ms. Peters: "Yeah. That." Defendant: "Is that the witness' copy you're referring to… Do you have a copy for counsel?"  Ms. Peters: "That."); see also Alves Depo. at 173.

Regarding showing of documents from across the table, see, e.g., Alves Depo. at 167 (Defendant: "Let the record reflect that Ms. Peters-" Ms. Peters: "Is showing it from far away across the table." Defendant: "-is showing the witness a document from far away across the table."); Routh Depo. at 235 (Routh: "I can't tell from here…").

[90] See, e.g., Routh Depo. at 302 (Defendant: "Counsel, can we take a break? We've been going for an hour and a half."  Ms. Peters: "I have a little bit of questioning along this line."  Defendant: "How much longer?" Ms. Peters simply resumed questioning); id. at 312-13 (Ms. Peters: "…How many different contacts do you have at Ameritrade?"  Routh: "Oh, I don't know." Defendant: "Counsel, it's well over… five minutes. We would like to take a break." Ms. Peters: "I'm in the middle of a question."  Defendant: "You said five minutes.  You started into a new line." Ms. Peters: "…[I]t's actually a violation to depart in the middle of a question."  Defendant: "Finish this question. The next one, we're leaving." Ms. Peters: "Do you have 51 contacts with Ameritrade?" Routh: "I don't know."  Ms. Peters: "Does that sound like-" Defendant: "That was the end of the question.  He gave an answer.  We are taking a break." Ms. Peters: "…He didn't say he needed a break.")

See also Charchour Depo. at 201 (Defendant: "Is this a good time for a break?" Ms. Peters: "No. I'm in the middle of a line of questioning." Defendant: "How long do you think the line will go? We've been going

deposition, when Doss' counsel objected to Ms. Peters mischaracterizing Doss' testimony and expressed his intention to approach a Magistrate, Ms. Peters threatened to call security and remove Doss and his counsel from the building.[91]

These and other examples of Ms. Peters' consistently confrontational behavior throughout depositions are troubling. "The discovery process is, to a substantial degree, dependent upon cooperation between opposing attorneys….The deposition itself is a part of a judicial proceeding, and attorneys have an obligation to conduct themselves with dignity in every phase of such proceedings." HAROLD BAER, JR. AND ROBERT C. MEADE, JR., DEPOSITIONS: PRACTICE AND PROCEDURE IN FEDERAL AND NEW YORK STATE COURTS 122 (2005).

### H.  Further Discovery Disputes

On April 4, at 3:17 P.M., Ms. Peters represented to Defendants' counsel that Judge Castel's "attorneys' eyes only" order "expired."[92] See Rabin Decl. Ex. 7. Following that representation, after the close of business that night, Ms. Peters' associate Deidre Sheridan called Defendants' counsel Peter Guirguis regarding Defendants' proposed confidentiality agreement of March 29. Both made clear to each other initially, and over the next few days, that Defendants did not want access for in-house counsel to confidential materials, and Plaintiffs did. See Guirguis Decl. ¶¶ 5-8; Sheridan Decl. ¶¶ 2-9; Guirguis Reply Decl. ¶¶ 5-7.

On April 5, Jeffrey Loop, a first-year associate at Dorsey, inexplicably and apparently without supervision, instructed Dorsey's managing clerk to serve by fax a subpoena duces tecum on Bahwan Cybertek, a third-party contractor whom Scivantage hired to program its source code, without notifying Defendants.[93] Rabin Decl. ¶ 46;

---

for quite some time." Ms. Peters: "It depends how responsive he is.").

[91] See Doss Depo. at 49 ("This is my deposition, you're interfering with it. And if you conduct yourself that way again, we are going to have Security take you and your client out and you can explain yourself to the judge why you conducted yourself that way.").

[92] Ms. Peters now claims that Mr. Rabin "let the issue [of the confidentiality order] lapse because it appeared to be of no real interest to him." Peters Decl. ¶ 78. This is laughable.

[93] The subpoena sought "all documents received from [Defendants] regarding Scivantage's Maxit tax lot accounting product, including, but not limited to… documents reflecting Business Requirements or other specifications." Rabin Decl. Ex. 46.

Loop, at this time, also served a third-party subpoena on a company called ShareBuilder without notice to Defendants, which he also termed as a "mistake." See 9/4/07 Tr. 162:24-163:20.

9/4/07 Tr. 159:22-162:4. Loop testified that this was merely a "mistake," and that no Dorsey associates or partners had instructed him to serve the third-party subpoena without notice to Defendants. 9/4/07 Tr. 162:5-23.

On April 5, Defendants' deadline to produce documents, Defendants produced approximately 10,000 pages of documents to the Court by CD-Rom, as well as a privilege log.[94] Defendants did not, however, produce documents to plaintiff, and instead requested, by written letter at 4:47 P.M., that I order Defendants' proposed Confidentiality Stipulation and Protective Order before they did so. See Letter of Richard Rabin, Apr. 5, 2007. Defendants, in that request, cited Ms. Peters' admitted sharing of information from the depositions with in-house counsel, her representation that Judge Castel's order "expired," and refusal to meaningfully respond to Defendant's proposed confidentiality stipulation. Id.

Defendants additionally requested that as Ms. Peters had recently requested extensive additional document discovery on April 3 (and represented that such discovery was due April 5), the deadline for Defendants' additional production should be extended to April 13, 2007 (albeit that documents should be produced on a "rolling basis"). See Letter of Richard Rabin, Apr. 5, 2007. Defendants requested that the deadline for Plaintiffs' production of discovery be similarly set for April 13 (also albeit that Plaintiffs, in good faith, should produce on a "rolling basis"). Id. Defendants also requested, since Defendants had noticed depositions and Plaintiff had not meaningfully responded, that I order nine depositions starting April 11, 2007. Id.

Ms. Peters, on her part, subsequently wrote the Court on April 6 and proposed a protective order of her own, so as to "remove this apparent obstacle to discovery."[95]

On April 6, I issued directives to the parties via email. I imposed a confidentiality "standstill," and ordered that all discovery would be on an "Attorneys' Eyes Only" basis (i.e., outside counsel, not in-house counsel). I directed the parties to submit either a joint confidentiality order or separate proposed confidentiality orders by Monday, April 9. I

---

[94] More accurately, Defendants' counsel represented to the Court that the documents could be delivered on the night of April 5, and the Court's law clerk requested that they be delivered the next morning, April 6.

[95] Ms. Peters also accused Defendants of "attempting to force Plaintiffs to sign the objectionable confidentiality order," and stated that because Defendants "[had] not moved for a protective order" (despite Defendants' request that I "so order" their protective order), Defendants' "non-compliance… warrants the imposition of sanctions." Letter of Kristan Peters, Apr. 6, 2007.

limited depositions to 10 for each side, total, including depositions already taken by Plaintiff.[96] I directed the parties to immediately meet and confer and present me with a list of each party's proposed deponents and the place, date, and time of these depositions by April 9, with the proviso that "if agreement is not possible… [the Court] will simply order the depositions and their place and timing [itself]." I adjourned, at Defendants' request, the deadline to respond to Plaintiff's additional document requests to April 13. Similarly, I adjourned the deadline for Plaintiff to provide documents to Defendant. I also provided that Defendants' images in the possession of the third-party vendor should be produced to Plaintiff's counsel after a final ruling on confidentiality.

I. Plaintiff's Motion to Reinstate the TRO

On April 5, Ms. Peters (on behalf of Plaintiff) filed a 2-page motion to reinstate the temporary restraining order against Defendants.[97] See "Plaintiff's Motion to Reinstate TRO…", Apr. 5, 2007 ("Pl. TRO Mot."). On April 9, Defendant filed an opposition to Plaintiff's motion, termed the motion "frivolous," and requested fees and costs associated with defending the motion.[98] At 7:11 P.M. that day, Ms. Peters requested that the Court "await ruling until such time as plaintiff submits its reply brief to the Court…" Email of Kristan Peters, 7:11 P.M., Apr. 9, 2007.

On April 11, Ms. Peters filed a reply. See "Plaintiff's Reply to Defendants' Opposition…", Apr. 11, 2007 ("Pl. TRO Reply"). Procedurally, Ms. Peters "sandbagged" her adversary by not having provided any evidence on three of four points in her original 2-page motion, but then attaching 133 pages of evidence (primarily, but not entirely, in the form of transcripts) in support of her 12-page reply brief. See Wolters Kluwer Fin. Servs. v. Scivantage, 2007 U.S. Dist. LEXIS 27048, at *2-3 (S.D.N.Y. Apr. 12, 2007).

Later, in her Declaration filed with her opposition to the sanctions motion, Ms. Peters averred that she called the Court's law clerk *ex parte* on April 5 for guidance as to filing the motion to reinstate the TRO. See Peters Decl. ¶ 230. Ms. Peters avers that she

---

[96] I also explicitly limited depositions to one day and seven hours, in accordance with Fed. R. Civ. P. 30(d)(2), until further Order of the Court.

[97] The client never authorized this motion. 7/23/07 Tr. 45:10-13.

[98] As Defendants note, Ms. Peters made the Thursday, April 5 motion returnable on Monday, April 9 (the Monday after Easter weekend).

mentioned that only "rough draft" transcripts were available. Ms. Peters avers that she asked the clerk whether the Court preferred "rough draft" transcripts or final transcripts at a later date, and that the clerk informed her that the Court preferred final transcripts at a later date. Ms. Peters then avers that she faxed several pages of final transcripts the following day to the Court.[99] See generally Peters Decl. ¶¶ 231-32.

Aside from the issue of transcripts, Ms. Peters provided no explanation for why the information in the (new) April 10 Declaration of David Stephens, as well as the (previously-filed) March 20 Declaration of Charles Ross, the March 29 Declaration of Brian Dalia, and the March 30 Declaration of Von Duran, all attached to her reply brief, was not provided in some form with the initial motion. Defendants emailed the Court subsequent to her reply and requested permission to file a sur-reply. See Email of Richard Rabin, Apr. 11, 2007 10:58 A.M. (referring to Plaintiff's "146-page 'reply'," and terming it "new arguments" and "wholly improper"); compare Email of Kristan Peters, Apr. 11, 2007 12:57 P.M.

In any event, on April 12, I denied Plaintiff's motion as procedurally improper gamesmanship, and substantively "bereft" of evidence. I declined to grant Defendant's request for fees, but warned Plaintiff that future improper conduct might warrant sanctions. See Wolters Kluwer Fin. Servs. v. Scivantage, 2007 U.S. Dist. LEXIS 27048, at *4. Substantively, Ms. Peters (on behalf of Plaintiff) provided no new evidence that showed a "likelihood of success on the merits," or "sufficiently serious questions going to the merits," that would have warranted reconsideration of my decision to dissolve the TRO on March 29.[100] See id. at *3-4. I made clear that "[a]s a hearing is scheduled for

_____

[99] Regarding Ms. Peters averment that she faxed several pages of transcripts the following day (April 6) to the Court, my Chambers has no records of receiving a fax from Ms. Peters on April 6 with transcripts. Ms. Peters did fax to the Court on April 5, at 12:29 P.M., in addition to her motion, transcript pages of Doss' deposition. Ms. Peters referred to those transcripts pages in her original motion. See Pl. TRO Mot. at 2. Doss' transcripts, however, were irrelevant to my opinion of April 12. I specifically noted in that Opinion that Plaintiff did not cite to evidence on three of her four substantive arguments, thus implying that Plaintiff indeed did cite to evidence on one of the four points (which, although not specifically stated in my opinion, were the allegations regarding Doss). See Wolters Kluwer Fin. Servs. v. Scivantage, 2007 U.S. Dist. LEXIS 27048, at *1-2. The "sandbagging" comment addressed Plaintiff's other three substantive arguments to which Ms. Peters failed to provide support of any kind until her reply brief, according to un-contradicted Chambers' records.

[100] As noted above, it was unclear from the evidence that Ms. Peters did attach to her initial motion regarding Doss' admissions at his deposition that he deleted certain files, and less clear that those admissions were relevant to Plaintiff's underlying contentions that Defendants had stolen trade secrets or breached their contracts and as a consequence Plaintiff suffered immediate irreparable harm (at least, harm

April 26 regarding Plaintiff's application for a TRO, reinstatement can, if it turns out to be appropriate, occur at that juncture." Id. at *4.

### J. Plaintiff's Motion for Contempt

Following my April 6 directive imposing a "standstill" and extending Defendants' deadline to produce documents, Ms. Peters moved the same day to, inter alia, hold Defendants in contempt for their failure to produce documents by the previous April 5 deadline.[101] Citing "obstruction of discovery," and Defendants' "fail[ure] to move for a protective order pursuant to Fed. R. Civ. P. 26(c)," despite Defendants' request that I "so order" their proposed protective order, Ms. Peters moved for an order of contempt and sanctions in the form of costs of the motion. Pl. Contempt. Mot. at 1-2.[102] Ms. Peters also requested that all discovery (presumably including Plaintiff's more recent requests, now due April 13) be provided that same day, April 6, so that Ms. Peters could adequately prepare for upcoming depositions.[103]

Ms. Peters also moved to compel the re-deposition of Alves (based on his allegedly "dilatory" behavior), compel the re-deposition of Doss, and to compel the deposition of Charchour. See Pl. Contempt. Mot. at 5.[104]

This motion for contempt was not fully briefed before Plaintiff voluntarily dismissed its case.

### K. Defendants' Motion to Dismiss

On Monday, April 9, Defendants filed a motion to dismiss Plaintiff's Complaint.

---

that could not be addressed more fully at the April 26 TRO hearing two weeks hence).

[101] Gold did not authorize this motion. 7/23/07 Tr. 45:14-19.

[102] Ms. Peters also stated generally that "Defendants have not made any claims of… inappropriate anticompetitive behavior by [Plaintiff] that can possibly justify withholding discovery." Pl. Contempt. Mot. at 6 n.6. This contention is risible. Defendants, from their entry into this litigation, made such claims. See, e.g., Def. Mem. at 1 ("Plaintiff's application… represents the worst type of abuse of the judicial process.), 23 ("[T]he TRO contains no limitations to prevent the plaintiff from pillaging the trade secrets and confidential information of defendants, and/or using the TRO as a sword to attack defendants and their business endeavors.").

[103] Ms. Peters also requested that all of Defendants' discovery be provided that day, as opposed to April 13, to conform to her personal schedule. As Ms. Peters' previously-scheduled vacation began on April 13 and continued through April 21, Ms. Peters averred that the extension of time to April 13 for Defendants to produce meant that counsel had a scant three days after she returned from vacation before the April 26 hearing to review documents. See Pl. Contempt. Mot. at 5.

[104] Plaintiff's counsel also requested attorneys' fees and court reporter fees relating to the Alves and Routh depositions. See Pl. Contempt. Mot. at 6.

Defendants argued first that the Court lacked subject matter jurisdiction over the action. Defendants noted that Plaintiff's sole federal claim, out of its ten claims, alleged that Defendants violated two provisions of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(a)(4) and 18 U.S.C. § 1030(a)(2)(c).

The Computer Fraud and Abuse Act is a criminal statute that prohibits "unauthorized access" to computers. (As noted, it is now undisputed that Defendants in this action never had access to Plaintiff's code.) Although a civil right of action exists under the Act, no civil right of action generally exists under the two provisions Plaintiffs base their claims upon. See B.U.S.A. Corp. v. Ecogloves, Inc., 2006 U.S. Dist. LEXIS 85988, at *4 n.5 (S.D.N.Y. 2006). As diversity is plainly lacking (given that both Plaintiff Wolters Kluwer and Defendant Scivantage are Delaware corporations), Defendants averred that no subject matter jurisdiction existed. See Defendants' Mem. Law. in Support of Mot. to Dismiss at 4.

Secondly, Defendants argued that Plaintiffs lacked personal jurisdiction over Defendants, as Doss, Routh, and Alves all worked in Massachusetts, where Scivantage is located. Def. Mem. Law at 9-10. Third, Defendants argued that Plaintiffs failed to state a claim on the merits that any "trade secret" was stolen. See Def. Mem. Law. at 13.[105]

L. Confidentiality Order

As noted, Defendants provided their proposed confidentiality order to Plaintiffs at 2:08 A.M., Thursday, March 29. On Friday, March 30, according to both Plaintiff's and Defendants' counsel, Judge Castel ordered that the depositions would be "attorneys' eyes only" until such time as the parties could work out a confidentiality agreement and present it to Judge Baer. On April 4, Ms. Peters represented that Judge Castel's order had "expired," but directed her associate Deidre Sheridan to negotiate with Defendants. It became clear fairly quickly that Defendants did not want the order to include in-house counsel, and Plaintiffs did.[106]

---

[105] Defendants also brought other arguments to dismiss Plaintiff's aiding and abetting claims, and breach claims.
[106] See, e.g., Sheridan Decl. ¶ 7 ("…[I]f we could not agree to at least review by identified in-house counsel, we were in fact at an impasse."); 8/15/07 Tr. 20:15-18 (Isaacson testified that Wolters Kluwer's position was that attorneys' eyes only information should be disclosed to in-house counsel).

Gold received "for the first time" on Thursday, April 5 for her "review and comment" Dorsey's draft of their proposed confidentiality order from Deidre Sheridan. Gold Decl. ¶ 11; 7/23/07 Tr. 33:2-7, 43:18-25. Gold discussed the draft with Mr. Isaacson, Ms. Peters, and one of Ms. Peters' associates on Friday, April 6, 2007. Gold Decl. ¶ 11.

Gold stated that her intention was to allow in-house counsel to have information in part to "comply with [Plaintiff's] internal and external financial reporting responsibilities."[107] Gold Decl. ¶ 10; Peters Decl. ¶ 109. Ms. Peters later reiterated that concern on several occasions but with no support for the proposition.[108] Gold stated that Wolters Kluwer had recently been involved in a situation where a confidentiality order prohibited the sharing of litigation information with a client, and that Wolters Kluwer counsel had to approach their adversary for permission to share information in order to effect a settlement. 7/23/07 Tr. 33:20-24.[109]

On Friday, April 6, at 6:23 P.M. (before Easter weekend), Ms. Peters emailed Defendants' counsel and requested that a lawyer for Defendants commit time to work on the confidentiality order over the weekend, to "get it worked out by no later than tomorrow." Rabin Decl. Ex. 12. Defendants' counsel Mr. Guirguis responded at 7:15 P.M. that night, "Please send us the document as soon as it is ready for our review." Rabin Decl. Ex. 13.[110]

At 7:50 P.M. that evening, Gold sent a fairly lengthy email to Ms. Peters, Isaacson, and Sheridan outlining her thoughts regarding the access that Wolters Kluwer needed. Peters Ex. A.

On Monday, April 9, at 2:01 P.M., Ms. Peters emailed, for the first time, a proposed confidentiality order to Mr. Rabin, eleven days after Defendants had proposed

---

[107] Defendants' counsel Mr. Guirguis averred that he was "not aware of any public filing requirements that would necessitate disclosure of defendants' trade secrets." See Guirguis Decl. ¶ 5.

[108] See, e.g., Email of Kristan Peters, Friday, April 6, 2007 7:23 P.M., at Guirguis Decl. Ex. 2 ("Your document was appropriate for a small privately owned company without in-house counsel, but was inappropriate for a publicly traded company with regulators, SOX obligations, inside and outside auditors, insurers, etc.).

[109] Admittedly, settlement appears to have been the last thing on Plaintiff's mind at this juncture of this litigation.

[110] Ms. Peters responded shortly thereafter at 7:23 P.M. and stated, "We are starting off a different document." See Guirguis Decl. Ex. 2.

theirs.[111]  See Rabin Decl. Ex. 14.  Shortly thereafter, at 2:50 P.M., Ms. Peters emailed Plaintiff's proposed confidentiality order to the Court, with a four-page letter brief attached.[112]  See Rabin Decl. Ex. 15.  Subsequently, on April 10, Ms. Peters wrote the Court to relate that she "leapt at the opportunity to work cooperatively," "work[ed] through the Easter weekend," and Defendants' counsel "never bothered to respond." "[Mr. Rabin] just submitted his own version with no effort at negotiation; not even a return call."  See Letter of Kristan Peters, Apr. 10, 2007, 1:55 P.M.[113]  Defendants' counsel, on their part, emailed the Court on April 9 at 6:02 P.M. the original Confidentiality Order they proposed to Defendants on March 29.  See Email of James Chou, Apr. 9, 2007 at 6:02 P.M.

Defendants' confidentiality order, which Plaintiffs variously had characterized as "wholly inappropriate,"[114] "objectionable" and "broadly worded,"[115] provided that "confidential" information could generally be disclosed to outside counsel, in-house counsel, and designated directors, officers, and employees, while "Attorneys' Eyes Only" information could generally be disclosed to outside counsel, and experts (under certain restrictions).[116]

Plaintiffs' proposed Confidentiality Order, in fact, provided for broader disclosure in a more vaguely worded fashion.  Plaintiff's proposed order provided that "confidential" information could generally be disclosed to outside counsel, in-house counsel, experts, or former employees.  Plaintiff also proposed that "highly confidential" information, if "technical," could generally be disclosed to outside counsel; designated in-house counsel, including Deidre Gold and Steve Isaacson; designated employees, including Plaintiff's employees Joseph Honor and Charles Ross, who currently work on

---

[111] For what it is worth, Ms. Peters omitted Defendants' counsel Mr. Guirguis from the email, although he was Defendants' lead negotiator on the issue.

[112] Wolters Kluwer did not review this letter before it was sent.  See 7/23/07 Tr. 35:12-15 (Gold testimony); 8/15/07 22:22-23:9 (Isaacson testimony).

[113] See also Peters Decl. ¶ 99 (Plaintiff was "unreasonably stonewalled by Defendants").

[114] See Plaintiff's Motion to Compel Depositions…, Apr. 6, 2007, at 1.

[115] See Letter of Kristan Peters, Apr. 10, 2007, 1:55 P.M., at 3.

[116] Under Defendants' Confidentiality Order, for example, experts shall maintain the "Highly Confidential" information in locked cabinets when not reviewing it, and shall return the information to the disclosing party upon the conclusion of their assignment.

Plaintiff's Gainskeeper program that competes with Defendants' program;[117] designated directors and officers, including Plaintiff's President, Brian Longe, and Plaintiff's parent company's CEO, Chris Cartwright;[118] and experts (without specific restrictions).[119]

Under Plaintiff's proposed order, disclosure of "non-technical highly confidential information" was similar to that of "technical highly confidential information," except that disclosure of "non-technical highly confidential information" to in-house counsel was not explicitly conditioned upon prior notice.[120]

Defendants' proposed order generally provided for a process by which a party could challenge a disclosure of confidential information before such disclosure was made. Plaintiff's proposed order, although it provided that notice be provided "prior" to disclosure for "technical highly confidential information" (but not, as noted, "non-technical "highly confidential information") did not provide for such a process.[121]

---

[117] Isaacson allowed for the fact that Honor and Ross, if granted access to "highly confidential technical information," as Wolters Kluwer sought, might have access to Scivantage's source code. See 8/15/07 Tr. 21:13-22:1; see also 8/15/07 Tr. 26:10-21.

[118] Additionally, in Ms. Peters' letter-brief accompanying her proposed order, she stated that "to varying degrees members of [Wolters Kluwer N.V.'s] Executive Board, including Nancy McKinstry (The [CEO] and Chairwoman of the Executive Board); the members of the Supervisory Board of WKNV and its Audit Committee; WKNV's Chief Financial Officer (Boudewijn Beerkens); WKNV's Corporate and Financial Services Division Chief Financial Officer (Norm Plaistowe) and Controller (Tom Newell)[;] WKNV's Senior Vice President, Accounting, and Control (Matthijs Lusse); WKNV's Vice President, General Counsel/Company Secretary (Maarten Thompson); WKNV's external (KPMG) and internal auditors; [and] WKNV's insurers and reinsurers may require access to information…" See Rabin Decl. Ex. 15 at 3. All these individuals, Ms. Peters averred, "require full information in order to make business decisions related to this litigation…" Id.

Ms. Gold had mentioned all these people in her April 6 email to Ms. Peters as needing some level of access. See Peters Ex. A. However, on April 9, at 5:10 P.M. (after Ms. Peters had already submitted the proposed confidentiality order to the Court), Isaacson clarified Wolters Kluwer's position and stated, "we are not looking for the ability to share technology trade secrets. For example we would not give source code to an auditor." WKFS Ex. 10.

[119] Additionally, under Plaintiff's proposed order, this "technical highly confidential information" could be disclosed to "any employee… that created or assisted in developing the "Technical Highly Confidential" information," without notice or designation. As Plaintiff's view in this litigation has been that Plaintiff developed nearly all the information that underlies Defendants' software program, this last clause might potentially be read to provide for disclosure of nearly all of Defendant's most "Highly Confidential Technical" information to Plaintiff's employees without designation, notice, or opportunity to challenge. Defendants, in Plaintiff's proposed order, were not granted similar disclosure.

[120] Regarding "technical highly confidential information," Plaintiff's proposed Order provided for notice "prior to any disclosure." Plaintiff's Stipulated Protective Order and Confidentiality Agreement at p.10. Regarding "non-technical confidential information," Plaintiff's proposed Order provided that notice "is provided," without any timetable. Plaintiff's Stipulated Protective Order and Confidentiality Agreement at p.10.

[121] Notice shall be provided to the opposing party prior to disclosure, although it is unclear, in Plaintiff's order, whether the opposing party has an opportunity to challenge the disclosure before it happens.

Defendants described Plaintiff's proposed order as "non-standard."[122] Indeed, it appeared strange that in Plaintiff's lawsuit, where the purported theft of Plaintiff's trade secrets was purportedly at issue, Plaintiff's proposed order sought broader access for a far greater number of people with less formal protections against disclosure – presuming, of course, that discovery would proceed on a reciprocal basis, as purportedly was occurring at this time. Defendants called it a "Trojan Horse designed to permit what plaintiff's case purportedly was designed to stop: the release of one company's trade secrets to individuals at another company." See Rabin Decl., Ex. 16, at 2. Defendants also noted at this time that Plaintiff has "filed multiple pointless motions designed to drown a smaller adversary in legal fees." Defendants contended as well that Plaintiff intended to "leisurely review defendants' highly confidential documents… while defendants patiently await the discovery that they deserve." Id. at 4. Wolters Kluwer employees, however, generally aver that their intention was not to seek discovery of Defendants' trade secrets, such as source code.[123]

Defendants also informed the Court at this time that Plaintiff had attempted to serve a subpoena to Defendants' third-party software programming consultants for information, including Defendants' source code, without notifying Defendants. See Rabin Decl., Ex. 16 at 4 n.4.

In any event, by written Order on April 12, noting that "[p]rotective orders that limit access to certain documents to counsel and experts only are commonly entered in litigation involving trade secrets," I substantively adopted Defendants' proposed confidentiality Order with minor changes.[124] I provided for neutral procedures such that if either party sought access to "attorneys' eyes only" information for either in-house counsel or employees, either party could apply to the Court for such access and provide an affidavit in support.[125] Plaintiff never subsequently sought access for its in-house counsel or employees through these procedures.

---

[122] See Email of James Chou, Apr. 9, 2007 at 6:02 P.M.

[123] See 8/15/07 Tr. 20:3-6 (Isaacson testimony); see also 7/23/07 Tr. 33:8-34:18 (Gold testimony), 9/4/07 Tr. 46:25-47:6 (Longe testimony)

[124] Following issuance of the confidentiality order on April 12, it appears that Defendants provided 22 boxes of discovery to Plaintiff the same day.

[125] See, e.g., Sullivan Marketing v. Valassis Communications, 1994 U.S. Dist. LEXIS 5824 (S.D.N.Y. 1994); Metropolitan Life Ins. Co. v. Bancorp Servs. L.L.C., 2000 U.S. Dist. LEXIS 15864, at *3-4

The Confidentiality Order provides, _inter alia_, as noted at length in my Opinion of May 23, 2007, that protected material shall not be used in "any other litigation proceeding."[126] _See generally_ Wolters Kluwer Fin. Servs. v. Scivantage, 2007 U.S. Dist. LEXIS 37306 (S.D.N.Y. Mar. 23, 2007). The Confidentiality Order provides for neutral procedures to challenge "attorneys' eyes only" designations. _See_ Wolters Kluwer Fin. Servs. v. Scivantage, 2007 U.S. Dist. LEXIS 37306, at *5-6, *6 n.6. That said, the Confidentiality Order provides that "attorneys' eyes only" material shall remain "attorneys' eyes only," and thus unusable in other litigation, until further Order of this Court, or Defendants' provision of consent. _See id._ at *5-6, *34 n.32; _see also_ Confidentiality Order ¶ 4(c).[127] The Confidentiality Order specifically provides that any obligations thereunder survive the termination of this lawsuit, and that this Court retains jurisdiction after the termination of this lawsuit to enforce the terms of the Order. _See id._ at *26; _see also_ Confidentiality Order ¶ 13.

M. Defendants' Document Production of April 11, and Related Activity

On April 5, as previously noted, Defendants presented approximately 10,000 pages of documents to the Court, along with a privilege log. Defendants, as noted, requested that I sign Defendants' proposed Confidentiality Order before they produced documents to Plaintiff. _See_ Letter of Richard Rabin, Apr. 5, 2007.

On Plaintiff's part, on April 4, Ms. Peters asked Jeffrey Loop, a Dorsey associate, to oversee Plaintiff's document production. _See_ 9/4/07 Tr. 150:12-23. On April 5, pursuant to Defendants' document requests of April 2, Wolters Kluwer provided a substantial number of documents in electronic form to Dorsey for Dorsey's review. _See_ 7/23/07 Tr. 94:6-96:8, 98:2-4. Dorsey then commenced review that day of that substantial number of electronic documents for responsiveness and privilege and the like.[128] _See_ Loop Decl. ¶ 5; 9/4/07 Tr. 153:17-154:5, 164:24-165:18.

---

(S.D.N.Y. 2000).

[126] "Protected Material requested and exchanged herein shall be used only for the purpose of the prosecution or defense of this action… [and] shall not be used for any business, commercial, or competitive purpose, or used in any other litigation proceeding." Confidentiality Order ¶ 7(a).

[127] "In the absence of written permission from the Producing Party or Designating Party, as applicable, or an order of the Court, any Protected Material consisting of or containing "ATTORNEYS' EYES ONLY INFORMATION" shall be used solely for purposes of the prosecution and defense of the above-entitled litigation…" Confidentiality Order ¶ 4(c).

[128] Loop, on Dorsey's part, relates that there was a "palpable sense of urgency" in the document review,

On April 6, as noted, I imposed a "standstill" and ordered that all discovery be "attorneys' eyes only" until further order.  <u>See</u> Rabin Decl. Ex. 8.  I also provided that Plaintiff's additional document requests of April 3 would be due Friday, April 13, and that documents requested by Defendants would also be due Friday, April 13.[129]  <u>Id</u>.

On Saturday, April 7, Mr. Rabin offered to produce documents to Plaintiff under the "attorneys' eyes only" restriction I had ordered.  See Rabin Decl., Ex. 31.  Ms. Peters, after first requesting that Defendants split documents into several categories (including a category for in-house counsel), then agreed to accept the documents as "attorneys' eyes only."  <u>See</u> Peters Decl., Ex. 8.  At 7:24 P.M. that day, Mr. Rabin offered to produce the documents on Sunday or Monday, and reiterated the offer at 8:31 A.M. Sunday morning, April 8.  <u>Id</u>.  Ms. Peters declined the offer, as it was Easter Sunday, and told Mr. Rabin to stop "harassing" her.  <u>Id</u>.[130]  The lack of civility aside, the Court takes some responsibility for not realizing by this time that Plaintiff's counsel was troubled; similarly, with more oversight, her firm might have reached the same conclusion.

On April 8, Mr. Rabin also inquired as to the status of Plaintiff's documents.  Ms. Peters, as noted, referred to her document production as "extraordinary."  <u>See</u> Peters Decl. Ex. 8.  Ms. Peters represented that "we were ready to produce some documents on April 5, but you refused to produce or exchange…" and characterized Plaintiff's efforts as an "extraordinary document effort."[131]  <u>See</u> Peters Decl. Ex. 8.

On April 10, Ms. Peters emailed Mr. Rabin and the Court's law clerk and asked Mr. Rabin, <u>inter alia</u>, "When will you produce the documents that the court has ordered several times that you produce…"  Email of Kristan Peters, Apr. 10, 2007, 5:53 P.M.  On April 11, at 12:23 P.M., Ms. Peters emailed Mr. Rabin and the Court's law clerk again and stated, <u>inter alia</u>, "[W]e are ready willing and able to provide you with documents, even though you only very recently issued your requests, long after I issued mine to you,"

---

and that Ms. Peters did encourage him to get as much discovery done as possible before the April 13 deadline.  9/4/07 Tr. 173:19-174:9.

[129] In my March 29 letter, I had provided that material should be "turned over on a rolling basis."  Rabin Decl. Ex. 5.

[130] Subsequently, on April 11, at Charchour's deposition, when Defendants' counsel Mr. Chou asked Ms. Peters "Do you want to make an exchange today?" Ms. Peters responded, "I said fine to that to Mr. Rabin Saturday.  Didn't you read the three emails I sent him?"  Charchour Tr. at 335.

[131] This despite the fact that the documents produced consisted largely of publicly-available information such as press clippings, articles, and marketing materials.

again cited Mr. Rabin's purported "continuing failure to produce in violation of the Court's orders," cited her emails of Saturday [April 7] "stating the above," and threatened that she would forward those emails to the Court if Mr. Rabin "pretend[ed] not to know where [she] stand[s] on those issues." Email of Kristan Peters, Apr. 11, 2007, 12:23 P.M.

Later that day, April 11, at Charchour's deposition, Ms. Peters, in support of her argument to re-depose Charchour, stated that "We asked you several times Saturday to produce the documents under [attorneys' eyes only]… Mr. Rabin has still refused to do so." Charchour Tr. at 326. Defendants' counsel Mr. Chou stated that "…[W]e have stood ready, as you know, to produce documents since I believe… Friday [April 6]." Charchour Tr. at 330. Ms. Peters retorted twice, "That's a patent lie." Id.

Regarding Plaintiff's documents, Ms. Peters stated then that she was not under a present order to produce (despite my prior admonitions to produce on a "rolling basis").[132] Charchour Tr. at 333. Defendants' counsel offered to produce his 10,000 pages that day if Ms. Peters was willing to make an exchange. Charchour Tr. at 335.[133] Ms. Peters responded, "Yes. Sure…. We turned around our production of documents much more readily than you have." Id. at 335-36. Ms. Peters represented that she would provide "everything that we've got," and that although she had not asked her associate Jeff Loop how many documents were ready, "as a seasoned counsel doing this for 20 years… the number of documents is [not] what's relevant. What is relevant is the quality of documents…. We've got a significant amount of documents that are quality documents here to produce… today" Id. at 339, 340.

Subsequent to Ms. Peters' conversation with Mr. Chou at the Charchour deposition, Ms. Peters asked Mr. Loop, for the first time, whether the documents were ready, and how many boxes. Loop Decl. ¶ 7; see 9/4/07 Tr. 167:18-168:10.[134] Loop

---

[132] "The Court only said that I should produce responses to your April 3rd request by April 13th. By my calculation, it is April 11th. You are under a present order to produce. I am not…. You're the only person who is in Contempt of Court." Charchour Tr. at 333.

[133] Mr. Chou stated, "[Y]ou haven't told us when you are going to exchange documents. If you offered it and gave us a date certain, we would have exchanged…" Charchour Tr. at 335. Ms. Peters responded, "That's simply not true." Id. Mr. Chou went on, "When are you going to produce these documents? …Do you want to make an exchange today?" Id.

[134] See 9/4/07 Tr. 167:18-168:3 (Court: "…[D]id [Ms. Peters] ever ask you before April 11 if the documents were ready… [D]id you have a conversation with her saying, Where are the documents, can we have the documents… Mr. Loop?" Loop: "No, your Honor.")

informed her that 500 pages of paper documents were available, i.e. the 500 pages of non-confidential, generally publicly available information that Wolters Kluwer had provided Dorsey on or about April 4. Loop Decl. ¶ 8; see also 9/4/07 Tr. 155:9-14. Loop provided those documents to Ms. Peters. 9/4/07 Tr. 154:17-22. Loop informed Ms. Peters that Plaintiff's substantive, and more substantial, documents would be ready for production to Defendants on Friday, April 13, which Loop understood to be the "scheduled date of the exchange." Loop Decl. ¶ 8. It is hard to believe that Mr. Loop understood the timetable and lead counsel did not.

Defendants produced over 50,000 pages of documents, comprised of 22 boxes, to Plaintiff the night of April 11. Rabin Decl. ¶ 44. Plaintiff, in response, produced the aforementioned 500 pages of non-confidential material to Defendants. Rabin Decl. ¶ 43; 9/4/07 Tr. 154:17-155:14; see also Wolters Kluwer Fin. Servs. v. Scivantage, 2007 U.S. Dist. LEXIS 37306, at *7 n.7 (S.D.N.Y. 2007).[135] At some point shortly thereafter, Ms. Peters complained to Defendants about their production in paper form and requested production in electronic form.[136]

On Thursday, April 12, at 6:34 A.M., Ms. Peters emailed Defendants' counsel Mr. Chou and stated that "Mr. Loop has more documents for you today and more again Friday."[137] See Def. Ex. 16. Mr. Chou subsequently contacted Mr. Loop at 9:55 A.M.,

---

[135] Ms. Peters now avers that Defendants' production of extensive discovery pursuant to her repeated demands, as opposed to her production of 500 publicly available pages, constitutes "gamesmanship" by Defendants. See Peters Decl. ¶ 185 ("Although Defendants make the point that the first 500 pages of discovery produced by Plaintiff were nonconfidential documents, this just illustrates the gamesmanship of the Defendants. Clearly, at least some of the 22 boxes they produced must have been nonconfidential. Yet when requested to produce nonconfidential documents first, Mr. Rabin refused, stating that he had no intention of culling through 22 boxes of documents…") Ms. Peters cites in support of her position to a purported April 7 email by Mr. Rabin at "Exhibit 50;" however, Exhibit 50 to her opposition was intentionally left blank.

[136] When Ms. Peters informed Loop that Mr. Chou had told her that Defendants were ready to produce 22 boxes of documents, Loop advised Ms. Peters that Plaintiffs should object to Defendants' production of documents in paper, rather than electronic, form. Loop Decl. ¶ 7.
Subsequently on Thursday, April 12, in her Motion for Adjournment, Ms. Peters referenced the fact that she had complained to Defendants about their production of documents in paper, rather than electronic, form. See Pl. Mot. for Adjournment, Apr. 12, 2007 at 2. Isaacson also recalled that around this time Ms. Peters had informed him that she would request electronic versions of paper documents. See 8/15/07 Tr. 99:17-23.

[137] Mr. Loop was not aware of this email at the time. 9/4/07 Tr. 175:12-24.
Mr. Rabin also avers that on this Thursday, April 12, Ms. Peters represented to him on a phone call that she possessed a CD-Rom containing 27,000 pages of Plaintiff's documents. Rabin Decl. ¶ 44.

but did not receive a response regarding documents (nor the documents themselves) that day.  See Def. Ex. 17.

On Friday, April 13, in the morning, Loop provided Ms. Peters with three DVD-Roms containing 27,000 pages of Plaintiffs' documents, which were ready for production.  Loop Decl. ¶¶ 8-9; Tr. 9/4/07 Tr. 155:18-22.  Ms. Peters, for reasons which will be related infra, did not produce the documents to Defendants that day.

N.  Court-Ordered Depositions

On March 29, as noted previously and as clearly as I could, I requested by letter a schedule for depositions, "obviously not to interfere one with the other," agreed to by the parties by Thursday, April 5.  Rabin Decl. Ex. 5.

On April 2, Defendants noticed depositions of nine of Plaintiff's witnesses to take place on Tuesday, April 10 through Saturday, April 14.[138]  Aside from the one deposition scheduled for Saturday, April 14, Defendants' noticed depositions did not conflict with Ms. Peters' vacation that she previously stated would begin on April 13.[139]  There is scant evidence, however, that Ms. Peters ever took any substantial steps to arrange for the depositions of her witnesses on the dates for which Defendants had initially noticed depositions.[140]  It is not clear whether Ms. Gold was informed of Defendants' April 2 notices.[141]

---

[138] Specifically, Defendants noticed the deposition of Joseph Honor, for April 10, 2007; Elizabeth Durkey, for April 10, 2007; Charles Ross, for April 11, 2007; Brian Dalia, for April 11, 2007; Brian Longe, for April 12, 2007; Bruce Lenz, for April 12, 2007; William Burnett, for April 13, 2007; Roger Eriksson, for April 13, 2007; and David Stephens, for April 14, 2007.  See Rabin Decl. Ex. 18.

[139] Strange as it would seem from the record before me, Ms. Peters averred in her Declaration that Defendants did not in fact seek to depose witnesses during the week of April 9 through 14, and rather, exhibited "gamesmanship of try-ing to schedule the bulk of depositions while lead counsel was unavailable" and attempted to "sandbag Plaintiff by scheduling everything it could for that week."  Peters Decl. ¶ 125 n.7, 127 ("…[B]ecause of the discourteous behavior of Defendants… they did not afford themselves the opportunity to proceed with any witnesses during the week of April 9 and declined to conduct a single deposition of a [Gainskeeper] witness.")  Ms. Peters' averments are plainly belied by the record.

Ms. Peters also averred in her Declaration that "Plaintiff offered its witnesses to be deposed during the week of April 9, and made witnesses available."  Peters Decl. ¶ 127.  She cited to Exhibit 58 in support.  However, Ms. Peters attached no Exhibit 58 to her Declaration.

[140] Originally, David Stephens's deposition was noticed for April 14.  See Rabin Decl. Ex. 18.  Stephens testified that although he discussed the date of April 14 with Ms. Peters, he was never requested to be present on that date, nor did he receive a notice of that date.  See 8/15/07 Tr. 123:16-124:13, 136:22-137:4, 137:19-24 ("April 12th… was the only date that I ever knew that I had to be deposed").

Originally, Joseph Honor's deposition was noticed for April 10.  See Rabin Decl. Ex. 18.  Honor testified that he was never notified that his deposition was noticed for April 10.  See 9/4/07 Tr. 18:2-9.  Honor

On April 3, as previously noted, Ms. Peters stated she had "priority" and that she "did not have to present anyone for depositions until [she] finish[ed] [her] depositions. See Routh Depo. at 435. On April 4, at 7:43 P.M., Ms. Peters emailed Mr. Rabin, stated that the schedule "will have to be rearranged," and stated that "if you submit it to the Court as is, I will inform the Court that you refused to confer with me…" See Rabin Decl. Ex. 20. On April 5, at 1:40 P.M., Ms. Peters communicated to Mr. Rabin her specific objections to Mr. Rabin's proposed depositions. See Rabin Decl. ¶ 29. Mr. Rabin represented that he would confer with his client. See Rabin Decl. ¶ 30.

Within the hour, at 2:21 P.M. that day, Ms. Peters faxed her proposed depositions schedule to the Court. Ms. Peters proposed a list of 14 (and potentially more) additional depositions, not including the four individual Defendants.[142] Ms. Peters' first eight proposed depositions directly conflicted with eight of Defendants' nine proposed depositions, despite my prior admonition that depositions were "obviously not to interfere one with the other."[143] Ms. Peters listed the deponents' work addresses under their

testified that Ms. Peters had asked him his availability "the week before," and that he told Ms. Peters he was available, and since "there was no hard date given" to him he assumed he didn't have to show up. See 9/4/07 Tr. 12-20.

Originally, Brian Longe's deposition was noticed for April 12, 2007. See Rabin Decl. Ex. 18. Longe testified that he thought the Court issued an order at some point in April scheduling his deposition, and that he thought he learned this at the deposition on April 3. See Tr. 47:9-21. It is unclear, though, whether Longe was referring to Defendants' April 2 notices of depositions, or the Court's April 11 order that ordered depositions. See 9/4/07 Tr. 47:16-23. Longe thought that his deposition was to take place in the time frame of April 23 or 24. See id. at 47:22-25. (My April 11 order in fact ordered Longe's deposition to take place on Friday, April 20. See Rabin Decl. Ex. 22.)

In any event, Longe testified that nobody had ever told him that his deposition was noticed for April 12. See 9/4/07 Tr. 54:25-55:3. Ms. Peters advanced the contention on cross that Longe had emailed her and asked her to quash his deposition on that date, but Longe did not recall that. See id. at 55:5-11, 55:20-23. Ms. Peters has not subsequently produced any email to that effect to this Court.

Originally, Charles Ross' deposition was noticed for April 11. See Rabin Decl. Ex. 18. Ross did not provide any testimony regarding any possibility of his deposition on that date. One can't help but wonder if her behavior was calculated to avoid any discovery on Plaintiff's part.

[141] Ms. Gold stated that she knew of an "April 2 order initially setting depositions," but it is not clear whether she refers to Defendants' April 2 notice or Judge Castel's March 30 order. See 7/23/07 Tr. 27:7-13; see also 7/23/07 Tr. 51:18-20 ("I saw the April 2 deposition schedule and order and then also received, late on the night of the 11th, what I believe was a second order.").

[142] As one of Plaintiff's proposed depositions was of "Certain Employees of Bahwan Cybertek," it appears Plaintiff envisioned taking more than the purportedly 14 depositions proposed.

[143] See Fax of Kristan Peters, Apr. 5, 2007, 2:21 P.M. Although Mr. Loop played a role in putting together this list of proposed depositions, substantively, Ms. Peters provided the names, and the proposed dates of the depositions (which generally conflicted with Defendants' noticed depositions), to Mr. Loop. See 9/4/07 Tr. 157:18-23.

names. Defendants, in their letter of April 5, requested that I order the depositions of Plaintiff's nine witnesses to proceed beginning on April 11. See Rabin Decl., Ex. 20.

On April 6, as previously noted, I directed the parties to immediately meet and confer and present me, if possible, with a list of each party's proposed deponents and their place, date, and time by April 9, with the proviso that "if agreement is not possible… [the Court] will simply order the depositions and their place and timing [itself]." See Rabin Decl. Ex. 8. I limited depositions to 10 for each side, total, including depositions already taken by Plaintiff, and explicitly limited depositions to one day and seven hours, in accordance with Fed. R. Civ. P. 30(d)(2), unless further Order of the Court was provided.[144] Id.

On April 9, Defendants provided, pursuant to my April 6 directive, a proposed schedule for depositions of 10 of Plaintiff's witnesses, to begin on April 12 and continue through April 23. Rabin Decl. Ex. 20. Ms. Peters failed to provide an updated proposed schedule pursuant to my directive.[145]

Accordingly, on April 11, 2007, at 6:06 P.M.,[146] by written Order, I ordered sixteen depositions to go forward – ten by Defendants, who had yet to take a deposition, and six by Plaintiff (given that Plaintiff had already taken four depositions).[147] See Rabin Decl. Ex. 22. As at that time, ten business days remained before the April 26 hearing, I scheduled two depositions per day for the next eight business days. Id.

At 8:59 P.M. on April 11, by email, Ms. Peters requested a conference call, stating, without specifying, that "some of the people scheduled for next week are out of state or away on vacation out of the country."[148] See Rabin Decl. Ex. 23. Noting that

---

[144] As previously noted, on April 6, Ms. Peters also filed a motion to compel the re-deposition of Alves and Routh and the deposition of Charchour.

[145] Also on April 9, David Stephens emailed Ms. Peters at 3:47 P.M., informed her that he had a conference in Chicago scheduled for the next several days, and asked whether she was "OK" with him being in Chicago or whether he should be in New York or Massachusetts instead. See WKFS Ex. 12. It is unclear if Ms. Peters responded.

[146] Ms. Peters avers that the Court issued its order at 6:11 P.M. See Peters Decl. ¶ 128. As Ms. Peters' proffered fax indicates, this is incorrect. See Peters Decl. Ex. 34.

[147] As Ms. Peters had proposed 14 additional depositions in her proposed deposition schedule of April 5, and failed to update it in accordance with my April 6 directives, I ordered the first six depositions on Ms. Peters' list. As Ms. Peters listed the work addresses of deponents on her proposed deposition schedule, and had failed to propose a different place, in accordance with my April 6 directives, I ordered Plaintiff's depositions to take place at the deponents' work addresses.

[148] Defendants, on their part, averred that "With all due respect to the personal schedules of all concerned, a

"the plaintiff never bothered to update her proposed schedule," and that "most, if not all [of Defendant's] notices were out as of April 2," I declined, by written endorsement on April 12, to revise my April 11 order. I additionally stated that "if you can agree other dates before the hearing, that's fine; if not, it is doubtful, depending on your adversary's largess, that they will testify" at the April 26 TRO hearing. Id.

For Thursday, April 12, and Friday, April 13, I scheduled depositions of two of Plaintiff's witnesses (David Stephens, on April 12, at 10 AM, and Charles Ross, on April 13, at 10 AM), and depositions of two of Defendants' witnesses (Michael Wiatrak, on April 12, at 9 AM, and Bill Wagner, on April 13, at 4 PM). Ms. Peters was responsible for scheduling depositions for Plaintiff. As described below, none of the four ordered depositions occurred despite the fact that, had Ms. Peters sought their presence, each and every one (as their testimony revealed) would have been available.

   a.   *Ordered Deposition of Plaintiff's Witness David Stephens*

David Stephens, as noted, was ordered to be deposed on April 12 at 10 AM. (Defendants, in their proposed deposition schedule of April 9, had proposed that time. See Rabin Decl. Ex. 21.)[149] Stephens was in Chicago for a business meeting. See Isaacson Decl. ¶ 16; 8/15/07 Tr. 122:9-10. He had asked Ms. Peters on April 9 whether he should have gone to the conference in Chicago rather than be in New York or Massachusetts, but it is unclear if he received a response. See WKFS Ex. 12.

At 9:23 P.M, Stephens emailed Ms. Peters and stated that he could land in New York at 3:10 P.M. WKFS Ex. 13. Stephens suggested, inter alia, that the deposition could take place at LaGuardia airport, or that it could be done by video conference. Id. There is no evidence Ms. Peters passed on those suggestions to Defendants' counsel.[150]

<hr />

lot of plans have had to be rearranged based on plaintiff's application and demand for expedited discovery, and both sides simply have to make arrangements to comply with the Court's order…" See Rabin Decl. Ex. 23.

Defendants also aver now that with the exception of one witness (who appears to be Ross, see Chou Decl. Ex. 13 at 4, but it is unclear), Ms. Peters had never previously represented that any witnesses would be on vacation the week of April 16, when Ms. Peters was on vacation. See Rabin Decl. ¶ 33.

[149] Both Gold and Isaacson state that they were "aware" of the Court's April 11 order that ordered Stephens' deposition. See Gold Decl. ¶ 16; Isaacson Decl. ¶ 15. Gold states that she did not communicate with Stephens. Gold Decl. ¶ 16. It is unclear whether Isaacson communicated with Stephens. Isaacson Decl. ¶ 15.

[150] Stephens also suggested that he could be deposed in Chicago. WKFS Ex. 13. Stephens recalled that Ms. Peters told him the following day that Defendants' counsel Mr. Rabin declined to fly to Chicago to

The next day, April 12, at 8:02 P.M., Ms. Peters stated that Stephens was not available the next week (the same week as her vacation).  5/24/07 Peters Decl. Ex. 43. Stephens, for his part, testified that although he had a vacation in Tortola from the 13th through the 18th, that he was "available" during that time to come back to New York and had discussed that with Ms. Peters.  See 8/15/07 Tr. 124: 1-13; 136:1-137:13.

> *b.  Ordered Deposition of Defendants' Witness Michael Wiatrak*

Michael Wiatrak, as noted, was ordered to be deposed on Thursday, April 12 at 9 AM at Scivantage's offices in New Jersey.  As noted, the previous night at 9:07 P.M., Ms. Peters stated in her final email that "I guess we will have to… proceed in NJ at 9…" Rabin Decl. Ex. 28.  Defendants aver that their counsel worked through the night to prepare for the deposition.  Rabin Decl. ¶ 38.

Neither Ms. Peters nor any representative of Plaintiff appeared in order to take Wiatrak's deposition at that time.  See Chou Decl. ¶ 47.  Defendants' counsel James Chou emailed Ms. Peters and another Dorsey associate, Jeffrey Loop, at 9:55 A.M. without any response.  See Chou Decl., Ex. 6.  Ms. Peters now avers that her failure to appear was due to "[Defendants' counsel] Mr. Rabin's lack of courtesy and refusal to cooperate regarding the scheduling of Mr. Wiatrak's deposition."  Peters Decl. ¶ 129.

> *c.  Ordered Deposition of Defendants' Witness Charles Ross*

Ross, as noted, was ordered to be deposed on Friday, April 13, at 10 A.M.  Ross was with David Stephens in Chicago on April 11 when Ms. Peters informed Ross of his ordered deposition.  See 8/15/07 Tr. 161:10-16, 167:23-168:1, 168:8-23.  Ross then traveled to New York on April 12.  See 8/15/07 Tr. 161:17-24.

On April 12, at 1:44 P.M., Ms. Peters emailed Defendants' counsel and stated that she had informed Ross to be available at 8 A.M. tomorrow (April 13), and that that would provide 6 ½ hours for his deposition, as Ross had to "depart for his vacation at 2:30 P.M."  See Chou Decl. Ex. 13 at 4.  Ross testified that he did not, in fact, have a vacation scheduled on April 13, nor had he told Ms. Peters that he needed to depart at 2:30 P.M. that day, nor had he advised Ms. Peters of any particular time that he would have had to leave his deposition that day.  See 8/15/07 Tr. 163:18-164:7, 164:19-21.  Ross testified that although he had a vacation scheduled for the next day, April 14, had his deposition

---

take his deposition.  See 8/15/07 Tr. 135:11-15.

been scheduled for April 13, he could have taken the last shuttle to Boston that night at 8 or 8:30 P.M.  See 8/15/07 Tr. 163:24-164:4.[151]

Defendants' counsel Mr. Chou replied at 3:18 P.M. that the deposition would proceed at 10 A.M. as ordered, and that Defendants were entitled to seven hours, but Defendants would proceed if Plaintiff stipulated to resume his deposition no later than Monday, April 23.  Id.  Ms. Peters replied at 3:23 P.M. that as Ross was away on vacation the next week, and that two depositions were scheduled for April 23, that "if you want more time, you will have to start earlier in the day."[152]  Id.  Ms. Peters alternatively offered Ross for April 24.  Id.  Mr. Chou responded at 3:50 P.M. that he thought it was feasible to continue Ross' deposition on April 23.  Id.

It appears that at some later point that afternoon, Ms. Peters and Mr. Rabin spoke by telephone.  At 6:19 P.M., Ms. Peters emailed Mr. Rabin to "confirm [their] conversation" that she "offered to have Mr. Ross available to you starting at 8 am to give you a full 7 hours of deposition time because of his flight schedule, but you declined." 5/24/07 Peters Decl. Ex. 66.  Ms. Peters averred that Mr. Rabin stated that "starting his deposition at 10 A.M. would be sufficient."  Id.  Ms. Peters stated that "[t]herefore, pursuant to your request, we will produce him at 10 A.M."  Id.

Mr. Rabin responded to Ms. Peters (and Marc Reiner) at 6:59 P.M. and stated that "For the first time in my career, I find it impossible to communicate orally with opposing counsel."  Chou Decl. Ex. 12.  Mr. Rabin suggested that "we conduct all future communications in writing."  Mr. Rabin then reiterated his prior position regarding Ross's deposition – that it would begin at 10 AM and last for seven hours, and that any time short of seven hours would be made up at a later date.  Chou Decl. Ex. 12.

Ms. Peters, at 8:02 P.M., offered either to begin with Ross on April 13 and finish on April 24, or that Ross could be deposed for a full day on April 24th.  Peters Decl. Ex.

---

[151] Ross testified generally that he didn't get involved in the scheduling, and that it was "you tell me when I need to show up and I will show up."  8/15/07 Tr. 164:8-14.

Ms. Peters, in her role as counsel, appeared to aver that she understood Ross' flight to be from Boston, rather than New York.  Ross rebutted that averment.  See 8/15/07 Tr. 169:21-24 (Ms. Peters, as counsel: "When you told me that you had to catch a flight at 8:30, are you sure that you were clear that it was from New York to Boston rather [than] from Boston to Florida?" Ross: "I thought it was pretty clear."); see generally 8/15/07 Tr. 169:21-171-21.

[152] Ross, for whatever it is worth, testified that he would have been available on April 23.  8/15/07 Tr. 165:16-18.

43. At 8:41 P.M that night, Mr. Rabin agreed to accept the offer to depose Ross for a full day on April 24. <u>See</u> Peters Decl. Ex. 43; Rabin Decl. ¶ 34 n.1. Ms. Peters forwarded Mr. Rabin's email to Ross at 9:33 P.M. <u>See</u> Peters Ex. G. Ross got off his plane in New York, saw Ms. Peters' email, and returned to Massachusetts the next morning, April 13. <u>See</u> 8/15/07 Tr. 162:2-4, 173:9-13. At 10:11 P.M., Rabin emailed Ms. Peters and stated, "We will take both Ross and Stephens on the 24th, beginning at 10 AM. We are doing this based solely on your representation that [Ross] has a vacation beginning 2:30 tomorrow so that he could otherwise not stay past 2:30. We will confirm the truth of this representation at his deposition." Def. Ex. 49.[153]

The scheduling of Ross' deposition then became a subject of discussion during the conference call with the Court on the afternoon of Friday, April 13.

### d. Ordered Deposition of Plaintiff's Witness Bill Wagner

Wagner, as noted, was ordered to be deposed on Friday, April 13, at 4 P.M., at Scivantage's offices in New Jersey. The prior day, Thursday, April 12, at 2:16 P.M., Plaintiff's counsel Marc Reiner asked Defendants' counsel to confirm his deposition. Defendants did so at 3:21 P.M. Chou Decl. Ex. 9. Ms. Peters subsequently informed Reiner that she wanted to take Wiatrak's deposition instead of Wagner's the next day, in part because she personally wanted to take Wagner's deposition at another time. 9/4/07 Tr. 193:3-15, 239:6-9, 240:6-23. At 4:40 P.M., Ms. Peters emailed Defendants' counsel, informed them that she had informed the court's law clerk (apparently *ex parte*) that Wiatrak's deposition was not taken, and asked, "Do you mind substituting Wiatrak for Wagner's deposition slot tomorrow?" <u>See</u> Chou Decl. Ex. 13 at 2. At 6:59 P.M., Mr. Rabin emailed Ms. Peters and Mr. Reiner that night and stated that Defendants were producing Wagner as ordered. <u>See</u> Chou Decl., Ex. 12. (Indeed, Mr. Rabin confirmed that Defendants would be producing all its Court-ordered witnesses at the Court-ordered times. <u>See</u> <u>id</u>.)[154]

---

[153] Subsequently, on Friday, April 13, at 12:26 P.M., Ms. Peters emailed the Court and stated, "Defendants… *requested* that we move Chuck Ross' deposition from today to the 24th, which I agreed to…" (emphasis added). <u>See</u> Email of Kristan Peters, Apr. 13, 2007, 12:26 P.M. This is another in what became a tissue of lies not only to the Court but apparently to her adversary as well.

[154] The one exception to Mr. Rabin's statement was that Plaintiff had requested, and the Court had ordered, the deposition of the unnamed "Vice President of Human Resources" of Scivantage. <u>See</u> Rabin Decl., Ex. 22. Mr. Rabin represented at that time, as Mr. Chou had earlier that afternoon, that Scivantage did not have

The next morning, Friday, April 13, the day scheduled for his deposition, at 9:23 A.M., Reiner emailed Ms. Peters and stated, "I would like to tell [Defendants' counsel] Rabin as early as possible that the Wagner deposition is not going forward today. Can I do that?"[155] See Dorsey Ex. N. Ms. Peters emailed back at 10:37 A.M. and directed, "Don't say anything yet to [Defendants' counsel] Rabin as I don't want to tip him off." Id.

At about 3:15 P.M. (apparently shortly after a conference call with the Court, discussed infra), Ms. Peters authorized Mr. Reiner to cancel Wagner's deposition. 9/4/07 Tr. 195:9-17. At 3:23 P.M., Reiner emailed Defendants' counsel and stated, despite Mr. Rabin's previous email confirming, "Since I have not heard from you… we are unable to go forward with the Wagner deposition." See Rabin Decl., Ex. 32. Defendants' counsel Mr. Chou emailed back at 3:55 and rebutted accurately that Mr. Reiner had, indeed, heard back from Defendants.[156] Id.

Wagner's deposition did not take place. See Chou Decl. ¶ 61.

O. Plaintiffs' Decision to Voluntarily Dismiss Pursuant to Rule 41

On Thursday, April 12, Dorsey counsel began to discuss the idea of a voluntary dismissal of the case pursuant to Fed. R. Civ. P. 41. Ms. Peters, Marc Reiner, Deidre Sheridan, and Jeffrey Loop discussed the idea in a meeting that day at some time before 2:18 P.M. 9/4/07 Tr. 173:11-14. Reiner initially proposed the idea.[157] Reiner Decl. ¶ 3;

---

a "Vice President of Human Resources." See Chou Decl., Ex. 12.; Chou Decl., Ex. 11. [It appears that Scivantage contracted the job out.]

By Ms. Peters' own contemporaneous averment, Ms. Peters, seven minutes after Mr. Chou emailed her and informed her that Scivantage did not have a "Vice President of Human Resources," called my law clerk ex parte to inform the Court of the issue. See Chou Decl., Ex. 11 (Ms. Peters, via email: "I am on the phone with the court about the VP of HR issue right now.").

[155] Reiner testified that his understanding was that the Wagner deposition was not going forward because, as discussed infra, Dorsey had already begun, with notice to no one, to plan to dismiss the case. 9/4/07 Tr. 241:11-15, 19-22.

[156] Reiner, in his Declaration, stated that "counsel never made direct reference to our request to substitute Wiatrak for Wagner." Reiner Decl. ¶ 7. Ms. Peters, in her Declaration, simply stated that "defense counsel never wrote back." Peters Decl. ¶ 263. Reiner's statement is technically true. Ms. Peters' statement is false.

[157] Reiner avers that he was familiar with the issue because in a prior case that he had defended, the plaintiff filed a Rule 41(a)(1) notice in response to a motion to dismiss for improper venue, and refiled a similar action in a different district (albeit eleven months later, rather than the same day). See 9/4/07 Tr. 180:16-181:11, see also Donoghue v. Tweeter Home Entertainment Group Inc., 02-cv-6155 (E.D.N.Y.); Donohue v. Tweeter Home Entertainment Group Inc., 04-cv-524 (S.D.N.Y.). Notably, in that prior litigation, Reiner's client eventually stipulated to transfer venue for the case to Massachusetts. See

<u>see also</u> 9/4/07 Tr. 180:10-19.  Mr. Reiner avers that Ms. Peters initially thought that Plaintiff should address the venue issue with a motion requesting certification of the case to Massachusetts.  Reiner Decl. ¶ 4.  Reiner asked Loop to send a broadcast email to the trial group asking if anyone had experience with a motion to transfer venue.  9/4/07 Tr. 166:7-14.  Loop received a response from another Dorsey associate indicating that it might take months to transfer the case, and if Dorsey was seeking "emergent relief," Dorsey would be better served by dismissing and re-filing.  <u>See</u> Ex. KP-34 (Email of Jeffrey Loop, Apr. 12, 2007 2:18 P.M.); 9/4/07 Tr. 166:7-14.

Eventually, Reiner recommended voluntarily dismissing the case, for, according to him, three reasons.  The first was that Defendants had filed a motion to dismiss which in part raised the issue of personal jurisdiction over Defendants.[158]  <u>See</u> 9/4/07 Tr. 181:22-182:10.  The second was that given that depositions had been ordered during Ms. Peters' vacation, Dorsey wanted to cancel and reschedule the depositions so that Ms. Peters could be present to defend them.[159]  <u>Id</u>.  The third was that Dorsey had been receiving "adverse rulings from the Court," and rather than "try and persuade the Court otherwise," Reiner thought it was better "to start with a different judge."  <u>See</u> 9/4/07 Tr. 182:7-10, 268:7-10.  For example, at 2:20 P.M. that day, April 12, Reiner emailed Ms. Peters, Sheridan, and Loop, and stated that "… I like doing something – i.e., [Rule] 41(a)(1) – where the judge expressly does not have any discretion to screw us either through action or inaction."  Ex. KP-34.

As Reiner points out, on that day, April 12, as noted above, I issued three orders that could be construed as adverse to Dorsey's client (and in two orders, perhaps more germane to Dorsey's concern, I noted deficiencies in counsel's advocacy as a partial basis

---

Donohue v. Tweeter Home Entertainment Group Inc., 04-cv-524 (S.D.N.Y.), Docket Entry #8; <u>Donoghue v. Tweeter Home Entertainment Group Inc.</u>, 04-cv-12073 (D. Ma.), Docket Entry #1.  One might infer from those facts that Mr. Reiner was also aware that the option of seeking a stipulation to transfer venue, as opposed to a Rule 41 voluntary dismissal, was available and, at the very least, more collegial.

[158] In Reiner's original Declaration, provided to the Court while Ms. Peters was still working for Dorsey and before Dorsey and Ms. Peters obtained separate counsel, he mentioned only this reason, and not the following two reasons.  <u>See</u> Reiner Decl. ¶¶ 3-4.

[159] In Reiner's words, "…[B]ecause of the discovery schedule that had come down with all of the depositions that were to take place while Ms. Peters was absent, concerning Ms. Peters' primary importance of her to our case, we thought it would be very important to have her available for those depositions, and to be able to refile and allow her, were those depositions to take place in the new action, we thought it would be very useful."  Tr. 181:25-182:7.

for my ruling).  First, I ordered Defendants' confidentiality order into effect, which denied Plaintiffs' in-house counsel and employees access to "attorneys' eyes only" information (although I provided for a neutral process by which either party could apply to the Court for access by its in-house counsel or employees).  Second, at 5:15 P.M., I denied Plaintiffs' request to modify my Order that ordered depositions of Plaintiffs' witnesses to take place, and noted that Plaintiff "never bothered to update her proposed deposition schedule."  See Rabin Decl. Ex. 23.  Third, at 5:28 P.M., I denied Plaintiffs' motion to immediately reinstate the TRO, and noted that Plaintiff "sandbagged" Defendant with its reply and that further gamesmanship may warrant sanctions (but additionally that a hearing was scheduled two weeks hence for April 26, at which Plaintiff could present argument in favor of reinstatement).  See Wolters Kluwer Fin. Servs. v. Scivantage, 2007 U.S. Dist. LEXIS 27048; see also Rabin Decl. Ex. 3.

Reiner and Ms. Peters met with Zachary Carter, head of Dorsey's New York trial group, at some point after the prior meeting among Dorsey counsel and proposed the idea of a voluntary dismissal and concomitant filing of a new complaint in Massachusetts. Carter concurred.  See 9/4/07 Tr. 182:18-183:1 (Reiner testimony); 9/11/07 Tr. 13:11-14:5, 17:8-11 (Carter testimony).  Carter was aware of the adverse orders and the argument to "start with a different judge," but kept from him was the fact that such a move entailed canceling already-scheduled depositions.[160]  Reiner subsequently drafted a Rule 41 voluntary dismissal notice.[161]  See 9/4/07 Tr. 183:5-7.

That day, April 12th, Ms. Peters emailed (apparently at 4:35 P.M., although it is not entirely clear) Ms. Gold a copy of the confidentiality order that I entered that day. See Ex. KP-61; 7/23/07 Tr. 54:6-9 (Gold testimony).  At 5:02 P.M., Mr. Reiner forwarded several recent letters and litigation filings in this action to Gold and Isaacson. See Exhibit KP-60.  Mr. Reiner included a copy of this Court's deposition order of April 11.  Not surprisingly, it does not appear that the two other orders of April 12 that

---

[160] See 9/11/07 Tr. 13:25-14:3 (Carter testified that Ms. Peters told him that "she believed that she would find a more receptive forum in the best interest of her client based on her experience of the litigation thus far…"); see also 9/11/07 Tr. 16:1-11 ("Ms. Peters was disturbed at certain rulings of the Court…"); see also 9/11/07 Tr. 72:6-73:13.  As to Carter's testimony regarding depositions, see 9/11/07 Tr. 15:18-25, 16:12-18.

[161] Reiner does not state exactly when he drafted this notice.  See 9/4/07 Tr. 183:5-7.

contained language noting deficiencies in counsel's advocacy were forwarded to its client.[162]

While the idea of a voluntary dismissal gained traction, at 4:02 P.M. that day on April 12, Ms. Peters submitted a formal motion to adjourn the April 26 hearing to May 3 or later, despite her prior multiple representations of immediate "irreparable harm" to her client. Later that day, Ms. Peters submitted a formal motion for a protective order, requesting to adjourn depositions until the "week of April 23rd."[163] See Rabin Decl. Ex. 24. Ms. Peters noted that Defendants had provided 22 boxes of discovery to Plaintiff (pursuant, of course, to Plaintiff's extensive discovery demands), and now argued, inter alia, that she needed extra time to review documents before depositions and the hearing, despite the fact that Plaintiff had produced no meaningful discovery of its own. Keep in mind, too, as I had, that this law firm has over 600 lawyers around the country, some of whom I presume are litigators.

That night, Dorsey associate Deidre Sheridan began drafting a complaint, and forwarded comments to Peters, Reiner, and others at 4:04 AM, Friday, April 13. See Dorsey Ex. N. At 9:23 A.M., Friday, April 13, Reiner emailed the Dorsey team, commented that it would be "useful to have local counsel lined up to file this [Massachusetts] complaint," and asked to "confirm that the client is on board…"[164] See Dorsey Ex. N. Ms. Peters emailed back at 10:37 A.M. and stated, "Still no decision on re-filing from Deidra [Gold]… Don't say anything yet to Rabin as I don't want to tip him

---

[162] Specifically, there is no evidence that Dorsey sent its client, before the voluntary dismissal, a copy of my 5:15 P.M. denial of Ms. Peters' request to modify the deposition schedule wherein I noted that "plaintiff never bothered to update her schedule." See 7/23/07 Tr. 54:3-25 (Gold testimony); 8/15/07 Tr. 34:17-22, 35:16-19, 36:1-4 (Isaacson testimony). Nor is there evidence that Dorsey sent its client, before the voluntary dismissal, a copy of my denial of Ms. Peters' request to reinstate the TRO nor the reasoning behind it. See 7/23/07 Tr. 54:3-25 (Gold testimony); 8/15/07 Tr. 34:17-22, 35:16-19, 36:1-4 (Isaacson testimony). Ms. Peters contended on cross that she brought the Court's denial of the TRO to Isaacson's attention, but Isaacson did not recall that she had. See 8/15/07 Tr. 96:1-4. (Ms. Peters did not contend that she forwarded an actual copy of that denial, including its language critical of counsel, to her client.)

[163] It appeared that the motion sought to generally adjourn any depositions taking place during the week of April 16 (which, of course, was the week of Ms. Peters' personal vacation) until the week of April 23. Although Ms. Peters represented that specific individuals were not available during the week of April 16, Ms. Peters noted in the conclusion of her motion that depositions were scheduled for "certain employees of Plaintiff and Defendant [from] April 12… through April 23," and sought ultimately that the depositions "referenced above" be rescheduled during the week of April 23. See also, supra note 138.

[164] Reiner also raised the issue of Wagner's deposition at this time, as noted infra.

off."[165]  Id.  Reiner testified that he understood Ms. Peters' comment about "tipping off" to refer to the voluntary dismissal.[166]

Ms. Peters averred in various documents and emails at this time, some to the Court, and some to Defendants, that Plaintiff's four main witnesses – David Stephens, Joseph Honor, Charles Ross, and Plaintiff's CEO Brian Longe – were all unavailable the following week to be deposed, which was the same week as Ms. Peters' vacation.[167]

At 12:03 P.M., I emailed the parties, proposed a conference call that afternoon, and asked Plaintiff, inter alia, to "clarify which deponents, specifically, were or are not available (as opposed to the unavailability of particular counsel), and for what reasons."  See Rabin Decl. ¶ 7.  I also requested that Plaintiff propose a specific alternate date, place, and time for their deposition but that it be before the hearing, and asked both parties to apprise the Court by email of their positions regarding Honor and Longe.  Id.

At 12:07 P.M., Defendants emailed the Court and generally opposed Plaintiff's motion for a protective order, stating that "[t]he schedule in this case has not been a mystery," and representing that Ms. Peters had generally and repeatedly refused to

---

[165] At some point Friday morning, before 10:37 A.M., Ms. Peters spoke with Isaacson regarding the voluntary dismissal.  See Dorsey Ex. N (Email from Ms. Peters, stating "I have talked with Isaacson this morning…"); see also 8/15/07 Tr. 32:24-25 (Isaacson says he received a "recommendation" to voluntarily dismiss).

[166] Indeed, Ms. Peters elicited this information herself on cross.  See 9/4/07 Tr. 243:4-6 (Ms. Peters, as counsel: "When I said tipping off Rabin, wasn't that related to the dismissal?" Reiner: "I believe so, yes.").

For Ms. Peters' side of the story regarding the voluntary dismissal, see generally "There Is No Evidence To Support Defense Counsel's Divinations Regarding Plaintiff's Motives About The Rule 41 Notice, And In Fact Their Allegations Are Provably False," at Peters Decl. ¶¶ 131-32 et. seq.

[167] In Plaintiff's Motion for Adjournment, Ms. Peters averred that "Plaintiff had informed defendants over a week ago that several witnesses were away during the week of April 16 because of school vacation schedules in Massachusetts."  Mot. for Adjournment at 3 n.2.  In Plaintiff's Motion for a Protective Order, Ms. Peters averred that "several of these deponents – including, but not limited to, Joseph Honor and Brian Longe – will be unavailable for their scheduled depositions during the week of April 16, 2007.  See Mot. for Protective Order at 1.  On Thursday, April 12, at 8:02 P.M., Ms. Peters averred to Mr. Rabin that Stephens, Honor, and Longe were not available the next week.  See Peters Decl. Ex. 43.  On Thursday, April 12, at 3:23 P.M., Ms. Peters averred that Ross was on vacation "out of state" the next week.  See Chou Decl. Ex. 13.

Regarding Honor, Honor testified that he would have been available to have been deposed during the week of April 16.  8/15/07 Tr. 212:1-3.  Honor generally testified that there was no hard date given to him for his deposition.  9/4/07 Tr. 19:6-12.

Regarding Longe, Longe requested that Ms. Peters reschedule his deposition for a day other than April 20, as he was selling his condo that day.  See 9/4/07 Tr. 53:22-54:24.  Longe believed, however, that he would generally have been available during the week of April 16 through April 20.  See 9/4/07 Tr. 48:1-17.

Regarding Stephens and Ross, their availability is addressed above.

provide witnesses for depositions during the preceding days. Because Ms. Peters did not serve the motion for adjournment upon Defendants, Defendants could not respond to it.[168]

At 12:26 P.M., Ms. Peters represented to the Court merely that Honor and Longe could be deposed April 24 or 25 (after her vacation), without stating the reasons for their unavailability. See Email of Kristan Peters, April 13, 2007, 12:26 P.M.

At approximately 12:30 P.M. Eastern time, Deidra Gold, during a conference call with Isaacson, Brian Longe, David Stephens, and Ms. Peters, authorized Dorsey & Whitney to file a Fed. R. Civ. P. 41(a)(1)(i) notice of voluntary dismissal, as well as to file a new complaint in Massachusetts.[169] See Gold Decl. ¶ 17; 7/23/07 Tr. 31:22-32:1; 8/15/07 Tr. 32:10-21; 8/15/07 Tr. 125:17-21. Isaacson states that this authorization to file the Rule 41 dismissal was a "final decision." See Isaacson Decl. ¶ 17; 8/15/07 Tr. 30:22-25, 106:15-107:5; Gold Decl. ¶ 5. Gold's understanding was that the action "would be withdrawn after our discussion and my authorization of that action." 7/23/07 Tr. 39:9-11. Longe's understanding of the decision made on this call substantively echoed Gold's and Isaacson's.[170]

Both Gold and Isaacson state that they were aware at this time that Defendants had filed a motion to dismiss based in part on lack of personal jurisdiction, although both aver that they had not seen Defendants' motion to dismiss at this time. See Gold Decl. ¶ 17; Isaacson Decl. ¶ 17; 8/15/07 Tr. 33:14-19.

---

[168] Mr. Chou asked to be served with a copy of the Motion to Adjourn after the Court's email of 12:03 P.M. Friday. Although Ms. Peters argues that Defendants make "false allegations," and avers that she subsequently emailed the document twice to Mr. Chou on Friday, it is clear from reviewing the record that both times, Ms. Peters emailed the Motion for a Protective Order, not the Motion to Adjourn. Compare Peters Decl. ¶ 118 with Chou Decl. ¶ 8. Ms. Peters also avers that she faxed the motion to Mr. Rabin. Peters Decl. Ex. 26. Mr. Chou avers that after consultation with Mr. Rabin and Akin Gump's mailroom, no such fax was received. Chou Decl. ¶ 52.

[169] Gold knew that the call began at 12:30 P.M. Eastern time because her calendar listed an 11:30 A.M. (Central time) conference call as a scheduling item, and that there were emails to confirm that time. See Tr. 7/23/07 32:2-8.

Stephens testified that the lawyers participated in the first half of the conference call and he participated in the "back half" of the call, and that by the time he joined the call, the decision had already been made to dismiss the case. See 8/15/07 Tr. 125:17-24.

[170] "…[W]hat was said, basically, was we were going to dismiss the case in New York City; they found out that there was a place in Boston, and Deidre [Gold] gave instructions to dismiss the case in New York City and, without any extraordinary measures, refile it in Boston." See 9/4/07 Tr. 49:15-21, 51:2-8 (Longe testimony).

Ms. Peters, on cross, averred that the client authorized Dorsey to first pursue an attempt to have the matter transferred to the District of Massachusetts, and alternatively, if that approach was not successful, to file a notice of voluntary dismissal.[171] 7/23/07 Tr. 70:4-20. Wolters Kluwer employees, as noted above, do not remember the conversation that way. Gold stated that she did not recall any discussion during this call regarding further discussions with the Court before making a decision to withdraw the case. 7/23/07 Tr. 39:21-25. Indeed, Gold, who authorized the voluntary dismissal as lead in-house counsel, stated that she was not even aware that a conference call was scheduled for later that day.[172] 7/23/07 Tr. 39:17-21. Gold specifically stated that she was not "presented with contingencies or conditions or anything of that nature."[173] 7/23/07 Tr. 40:1-2. It is also not clear, but appears extremely unlikely, that the parties discussed the relative likelihood that a district judge might agree to transfer a case to a new venue based on an unbriefed oral application by one party, and that that transfer might be effectuated by the close of business that day. What does appear, and appears beyond peradventure, is that the participants on this call agreed that by the end of the day, one way or another, the case would be in Boston.[174]

---

[171] In her earlier Declaration, Ms. Peters more simply averred that Wolters Kluwer made the decision to voluntarily dismiss later in the day, after (or during) the conference call with the Court. See Peters Decl. ¶ 132 ("Plaintiff did not decide to file a Rule 41(a)(1) dismissal until after Judge Baer rejected the change of venue…") insofar as Ms. Peters' statement implies a decision by the client to dismiss (as presumably would be necessary to end a lawsuit), those statements appear to be inaccurate.

Reiner shares Ms. Peters' understanding of the client's directives to pursue an "alternative strategy," although as Reiner was not on the April 13 call with Wolters Kluwer employees, it appears that Reiner's only knowledge of the client's directives comes from Ms. Peters. See 9/4/07 Tr. 183:8-14 (Reiner testimony); 8/15/07 Tr. 32:10-21 (Isaacson notes participants on call, without mentioning Reiner).

[172] Although Gold stated that she was not aware that the Court had requested a conference call for that afternoon at this time, see 7/23/07 Tr. 39:17-20, Isaacson stated that Ms. Peters made him aware at this time of the Court's requested conference call, although he was not aware of the purpose of the call. See 8/15/07 Tr. 33:7-13.

[173] Isaacson emailed Ms. Peters on April 17 and stated, summarizing the points that Gold made at the end of this conversation, that "we have been informed that we have the right to dismiss the New York action and we are okay with the dismissal." WKFS Ex. 18. Isaacson did not, when he summarized this conversation, mention the idea of a 1404(a) transfer of venue. Id.

Gold did state, when asked by Ms. Peters "[D]o you recall me telling you that I wanted a change of venue under 1404 but in case the judge did not go along with that we needed to have approval of 41(a)(1) just in case?" that "I don't recall specifically, but that may have been… part of the discussion." 7/23/07 Tr. 70:10-15.

[174] For example, Longe testified, "I don't know what 1404 or 41… is… It's the equivalent of speaking French to me… If you're talking about dismissing and sending it to Boston, the answer is that with the inside counsel's discussion… they recommended that and I approved it." See 9/4/07 Tr. 56:4-57:14.

Clearly, all parties understood that depositions would be cancelled by this voluntary dismissal.  See 8/15/07 Tr. 33:20-23 (Isaacson stated that it was his "intention" to cancel depositions by this Rule 41 dismissal); see also Gold Decl. ¶ 19 (Gold "understood" that subsequent depositions would be "dismissed promptly after [she] authorized [Dorsey] to file a notice of dismissal."); see also 7/23/07 Tr. 53:19 (Gold stated "It was my expectation…").[175]

Regarding adverse orders issued by the Court, both Gold and Isaacson testified that they were aware at this time that the Court had entered Defendant's proposed Confidentiality Order, but opined that they had never been told that the Court had declined to modify the deposition schedule nor that the Court had denied Plaintiff's application to reinstate the TRO.  See 7/23/07 Tr. 54:3-25 (Gold testimony); 8/15/07 Tr. 34:17-22, 35:16-19, 36:1-4 (Isaacson testimony).  It appears that some discussion took place regarding the idea of, as Reiner put it, "starting with a different judge."  See 9/4/07 Tr. 58:5-19 (Longe testified, "There was discussion on the phone as to whether we would have a better outcome in Boston…. Deidre [Gold] recommended with Steve [Isaacson] that we move it to Boston on the advice of outside counsel…")

Gold stated that around this time, she was discussing with Dorsey her desire to have a "more orderly managed case," to do a "full case review," and to "proceed more normally."  See 7/23/07 Tr. 47:17-48:11.[176]

P.  Friday, April 13 Conference Call with the Court, and Subsequent Voluntary Dismissal

At 2:30 P.M. on Friday, April 13, my law clerk at my direction emailed the parties and asked if it was possible to set up a conference call in 15 minutes.  Email of Mark Noferi, Apr. 13, 2007, 2:30 P.M.  The parties generally responded affirmatively.  Ms. Peters simply responded, "yes."  Email of Kristan Peters, Apr. 13, 2007, 2:31 P.M.

---

[175] That said, Gold avers that she did not "direct or specifically discuss… cancellation…" 7/23/07 Tr. 52:9-11.

[176] In that vein, subsequently on April 17, Isaacson emailed Ms. Peters, copying Gold, and summarized "from his notes" the points that Ms. Gold made at the end of this April 13 conversation, which included, inter alia, that "we are okay with filing the [Massachusetts] complaint, with no request for an expedited discovery process," that "we need to have a more detailed review of the case with you… before proceeding with the Massachusetts action beyond filing the complaint," and that "if we proceed, early on we need to address the protective order with the Court in Massachusetts."  Ex. WKFS 18.

Beginning shortly after 2:45 P.M., I held a conference call with counsel for the parties.[177]  Ms. Peters, and at times Marc Reiner, represented Plaintiff; Mr. Guirguis represented Defendants.[178]  See 9/4/07 Tr. 183:15-16; Reiner Decl. ¶¶ 5-6; Guirguis Decl. ¶ 15.

At the beginning of the call, which had been scheduled to address depositions, Ms. Peters attempted to raise arguments regarding a transfer of venue in light of Defendants' pending motion to dismiss.[179]  See 9/4/07 Tr. 183:19-20 (Reiner testimony). The change of venue motion had not yet been answered and I declined to address the issue at that time.  See Reiner Decl. ¶ 6 ("The Court stated that it did not want to address the issue at that time because the issue was not yet ripe."); Peters Decl. ¶ 132.  Believe it or not, the parties then discussed the deposition schedule for the following days. See Reiner Decl. ¶ 5; Peters Decl. ¶¶ 154-158 (relating discussions during this conference call regarding scheduling of depositions of various witnesses).  This discussion ensued even though Plaintiff's counsel was fully aware that the New York case would be, or for that matter may already have been, dismissed and thus no depositions were even contemplated.  At one point, I noted (as I had in my April 12 denial of Ms. Peters' email request to adjourn the depositions) that witnesses would be precluded if their deposition could not be arranged before the April 26 hearing.  See Peters Decl. ¶ 156; Guirguis Decl. ¶ 15 ("[Ms. Peters] stated that she would proceed with plans to present certain witnesses irrespective of the Judge's rulings").

Later we learned that during this telephone conference, Jordan Brackett, a first-year Dorsey associate, periodically entered Ms. Peters' office to obtain her handwritten revisions to a draft of the Massachusetts complaint.  Brackett Decl. ¶ 6.

Following (or, it is not clear, perhaps during) this conference call after Ms. Peters raised the issue of a transfer, Ms. Peters directed Reiner to file the Rule 41(a)(1)(i) notice

---

[177] Because Ms. Peters has put in issue untranscribed conversations with myself or my law clerk by seeking the testimony of myself or my law clerk regarding those conversations in connection with her motion for my recusal, I will not rely on my (or my law clerk's) independent recollection of this conversation.

[178] Ms. Peters states that Mr. Rabin represented Defendants on the call and makes complaints about his behavior.  See Peters Decl. ¶ 154-59.  Defendants note that Mr. Rabin did not participate in the call.  See Guirguis Reply Decl. ¶ 15; Rabin Reply Decl. ¶14.

[179] Ms. Gold states that she did not direct Ms. Peters to raise this issue.  7/23/07 Tr. 53:11-16.

of voluntary dismissal.[180]  9/4/07 Tr. 183:19-21; Reiner Decl. ¶ 6; Peters Decl. ¶ 132. Reiner signed the voluntary dismissal, and instructed a member of the managing clerk's office to file the notice.  9/4/07 Tr. 183:23-25.  Before it was filed, Reiner attached to the voluntary dismissal a standard certificate of service, except that on this certificate of service, where it states "a copy of the foregoing has been sent via U.S. Mail and electronically," Reiner manually crossed out the words "and electronically."[181]  See Rabin Decl. Ex. 34; 9/4/07 Tr. 184:5-19.[182]  Reiner then arranged for service on Defendants' counsel by regular mail only.  9/4/07 Tr. 184:1-4.  Dorsey did not notify the Court of the voluntary dismissal.[183]  See 9/4/07 Tr. 184:20-185:9, 185:14-20.

At 5:02 P.M., in an effort to "arrange the depositions more conveniently for all concerned," I emailed the parties, including Ms. Peters, Mr. Reiner, and Ms. Peters'

---

[180] Reiner's Declaration, filed before Dorsey and Ms. Peters procured separate counsel, somewhat misleadingly conflates the issue of the timing of the decision to voluntarily dismiss with the actual filing of the voluntary dismissal.  Reiner's Declaration states that "The decision to actually file a notice pursuant to Rule 41(a)(1) was not made until after the Court stated… that it would not consider transferring the action…"  Reiner Decl. ¶ 5; see also Reiner Decl. ¶ 6 ("[A]fter the Court made that statement, Ms. Peters instructed me to have the Rule 41(a)(1) notice filed and to draft virtually the same complaint to file in Massachusetts…")  Reiner did not refer to the conference call with Wolters Kluwer counsel in that Declaration.  Although Reiner's Declaration gives the impression that the decision to dismiss was made before the Court's conference call, upon closer review, his Declaration is also susceptible to the (technically true) interpretation that while the decision to dismiss may have been made before the conference call (which Reiner did not mention), the formality of the decision to "actually file" the notice was made after the call (which Reiner did mention).

Additionally, insofar as Reiner's Declaration implies that the initial direction to draft the Complaint was given after this conference call, Reiner's Declaration is at best misleading.  The process of drafting the Complaint began the night before, after Dorsey had decided to recommend the strategy of voluntary dismissal.  See Dorsey Ex. N; see also 9/4/07 Tr. 188:3-9 (Reiner testified later that he worked on the Complaint "at the later stages, after a draft of it had been drafted…").

Ms. Peters, for her part, simply avers that Plaintiff (presumably her client Wolters Kluwer) made the decision to voluntarily dismiss after this conference call.  See Peters Decl. ¶ 132 ("Plaintiff did not decide to file a Rule 41(a)(1) dismissal until after Judge Baer rejected the change of venue…")  As noted above, this version of events is contrary to the evidence.  Notably, there is no evidence that Ms. Peters or Dorsey communicated with the client at all following the conference call with the Court.  The die had been cast earlier in the day.

[181] Gold stated that she received an email copy of the voluntary dismissal at the end of the business day. See 7/23/07 Tr. 55:3-5; Gold Decl. ¶ 18.  Isaacson, when he received his copy, did not notice that the provision of service electronically had been manually crossed out.  8/15/07 Tr. 36:10-15; see also Isaacson Decl. ¶ 17.

[182] As noted, Reiner avers that Ms. Peters instructed him not to notify the other side.  However, although Reiner received the previous instruction from Ms. Peters "not to tip off Rabin," there is no evidence that Reiner received a more specific instruction to cross out the provision for service by email on this Certificate of Service.

[183] Reiner averred that as the decision not to notify Defendants' counsel had already been made, "to inform the Court without notifying opposing counsel would have to be an ex parte conversation."  9/4/07 Tr. 185:14-20.  I suppose this was Reiner's philosophy that two wrongs make a right.

secretary, and offered to adjourn the hearing scheduled for Thursday, April 26 to Monday, April 30, I wrote that "[n]ot hearing from you by 6:00 P.M. tonight, I will assume this is doable for all concerned." See Rabin Decl. Ex. 27. Defendants' counsel responded that adjournment was acceptable. See Def. Exs. 26, 27. Dorsey did not respond.[184] The Court continued to be in the dark about the dismissal when I offered to delay the hearing a few days to accommodate counsel.

Q. Filing of Massachusetts Complaint

Reiner finalized the Massachusetts Complaint in the late afternoon and early evening of Friday, April 13.[185] Reiner Decl. ¶ 6.

Plaintiffs requested in the Massachusetts action, inter alia, a permanent injunction that would have granted much of the same relief as the previously-dissolved TRO in this Court, as well as injunctive relief against the new Defendant, Bahwan Cybertek. Rabin Decl. Ex. 33, at 30.[186] Indeed, Reiner called it "virtually the same Complaint." Reiner Decl. ¶ 6. Plaintiffs also requested attorneys' fees. Id.

Plaintiffs did not immediately serve the Massachusetts Complaint on Defendants.[187] Rabin Decl. ¶¶ 47-53.

Defendants aver that Plaintiff used information elicited from the "Attorneys' Eyes Only" depositions in the Massachusetts complaint, in violation of the "attorneys' eyes only" restriction, and the language in the Confidentiality Order that prohibits use of such information in "any other litigation." See Rabin Decl. ¶ 49 n.3; Chou Decl. ¶ 72;

---

[184] Ms. Peters opposes Defendants' motion for sanctions for "failure of Plaintiff's counsel to respond" in part on the grounds that "…[T]he Court's email by its very terms states it did not require a response." Peters Decl. ¶ 163. Ms. Peters turns the meaning of the Court's email on its head. The clear import of the email is that if no response was provided, the Court would assume that the TRO hearing, that Ms. Peters herself had requested to adjourn, would proceed on April 30, and that depositions in this action would proceed as well. See Rabin Decl. Ex. 27.

[185] Ms. Peters confirms that. "I was not involved in the finalizing, or the actual filing of the Complaint in Massachusetts, as I had already left the country. My partner, Marc Reiner, supervised that." Peters Decl. ¶ 282.

[186] Specifically, Plaintiffs requested a permanent injunction "enjoining Scivantage, its agents, employees, servants, and those acting in concert therewith, from making further use of plaintiffs' proprietary information and trade secrets"; "enjoining Scivantage and its agents and employees from marketing Maxit to plaintiff's clients and potential clients"; "enjoining Scivantage, its agents, employees, and all those acting in concert therewith from marketing, selling, or using Maxit for any customer or client"; "enjoining [Bahwan Cybertek], its agents, employees, servants, and all those acting in concert therewith, from making further use of plaintiffs' proprietary information and trade secrets." See Rabin Decl., Ex. 33 at 30.

[187] Ms. Peters does not dispute this, but merely avers that the Federal Rules of Civil Procedure allow 120 days for service of process. Peters Decl. ¶ 161.

Guirguis Decl. ¶ 19. Specifically, Defendants aver that a) the fact that Charchour was aware that Doss, Alves, and Routh had non-disclosure agreements with CCH; b) Scivantage's use of Bahwan Cybertek as its key technological consultant; and c) Scivantage's use of the SharePoint document management system were elicited during depositions. See id. Mr. Reiner avers that he (and other associates) reviewed the Massachusetts Complaint before filing, and "it was [his] intent, and I believe this intent was carried out in full," that the information in the Massachusetts Complaint was either in the previous New York Complaint or independently available from other sources. Reiner Decl. ¶ 6; 9/4/07 Tr. 233:12-234:3.

R. Plaintiff's Failure to Provide Documents on April 13

Plaintiffs did not produce any discovery by the Friday, April 13 deadline, other than the earlier referred-to 500 pages of press releases, etc. As Ms. Peters notes, "[P]ursuant to the Rule 41(a) notice, the discovery order was dissolved." Peters Decl. ¶ 165. Indeed, Ms. Peters avers that "…because counsel was working to get the [Massachusetts] complaint prepared, it did not take the time away from that important task… to do a document exchange." Peters Decl. ¶ 165.

Both Gold and Isaacson opine that they were unaware of Plaintiff's deadline to produce documents that day, April 13. See 7/23/07 Tr. 55:15-56:1; 8/15/07 Tr. 36:25-37:4.

S. Defendants' Delivery of Documents on April 13

At 7:14 P.M., Defendants' counsel James Chou emailed Marc Reiner and Ms. Peters to inform them that Defendants were ready to produce 3 CD-Roms of documents "within the hour." Chou Decl. Ex. 16. Chou also asked Reiner and Ms. Peters to confirm whether they would similarly produce documents, and mentioned that Ms. Peters had represented to him that Plaintiffs would produce two CD-Roms. Id. Interestingly, there was as yet no notice to Defendants of the filing in Massachusetts or that this New York case was to be dismissed. The Plaintiff failed to produce documents, although the Defendants produced documents without any notice as yet that the case was no longer a viable litigation in this District.

Incredible as it may sound, Both Ms. Peters and Mr. Reiner aver that they had no "forewarning" that Defendants would be producing documents to them that night, despite

the clear deadline for Defendants to produce on April 13 pursuant to my April 6 directives, and despite Ms. Peters' repeated entreaties to produce documents by that date, or else she would move for sanctions. See Reiner Decl. ¶ 8; Peters Decl. ¶ 166.[188] Indeed, Ms. Peters specifically referenced that April 13 deadline on April 11, when, at the Charchour deposition, she pushed Defendants to produce documents earlier. See Charchour Tr. at 328 ("…I'm leaving for Turkey on the 13th and producing documents to me for the first time on the 13th is going to impede my ability to prepare on the 26th…")[189]

Neither Mr. Reiner nor Ms. Peters responded to Mr. Chou's 7:14 P.M. email. Ms. Peters avers that she was on a plane to Turkey at this point.[190] Peters Decl. ¶ 46. Mr. Reiner avers that he was in his "colleague's office working," and that he did not check his email at this time, as he did not regularly carry his Blackberry around with him in the office.[191] 9/4/07 Tr. 190:7-19. While this may be true, it stretches credulity in a case like this, where email flowed back and forth constantly at all hours of the day and night.

At about 7:20 P.M., Akin Gump's employee Evandro Gigante, who was coordinating delivery of the documents with the Dorsey mailroom staff, called Dorsey's mailroom and told them that he was delivering a package to Marc Reiner. Gigante Decl. ¶¶ 7-8. The mailroom told him that Reiner was still in the offices. Id. at ¶ 8. Gigante communicated to Mr. Chou that Mr. Reiner was still in the offices. Chou Decl. ¶ 66. Chou called Mr. Reiner. Mr. Reiner did not answer his phone.[192] Chou Decl. ¶ 67. At

---

[188] "No one from Akin Gump had even given me forewarning…[O]nce again, Defendants are projecting their admitted bad conduct and obstructionist behavior on an innocent party." Peters Decl. ¶ 166.

[189] Additionally, Ms. Peters had complained to the Court in Plaintiff's April 12 Motion for Adjournment that Defendants had not produced documents in electronic form, rather than paper form; presumably, these documents would be due on April 13. See Pl. Mot. for Adjournment, Apr. 12, 2007 at 2. Although Plaintiff moved to adjourn the hearing date, Plaintiff did not move to adjourn Defendants' deadline to produce discovery.

Jeffrey Loop, for what it is worth, certainly was aware of the April 13 deadline to produce documents. See Loop Decl. ¶ 8 (referring to April 13 as the "scheduled date of the exchange.").

[190] It is not clear when, exactly, Ms. Peters left the office to go to the airport, when her flight boarded, and whether she had her Blackberry turned on during this time.

[191] See also 9/4/07 Tr. 192:13-18 ("…I carry around my Blackberry more often now, Your Honor.").

[192] Ms. Peters alleges that "Defendants do not allege they called Mr. Reiner directly to advise him of the delivery." Peters Decl. ¶ 168. Her contention is plainly contradicted by Mr. Chou's. Ms. Peters generally avers that Defendants "asked the Court to sanction Plaintiff and its counsel based on [Defendant's] surprise visit and surprise production and their ineffectual efforts to communicate between mail clerks instead of counsel of record." Peters Decl. ¶ 168.

about 7:50 P.M., Gigante called the same Dorsey mailroom employee, who said he had just seen Reiner in his (own) office. Gigante Decl. ¶ 9. Around 8 P.M., Akin Gump delivered 3 CD-Roms containing 153,000 pages of documents in electronic format to Dorsey & Whitney, along with a privilege log. Rabin Decl. ¶ 45; Rabin Reply Decl. ¶ 15, Ex. 9. Specifically, Defendants provided a) electronic copies of the approximately 54,774 pages it provided on April 11 in paper form, in response to Ms. Peters' further demands, and b) 98,474 pages of additional documents, in accordance with Ms. Peters' requests and the Court's discovery orders.[193] See Rabin Reply Decl. ¶ 15, Ex. 8, 9.

At 8:08 P.M., Mr. Chou emailed Mr. Reiner and Ms. Peters to inform them that the documents had been delivered. Chou Decl. Ex. 17. Mr. Chou asked for "the courtesy of a reply" regarding Plaintiff's documents and their intention of proceeding with depositions next week. Id. Neither Mr. Reiner nor Ms. Peters responded.

Mr. Reiner avers that he did not learn of the aforementioned events of Defendants' delivery until he returned home and read his emails around 9 P.M. Tr. 188:17-189:18. I found Mr. Reiner's testimony on this score less than credible.[194]

The next day, Saturday, April 14, at 11:52 A.M., Defendants' counsel Mr. Rabin emailed Mr. Reiner and Ms. Peters and demanded immediate production of Plaintiff's documents. See Rabin Decl. ¶ 53, Ex. 36. Mr. Rabin also represented that he would move for contempt on Monday, "for this and various other conduct." Id. At 12:53 P.M. that day, Mr. Chou emailed Mr. Reiner and Ms. Peters and asked to "work out the deposition schedule" with regard to witnesses that Ms. Peters had indicated were unavailable. See Chou Decl. Ex. 18. Neither Mr. Reiner nor Ms. Peters responded that

---

[193] Ms. Peters and Mr. Reiner averred at the time, and subsequently in their Declarations, that the documents Defendants provided to Plaintiffs on Friday, April 13 were the "same" as the documents previously produced by Defendants on Wednesday, April 11, and thus that Plaintiff did not actually accept "different" discovery after its dismissal of the case. See Reiner Decl. ¶ 8 ("They had produced the same documents in hard copies…"); Peters Decl. ¶ 167 ("Defendants falsely accuse Plaintiff of accepting discovery produced by Defendants after having dismissed the case. In fact, the truth is that the 3 CD ROMs produced on April 14 [sic] were simply identical information of [sic] the 22 boxes of documents *already produced on April 11 before Plaintiff had even considered a 41(a)(1) dismissal*. [Citation.] Therefore, this allegation is provably false.") (emphasis intact).

These contentions are clearly inaccurate. More disturbing, it is unclear how Ms. Peters or Mr. Reiner would have any basis to advance these contentions if, as Mr. Reiner contends, Reiner Decl. ¶ 8, Ex. B, Dorsey did not review these documents to ascertain their contents at the time they were received.

[194] See, e.g., 9/4/07 Tr. 191:7-11 (Court: "So you just went home and in the midst of this fairly upsetting and decidedly exciting in many ways litigation, you didn't bother looking at your email for several hours?" Reiner: "I didn't know anything was coming.").

day.  Defendants' counsel continued to work through the weekend to prepare for the depositions to take place during the upcoming week, Rabin Decl. ¶ 53, still without notice of the filing in Massachusetts.

On Sunday, April 15, 2007, at 1:21 P.M., Ms. Peters emailed Defendant's counsel Chou and Rabin from Turkey.  See Peters Decl. ¶ 164; Rabin Decl. Ex. 37.  She began, "I assume from below you did not get notice of our 41(a)(1) notice Friday."  Rabin Decl. Ex. 37.  She stated, "We filed our new claim Friday as well [sic] with a changed complaint," but there was no information as to where the claim was filed, nor in what court.  Id.  She informed Defendants' counsel that Plaintiff would not serve them until she received notice that they would be representing the Defendants, as "we are filing under seal."[195]  Id.  In fact, the Massachusetts complaint was not filed under seal.  See Chou Decl. ¶ 71; Rabin Decl. Ex. 33.[196]  Ms. Peters concluded, "There are no depositions next week as the previous matter has concluded and a new matter has replaced it."  Rabin Decl. Ex. 37.

T.  Plaintiff's Subsequent Refusal to Return Discovery

Defendants' counsel Mr. Rabin emailed Ms. Peters and Mr. Reiner at 5:25 P.M., Sunday, April 15, and asked Plaintiff to confirm whether it would return all of the documents, including the electronic documents Plaintiff requested, as they were delivered to Plaintiff's office Friday evening after its voluntary dismissal of the case.  See Peters Decl. Ex. 67; Rabin Decl. Ex. 38.  Ms. Peters responded, at 5:45 P.M., "No."  See Rabin Decl. Ex. 38.

At 6:01 P.M., Ms. Peters responded in more detail, stating that "[Y]ou are misrepresenting the facts about the timing of delivery.  The security at the front door and your emails to me on the point and your own delivery service will make clear that you are once again being dishonest…"  Rabin Decl. Ex. 38.  Ms. Peters stated, "We will comply with the timetable set forth in the court's order…"  Id.  Mr. Rabin emailed at 6:02, and 6:05 P.M., stating that the production was made Friday night, per Plaintiff's request, and

---

[195] "It is unclear to us whether they will be using you in the new case, and therefore because we are filing under seal and keeping things confidential, it is inadvisable for us to serve you until we are notified the clients want to use you in the new matter and want us to provide you with filings…"  See Rabin Decl. Ex. 37.

[196] The complaint was publicly available on PACER.  Chou Decl. ¶ 71.

asked Ms. Peters to confirm its return.  <u>See</u> Rabin Decl. Ex. 38; Peters Decl. Ex. 67.  At 6:16 P.M., Ms. Peters again refused, stating, "We have no obligation to jump through hoops for you at the first instance you make a demand when we and the court have been asking you to comply with timetables for weeks that you have thumbed your nose at."[197] <u>See</u> Rabin Decl. Ex. 38.

Ms. Peters stated, "Assumedly everything is relevant to the new action…"  <u>Id</u>. Although, as noted, Ms. Peters cited the section of the Confidentiality Order that provided for the return of documents within 90 days, she did not cite to its sections that prohibited use of discovery in "any other litigation proceeding."  Ms. Peters continued, "I am on vacation and will review the matter… when I return."  <u>Id</u>.

U. <u>Court's Order of April 16 to Return Discovery, and Plaintiff's Subsequent Copying of Discovery</u>

On Monday morning, April 16, 2007, at 9:39 A.M., Defendants' counsel Mr. Rabin informed the Court by email that Plaintiff voluntarily dismissed the case, accepted documents, and now refused to return them.  Rabin Decl. Ex. 39.  At 10:18 A.M., Mr. Reiner responded and stated that the document production was "contained in a single manila envelope" that "apparently contains discs" and "was delivered to my office on Friday while I was not there."  Rabin Decl. Ex. 39.  Mr. Reiner represented that the envelope "remains sealed and unopened," and "[t]he envelope will remain unopened until after Mr. Rabin and Ms. Peters have had the opportunity to resolve this matter."  <u>Id</u>.  Mr. Reiner did not see "any need for an emergency conference call."  <u>Id</u>.  At 11:21 A.M., Mr. Rabin also informed the Court, for its first inkling, that Plaintiff had filed the Massachusetts action.[198]  <u>See</u> Rabin Decl. Ex. 41.

---

[197] Ms. Peters generally continues to stand by these kinds of assertions.  <u>See</u>, <u>e.g.</u>, Peters Decl. ¶ 170 ("Defendants insisted on filing email motions… It was this irrational insistence on an immediate response that created the problem…"); <u>id</u>. at 183 ("Mr. Rabin sought to sandbag me while I was out of the country with emergency requests…"); <u>see generally</u> <u>id</u>. at 120 ("Plaintiff actively participated in discovery, tried to work out discovery issues with Defendants, accommodated Defendants' requests (for which Plaintiff was consistently rewarded with Defendants' sandbagging), met every deadline, and consistently acted in good faith.").

[198] Mr. Rabin also alleged that Plaintiff had used information from the "attorneys' eyes only" depositions in this action in its complaint filed in Massachusetts.  <u>See</u> Rabin Decl. Ex. 41.  Mr. Reiner, at 11:32 A.M., challenged this assertion, stating that the information it used in the Massachusetts complaint was either publicly available or came from Plaintiff's clients.  <u>See</u> Rabin Decl. Ex. 41.

At 12:25 P.M., Ms. Peters emailed Reiner and expressed her belief that the information in the transcripts of the depositions (that had been ordered "attorneys' eyes only" by Judge Castel) was not confidential.[199]  See Peters Ex. 40.  Reiner emailed back at 12:29 P.M. and informed Ms. Peters that the Confidentiality Order precluded use of the deposition transcripts in different litigation.  See id. ("we will move to file under seal ASAP, but that doesn't address the issue that confidential information cannot be used in a different litigation per the order.")  Ms. Peters emailed back at 12:35 P.M. and told Reiner, despite her email to Defendant's counsel the prior day canceling depositions because "the previous matter has concluded and a new matter has replaced it," that "this is not a different litigation.  This is the same litigation in another venue."  See id.

Shortly before 2:45 P.M., on April 16th, my law clerk set up a conference call between the parties and myself.  See Dorsey Ex. P.  Reiner informed Ms. Peters by email. Id.  After a short exchange, at 3:17 P.M., Ms. Peters emailed Mr. Reiner and stated, "I am going to want a copy made of the discs no matter what the judge says… We have a right to retain this because it is derivative of our info… I will take the heat for that decision, but I am going to want a copy made no matter what."[200]  Id.

The conference call with Mr. Rabin and Mr. Reiner began at about 3:20.[201] 9/4/07 Tr. 198:20-22.  The substance of the conversation was Defendants' request to have the documents returned.  9/4/07 Tr. 200:9-11; Rabin Decl. ¶ 57.  Reiner raised the argument that the Massachusetts litigation was substantively the same as the new

---

[199] Ms. Peters expressed the argument, which she would return to, that the "attorneys' eyes only" deposition testimony was no more than information that had already been disclosed before the "attorneys' eyes only" depositions, and thus, despite Judge Castel's order of the depositions as "attorneys' eyes only" until further order of this Court, this Court's subsequent order of April 6 providing that the depositions remained "attorneys' eyes only," and this Court's Confidentiality Order of April 12 providing for procedures to govern "attorneys' eyes only" materials (including procedures to challenge "attorneys' eyes only" designations), but further providing that "attorneys' eyes only" material remained so until further Order of this Court (or consent by Defendants), that the information was not presently "attorneys' eyes only."  See Peters Ex. 40 ("… the stuff we have in the transcript is no more than his statement that he submitted before attorneys' eyes only was imposed…"); see also id. (Ms. Peters stated at 12:35 P.M., "We haven't discussed a single thing about their trade secrets.").

[200] Ms. Peters also averred that she would "take it up with Judge Stearns under the crime fraud exception." See Dorsey Ex. P.

Prior to these statements, Ms. Peters directed Reiner that "if the Court asks when we decided to dismiss and remove THAT is ATTORNEY CLIENT PRIVILEGED." (emphasis intact).  See Dorsey Ex. P.

[201] Because Ms. Peters has put in issue untranscribed conversations with myself or my law clerk by seeking the testimony of myself or my law clerk regarding those conversations in connection with her motion for my recusal, I will endeavor not to rely on my (or my clerk's) independent recollection of this conversation.

litigation. 9/4/07 Tr. 200:14-23. Reiner also raised Plaintiff's concerns that Defendants would "spoliate" evidence. 9/4/07 Tr. 200:14-23. In part to cap the escalating controversy over Plaintiff's accusations of spoliation, and according to both Mr. Reiner and Mr. Rabin, I ordered Dorsey to return the documents that Defendants had produced into the Court's custody and to do so within 24 hours. 9/4/07 Tr. 200:24-201:3; Rabin Decl. ¶ 57.

At 3:48 P.M., Mr. Reiner emailed Ms. Peters in Turkey to inform her of the results of the call. Reiner informed Ms. Peters that "the Court ordered all of the documents be sent to the Court within 24 hours."[202] Dorsey Ex. Q. In one more shocking example of what at best may be described as unprofessional conduct, Ms. Peters emailed back at 3:54 P.M., "This is exactly what I thought would happen which is why I told you I want copies of the disc[s]."[203] Id.

Ms. Peters and Mr. Reiner subsequently spoke on the telephone around (most likely slightly before) 4:30 P.M. Eastern time.[204] 9/4/07 Tr. 203:6-13. Ms. Peters told Reiner that she wanted to have the documents copied, and that Dorsey would retain the copies.[205] 9/4/07 Tr. 203:14-22. Ms. Peters reiterated that it was "her decision." 9/4/07

---

[202] Mr. Reiner's email to Ms. Peters read in full:

"We just had the conference call with the Court.

Rabin complained about us having their documents, etc. now that the case is over. I explained that the documents were governed by the destruction procedures in the protective order, that the documents would be necessary in the MA action, and that there was a real danger of spoliation. The Court didn't seem to care about the protective order, said we should seek new discovery in MA, and that we could store the documents in his chambers if we were worried about spoliation. The court ordered that all of the documents be sent to the Court within 24 hours.

The Court was clearly under the impression that we filed the 41(a)(1) notice while we were on the phone with him talking about deposition times and was rather upset about it. He seemed to be happy to be done with the case, but he cryptically suggested, twice, the notion that he could still issue sanctions and all but invited Rabin to make such a motion. Rabin undoubtedly will do so, but that would be just b.s... There's no basis for any belief that we did anything improper by bringing the case.

Rabin did not bring up any issues regarding anything in the MA complaint."

See Dorsey Ex. Q.

[203] By her own admission, Ms. Peters states that "… I believed the Court's oral order involved… a return of [Defendants'] April 11 and April 13 production of documents." Peters Decl. ¶ 267.

Regarding her prior email that she wanted copies of the documents made "no matter what," Ms. Peters averred that when this Court actually ordered the return of the documents, she "obeyed it… Liking an order and obeying an order are two different things, and I understood the difference." 9/11/07 Tr. 183:6-14. Ms. Peters' contention is belied by her contemporaneous email shortly after she learned of my order.

[204] Reiner remembers that Ms. Peters called him; Ms. Peters remembers that Reiner called her. See Peters Decl. ¶ 267; 9/4/07 Tr. 203:8-9.

[205] According to Reiner, Ms. Peters also told Reiner that as soon as she returned, she would "not keep the

Tr. 203:23-204:3. Reiner told Ms. Peters that he didn't think that this was a very good idea, and that he thought it would be better simply to return the documents.[206] 9/4/07 Tr. 204:4-7; 9/11/07 Tr. 266:1-12. Ms. Peters, according to her, explained to Reiner that if he filed a motion for a protective order that act alone—i.e. the act of filing—created a "legal safe haven."[207] 9/11/07 Tr. 264:10-17, 268:20-269:7.

Reiner approached a colleague seeking guidance, who suggested he contact Richard Silberberg, a Dorsey partner who also served on Dorsey's management committee and as the head of Dorsey's advocacy practice. 9/4/07 Tr. 72:23-74-12, 77:3-7; 205:6-17. Reiner went to Silberberg's office. 9/4/07 Tr. 77:3-7, 205:18-23. Reiner told Silberberg about the conference call with the Court and that the Court had directed that documents be produced to the Court. 9/4/07 Tr. 77:19-78:3, 205:18-23. Reiner told Silberberg that he had called Ms. Peters in Turkey and told her the results of the conference call, that Ms. Peters had indicated that she wanted to have a copy of the documents made before returning the documents to the Court, and that Reiner had told her not to make copies, but that Ms. Peters had resisted that suggestion. 9/4/07 Tr. 78:3-21, 205:18-23. Reiner told Silberberg that he was concerned that Ms. Peters' course of action would violate the Court's order. 9/4/07 Tr. 78:3-21.[208]

Silberberg told Reiner that Dorsey would not make copies of these documents and would comply with the Court's order. 9/4/07 Tr. 78:25-79:2, 205:24-206:3. (Silberberg testified that he was not aware at this time that copies were already being made, if they were. 9/4/07 Tr. 80:7-21.) Reiner asked that someone else communicate that information to Ms. Peters, as Reiner had already tried to convince her that copies not be made, and further complicating matters, that Mr. Reiner's wife worked for Ms. Peters'

---

[206] secret but go right down to Chief Judge Wood's chambers and tell Chief Judge Wood what she had done [and] why she had done it…" 9/4/07 Tr. 203:16-22.

[206] Mr. Reiner averred that he did not use stronger language regarding the Court's order because "[t]his was something that it was clear that Ms. Peters was determined on and I worked enough with Ms. Peters to know that I was not going to be successful in changing her mind on this." 9/4/07 Tr. 208:1-6.

[207] I inquired as to Ms. Peters' concept of this "legal safe haven," "Is there any view that you hold that has any legitimacy whatsoever that suggests that by filing a motion you create something like a safe haven without a Judge's signature?… [W]hy bother having me… sign an order? Just file it and you are home free." See 9/11/07 Tr. 269:16-271:4. Ms. Peters eventually conceded that "if you file it and say, please, that's not an order." See id. at 271:11-13.

[208] Reiner, according to Silberberg, also told Silberberg that Ms. Peters had indicated her intention to raise the matter of the transcripts with Chief Judge Kimba Wood. 9/4/07 Tr. 82:16-21, 83:1-7.

husband at a different organization, making their relationship awkward.  9/4/07 Tr. 79:4-11, 206:5-207:2.  Silberberg contacted Zachary Carter, head of the New York trial group, and asked Carter to broach the matter with Ms. Peters.  9/4/07 Tr. 79:12-80:1, 206:5-13; 9/11/07 Tr. 15:2-17.[209]

Reiner emailed Ms. Peters and Carter at 4:39 P.M. and informed her that Carter would be calling her.[210]  Dorsey Ex. QQ.  Mr. Carter called Ms. Peters in Turkey.  9/11/07 Tr. 17:20-18:16.  Carter remembered this conversation as heated.[211]  9/11/07 Tr. 20:14-17.  Ms. Peters expressed her view to Carter that if Dorsey returned the documents to this Court, that I might eventually rule against her and require that the documents be returned to Defendants, and thus the documents would be unavailable to her to use in Massachusetts.[212]  9/11/07 Tr. 18:21-19:22.  Ms. Peters expressed that she wanted to seek a protective order to retain a copy of the documents to use in Massachusetts.[213]  9/11/07 Tr. 19:23-20:1.  Carter told her that seeking a protective order was appropriate, but the mere filing of a protective order would not remove her obligation to return the documents pursuant to the Court's order.  9/11/07 Tr. 20:2-7, 8-14 ("…[W]hether she agreed with your order or not she had to comply with it, [and] until and unless she had successfully applied to you for a protective order, we were under an obligation to return the documents to the Court as directed by the deadline that had been set by the Court.").

Carter was unclear on whether he was aware that copies were already made, or in the process of being made, if they were being made.  9/11/07 Tr. 21:9-13.  Ultimately, Carter avers that he communicated to Ms. Peters that she could direct the copying of documents, so long as all the copies were delivered to the Court by the deadline to return documents if Dorsey had not successfully obtained a protective order in the meantime.[214]

---

[209] Silberberg excused Reiner from responsibility at this time of pursuing the issue of the copying of the documents, but averred that it was not his intention to excuse him of responsibility for the litigation generally.  See 9/4/07 Tr. 89:18-90:22.

[210] Subsequently, Ms. Peters called Reiner and expressed her displeasure with Reiner's decision to talk to Carter without talking to her first.  9/4/07 Tr. 209:5-11.

[211] Ms. Peters did not.  See 9/11/07 Tr. 93:5-94:8

[212] "Because of Ms. Peters' concerns… she was not confident that when the Court indicated that it was going to be a neutral custodian of the documents that the documents would not be turned over… back to the defendants… and consequently unavailable."  9/11/07 Tr. 19:12-22.

[213] Ms. Peters also advanced the idea that because the April 16 order was oral, that it might not be a valid order at all.  See 9/11/07 Tr. 22:6-16.

[214] "…The issue was retention of the documents.  It was clearly the heart of your order that we should not

9/11/07 Tr. 21:14-22:1, 23:18-24:5. Carter understood, however, that the turnaround time to draft a protective order, let alone receive action upon it by the Court, by the next afternoon was quite short.[215] 9/11/07 Tr. 23:3-24:5.[216]

At (it appears) about 5:30 P.M. or so, Ms. Peters attempted to call her secretary at Dorsey.[217] 9/12/07 Tr. 420:19-22. Dorsey's secretary supervisor, Eve Morris, overheard the page for Ms. Peters' regular secretary, and as Ms. Peters' secretary had left for the day, Ms. Morris answered.[218] Id. Ms. Peters asked Ms. Morris to make copies of documents, and to work with Marc Reiner on the project. 9/12/07 Tr. 420:23-421:7. Ms. Morris called Reiner, informed him that Ms. Peters had directed her to make copies of the documents, and asked where the documents were located. 9/4/07 Tr. 204:16-21; 9/12/07 Tr. 421:12-14. Reiner told her where the documents were, although Ms. Morris testified that Reiner was "reluctant to speak" to her and said, "I really don't want anything to do with this."[219] 9/12/07 Tr. 421:15-20; 9/4/07 Tr. 205:1-5. At 5:53 P.M., Ms. Morris emailed both Ms. Peters and Mr. Reiner and informed them that another Dorsey employee "was in the process of having the 22 boxes of documents picked up… and copied overnight." Ex. KP-41.

At 6:31 P.M., Ms. Peters left a voicemail for Mr. Reiner telling him that she had spoken with Mr. Carter, that she had spoken with the secretary, Eve Morris, that the documents would be copied, and that a motion would be made to Judge Baer seeking the immediate transmission of the documents to Massachusetts.[220] See Dorsey Ex. R.

---

be in possession of originals or copies. However, if she wanted to copy or direct the copying of documents before our deadline to return those documents and if she managed to secure from the Court a protective order that permitted us to retain those documents before the deadline had expired, that would be fine… [S]he could make a million copies…" 9/11/07 Tr. 21:14-24.

[215] Carter averred, "Actually, your Honor… with the aid of a Blackberry and a laptop, extraordinary things can be done long distance…" 9/11/07 Tr. 23:7-9.

[216] Carter also suggested at this time that Ms. Peters return early from her vacation. 9/11/07 Tr. 29:19-30:6.

[217] Reiner remembers that Ms. Peters called Eve Morris before he spoke to Carter. 9/4/07 Tr. 204:18-206:13. This appears implausible, both because a very short amount of time passed between Reiner's earlier conversations with Ms. Peters and the conversation between Mr. Silberberg and Carter, and because Ms. Morris remembered that her conversation with Ms. Peters happened around 5:30, as she was "working late" and that Ms. Peters' regular secretary had already left. 9/12/07 Tr. 420:19-22.

[218] Ms. Peters professed not to recall this exchange. See 9/11/07 Tr. 262:3-13.

[219] Ms. Peters advanced the contention on cross that it was Reiner's idea to copy the documents, and that Reiner had recommended that Ms. Peters call Eve Morris. Reiner characterized that notion as "beyond false" and almost "delusional." 9/4/07 Tr. 259:1-3.

[220] "This is what we are thinking of doing, filing/copying the documents tomorrow/tonight which… Eve

(transcription of voicemail). Ms. Peters added that Dorsey would "not retain a copy." See id. Ms. Peters also directed that a motion be made to the Massachusetts Court, wherein "we should attach the copies of the transcript… and maybe the reply brief that we filed so that… Judge Stearns' court can see what we are talking about…" Dorsey Ex. R.

At 6:49 P.M., Ms. Peters followed up with an email to Reiner confirming the plan and, stating, inter alia, that Judge Stearns in Massachusetts now had "joint jurisdiction." Peters Ex. 39.[221] Reiner emailed back and again expressed concern regarding the provisions of the Confidentiality Order, stating that the motion to Judge Stearns "may be a bit tricky since the evidence of spoliation, etc. is still Highly Confidential."[222] Id. Ms. Peters responded at 7:00 P.M. and, inter alia, stated flatly, "Evidence of spoliation is not still highly confidential." Id. Ms. Peters represented that she would draft the motion to this Court. Id.

Reiner, according to him, felt that even though Dorsey was copying documents that the Court had ordered to be returned, because Dorsey would not be retaining those documents past the Court's deadline to return them, Dorsey was (technically) complying with the Court's order.[223] 9/4/07 Tr. 211:24-212:9. See also, Tr. 224:3-16.

The next morning, Tuesday, April 17, Reiner instructed an associate to draft a protective order to this Court, as he had seen no draft from Ms. Peters, and the deadline to return documents was approaching.[224] 9/4/07 Tr. 212:19-213:1. At 11:15 A.M., Reiner forwarded that draft to Ms. Peters. Dorsey Ex. S. Around this time, Dorsey gave

---

Morris says can be done by tomorrow. Filing a motion for protective order with Judge Baer tomorrow… and tell… the court that we would like a copy made for Judge Stearns as well… So that's what we are going to try and do… Preserve a copy, tell them that we are doing it, tell them that we are going to immediately send it to Judge Stearns to preserve as evidence in this case… So in other words, a protective order with Judge Baer saying a second copy will go to Judge Stearns, and then inform Judge Stearns why these documents are being sent to him copying pages of the transcript, etc." See Dorsey Ex. R.

Ms. Peters also opined that Carter "thought that was better… than asking Kimba Wood to do it." Id.

[221] "Let's do a motion for a protective order informing the Court that we are filing a copy with [Judge Stearns] as he now has joint jurisdiction." See Peters Ex. 39.

[222] See also 9/4/07 Tr. 213:8-20 (Reiner testified that he was aware of the provisions of the Confidentiality Order at this time).

[223] See also 9/4/07 Tr. 223:12-15 (Court: "… [T]he idea was that you wouldn't have any copies, right? I mean that was the substance of the order." Reiner: "That we would not *retain* any copies after the deadline you set, yes…") (emphasis added); see also 9/4/07 Tr. 224:17 (Reiner: "This was not my plan, Your Honor.").

[224] Reiner was aware at this point that copying had already begun. See 9/4/07 Tr. 218:11-219:3.

instructions to a mailroom employee to bring the original 22 boxes of documents down to the Court, but to wait outside the courthouse and not deliver them until the motion for a protective order had been filed and Dorsey gave the go-ahead.  9/4/07 Tr. 219:16-220:4.

At 12:15 P.M., Ms. Peters emailed back with comments, and reiterated that she envisioned that Dorsey would "do the copying necessary whilst filing a protective order."[225]  Dorsey Ex. T.  At 12:19 P.M., in response to an email from Reiner asking about the timing of delivery of boxes to the Court, Ms. Peters responded that "we should send the motion before we send the documents."  Peters Ex. W.  Ms. Peters, in contradiction to her earlier voicemail providing that Dorsey would "not retain a copy," now added that "[o]nce all the copies are made," Reiner should send Defendants' original documents to this Court, but "retain the copies of the 22 boxes until such time as Judge Baer rules on our motion."[226]  Peters Ex. W.  Ms. Peters and Reiner traded emails about the draft of the motion for a protective order during the next two to three hours.  See Dorsey Ex. T.

At 2:55 P.M., Reiner emailed Ms. Peters, informed her that the boxes were due shortly, and asked her if she had any further comments on the motion.  Dorsey Ex. T.

At some point this day, Reiner spoke with Isaacson.[227]  Reiner mentioned that Defendants had produced additional documents on Friday, April 13, that the Court had requested that they be returned, and that Dorsey was in the process of drafting a motion to transfer the documents to the Massachusetts court.  See 8/15/07 Tr. 37:15-39:13.  Isaacson instructed him not to file the motion and to return the documents to this Court.[228]  See 8/15/07 Tr. 39:3-13.

---

[225] Ms. Peters averred on cross that she intended this email to be a final directive to file the motion, although Reiner rebutted that Ms. Peters had directed him to provide materials to her for review before filing them with the Court.  See Tr. 246:18-247:3.

[226] Ms. Peters added that "[i]n the meantime, we should not review the docs as we are holding them here in escrow for Judge Stearns…"  Peters Ex. W.

[227] Isaacson remembered this call as taking place in the afternoon, but was not sure.  See 8/15/07 Tr. 38:7-13.

[228] Isaacson testified that he was not aware at this time that the Court had held a conference call on April 16, or the substance of that call, or of my email of 4:48 PM that day again ordering the return of discovery.  See 8/15/07 Tr. 39:24-40:16.  It does not appear that Isaacson was aware that copies had been made.

## V. Court's Order of April 17 to Return Discovery

On Tuesday, April 17, 2007, at approximately 2:45 P.M., Dorsey's mailroom employee delivered 22 boxes of Defendants' discovery from Plaintiff, as well as the aforementioned envelope that contained three CD-Roms, and Defendants' privilege log. Contrary to Mr. Reiner's prior representation, however, that envelope was not sealed and was opened. My law clerk emailed the parties at 3:02 P.M. to communicate this information.[229] See Rabin Decl. Ex. 40.

Around this time, Reiner spoke with Carter and informed him that copies of the documents had already been made (without a motion having been filed, let alone acted upon) and that the Court's law clerk had communicated that the envelope containing CDs had been opened. 9/4/07 Tr. 217:14-20; 9/11/07 Tr. 24:6-25:11. Carter expressed surprise that copies of the CDs had been made before the motion had been filed.[230] 9/4/07 Tr. 217:14-20, 9/11/07 Tr. 24:6-25:11. Carter and Reiner agreed to notify the Court that copies had been made. 9/4/07 Tr. 217:21-218:2.

At 3:36 P.M., Mr. Reiner informed the Court that Dorsey had made "copies of those documents… in connection with a motion we plan to file shortly," because the "issue of spoliation will be before Judge Stearns."[231] Rabin Decl. Ex. 41. Mr. Rabin responded at 4:03 P.M. that he was "incredulous," and would have remained ignorant of the unsealing and copying were it not for my law clerk's email. Rabin Decl. Ex. 42. Mr. Rabin also noted that the "spoliation" issue is a "phantom of plaintiff's imagination," since the documents were now in the custody of this Court. Id. Mr. Rabin requested the return of all copies of all documents in its possession to the Court immediately. Id.[232] Mr. Rabin noted that the Confidentiality Order barred the use of documents in other litigation (including the Massachusetts action), and at 4:15 P.M., specifically noted the

---

[229] On Dorsey's part, Reiner expressed surprise that the mailroom employee had "jumped the gun" and delivered the documents without specific go-ahead. See Dorsey Ex. T.

[230] It is unclear whether Carter knew or understood that copies of the boxes had been made at this point. See 9/11/07 Tr. 24:11-17 (this was apparently "the first time [Reiner] had indicated that there was also an envelope that had disks and there was some issue as to whether or not the disk was being copied…").

[231] Carter approved the sending of this email. 9/4/07 Tr. 222:9-16.

[232] Mr. Rabin stated, "I understand Mr. Reiner to be stating that he has violated the Court's Order of yesterday afternoon, by making a copy of all documents supplied to him before returning the originals to the Court. I thus understand him to be saying that… he continues to possess the documents that the Court ordered be returned to it.." Id.

language of Paragraph 7(a) of the Confidentiality Order that stated, <u>inter</u> <u>alia</u>, that protected material could not be used in "any other litigation proceeding." See <u>id</u>.; see also Email of Richard Rabin, Apr. 17, 2007 4:15 P.M. Mr. Reiner reiterated, at 4:15 P.M. (despite his prior warnings to Ms. Peters), that "[c]opies of the documents were made so that Judge Stearns may have a copy." See Email of Marc Reiner, Apr. 17, 2007, 4:15 P.M.[233]

At 6:17 P.M, Isaacson emailed Ms. Peters, copying Gold, and summarized "from his notes" the points that Ms. Gold made at the end of their Friday conversation, which included, <u>inter</u> <u>alia</u>, that "we are okay with filing the [Massachusetts] complaint, with no request for an expedited discovery process," that "we need to have a more detailed review of the case with you… before proceeding with the Massachusetts action beyond filing the complaint," and that "if we proceed, early on we need to address the protective order with the Court in Massachusetts."[234] Ex. WKFS 18.

Sometime this Tuesday evening, Reiner called Ms. Peters and requested to be removed from the case, owing particularly to the awkward situation of their spouses working together. 9/4/07 Tr. 229:17-230:11.

On Wednesday, April 18, at 9:16 A.M., after Ms. Peters responded to Isaacson's email, Gold emailed Peters (copying Isaacson) and reiterated her desire for a "sit down… after we had the chance to review what we could legally have access to from the prior proceeding." Ex. WKFS 18. Gold asked as well that the client be more fully informed "along the way" than perhaps had been requested in Ms. Peters' prior work for the company. Ex. WKFS 18. Gold also stated, "We expect to review pleadings in advance of their filing." Id.

Also on Wednesday, April 18, in the morning, Dorsey returned their copies of Defendants' documents to Defendants' counsel at Akin Gump. 9/4/07 Tr. 228:22-229:1. Mr. Reiner also arranged for the return of documents produced separately by Defendant Sanjeev Doss to Doss' separate counsel.[235] 9/4/07 Tr. 229:7-16.

---

[233] Mr. Reiner also stated that "it was our understanding that the Court's Order addressed that the Court be given custody of all copies of defendants' documents." See Email of Marc Reiner, 4:15 P.M., Apr. 17, 2007.

[234] Isaacson also requested an estimate of costs incurred so far. See Ex. WKFS 18.

[235] Doss' counsel had informed Reiner the night before that Doss had produced documents separately to Plaintiff, and requested their return. 9/4/07 Tr. 229:7-16.

On Wednesday, April 18, in the afternoon, Ms. Peters removed Reiner from the case. 9/4/07 Tr. 231:15-20. Reiner avers that the reason was the stress of their personal situation with their spouses. 9/4/07 Tr. 230:8-11. Ms. Peters advanced the contention that she fired Reiner from the case because when he returned Doss' documents directly to Doss' counsel the prior day in an effort to comply with my April 17 order, without telling Ms. Peters, he had (according to Ms. Peters) violated my April 16 order that directed Dorsey to return Defendants' documents to the Court (which, although it goes without saying, was superseded by my April 17 order).[236] 9/4/07 Tr. 254:23-255:10; 9/11/07 Tr. 280:3-15. At some point this day, Ms. Peters also called the first-year associate Jordan Brackett, directed him that documents and briefs could leave Dorsey's offices only at her direction, and criticized Mr. Reiner's return of the documents.[237] Brackett Decl. ¶ 10.

Dorsey witnesses generally agree that at this point and onward, Ms. Peters possessed overall responsibility for the handling of the case, despite being on vacation. See 9/4/07 Tr. 91:23-92:2 (Silberberg testimony); 9/11/07 Tr. 29:7-12 (Carter testimony).[238]

At 5:03 P.M., Mr. Rabin represented to the Court that he had received only two of the three CD-Roms that I had previously ordered Plaintiffs to return to Defendants. See Email of Richard Rabin, Apr. 18, 2007 5:03 P.M. Mr. Reiner avers that only two copies were able to be made in the short time period that Dorsey possessed the CDs, and thus, only two were returned.[239] See Reiner Decl. ¶ 10.

---

[236] See 9/4/07 Tr. 254:23-255:10 (Ms. Peters, as counsel, cross-examining Reiner: "And it was immediately after I believe that you had violated that Court order and returned the transcripts to [Doss' counsel] Mr. Richardson instead of the Court that I asked you to step down, isn't that right?"); see also 7/23/07 Tr. 57:11-17 (Ms. Peters, as counsel, to Court: "Mr. Reiner didn't ask to be removed. I took him off the case because he was sending things out without review and much of which was erroneous… and telling me things about the Court's order that turned out not to be true. And the e-mail correspondance shows that I fired him.").

Ms. Peters, as witness on direct, later contradicted her statement as counsel that she "fired" Reiner. See 9/11/07 Tr. 280:24-281:12 ("I think fire is a very strong word…")

[237] Specifically, Brackett relates in his Declaration that Ms. Peters told him that Mr. Reiner's willingness to return the documents pursuant to a Court order was glaring evidence of his "inexperience and nervousness," and that Brackett should only follow her lead in this case, as Ms. Peters did not get "nervous," and would not have made the same "mistakes" such as returning the documents. See Brackett Decl. ¶ 10.

[238] Carter testified, "the responsibility of a litigation remains with the partner in charge of that litigation whether they're in New York or Timbuktu…" See 9/11/07 Tr. 29:7-12.

[239] Defendants noted that the underline middle copy of the three CDs was missing, see Rabin Decl. ¶ 61; Chou Decl. ¶ 77, which appeared strange. (So the argument goes, if Plaintiff's counsel began to copy the three CDs

On Wednesday, April 18, 2007, Mr. Rabin also forwarded to the Court Reiner's letter to Defendants of April 17, in which Plaintiff objected to the designation of the deposition transcripts as "attorneys' eyes only," and provided its own designations of "attorneys' eyes only" material in the six transcripts.[240] Mr. Rabin also forwarded to the Court Reiner's subsequent letter to Defendants of April 18, in which Plaintiff "clarified" its letter of April 17 to state that it "object[ed] to the designation of any of the defendants' deposition transcripts as "Confidential" or "Attorneys' Eyes Only." Defendants argued at that time that "plaintiff has voluntarily dismissed this suit, leaving no valid reason to… use [the transcripts] in any new action." Defendants specifically requested that Plaintiff turn over to Defendants all copies and originals of the deposition transcripts in this action.

On Thursday, April 19, the Court's law clerk, at my direction, held a conference call with Defendants' counsel Mr. Chou and Plaintiff's counsel Mr. Reiner to ascertain the situation.[241] Mr. Reiner represented that he could not answer questions about the missing CD-Roms, as he had been transferred off the case due to "internal staffing issues." Chou Decl. ¶ 78; 9/4/07 Tr. 234:9-235:10. My law clerk asked who could speak about the case. 9/4/07 Tr. 235:3-5. Mr. Reiner represented that as Ms. Peters was in Turkey, and Deidre Sheridan was unavailable at that time, that no one was currently available to speak with the Court. See Chou Decl. ¶ 78; 9/4/07 Tr. 235:3-10.

W. Court's Conversation with Zachary Carter on Thursday, April 19

That afternoon, Thursday, April 19, I contacted Bob Dwyer, the managing partner at Dorsey & Whitney's New York office, who advised that I should contact another partner, Zachary Carter. 9/4/07 Tr. 236:2-5, 9/11/07 30:19-24. My law clerk spoke with Mr. Carter briefly and scheduled a conversation between Carter and I that evening. 9/4/07 Tr. 30:25-31:5.

---

and stopped, it would have copied the first two.)

[240] It is worth noting that the Protective Order provides that "Discovery Material… may be so designated by such Producing Party…" and does not similarly provide that the Receiving Party may designate material. Protective Order ¶ 3(a).)

[241] Because Ms. Peters has put in issue untranscribed conversations with myself or my law clerk by seeking the testimony of myself or my law clerk regarding those conversations in connection with her motion for my recusal, I will endeavor not to rely on any independent recollection of my law clerk of this conversation.

Mr. Carter subsequently called Ms. Peters in Turkey to discuss the matter with her. Peters Decl. ¶ 197; 9/11/07 Tr. 31:13-32:1. Ms. Peters requested to be on the conference call with the Court. 9/11/07 Tr. 32:2-4. Carter communicated to Ms. Peters that he thought it was in Dorsey's best interest that, given that the Court appeared to be concerned about the conduct of counsel, Ms. Peters not be on the call.[242]   9/11/07 Tr. 32:5-13, 102:15-103:3. Ms. Peters communicated her concerns of "spoliation" to Mr. Carter. Peters Decl. ¶ 197. While hard to believe, it appears that the concerns about spoliation were concerns about what the Court might do with or to the records.

At 4:34 P.M. that evening, Defendants had faxed to Dorsey (and shortly thereafter, to the Court) a proposed Order that would have required Plaintiff to return and/or destroy all copies of transcripts taken in this action, and communicated at my direction that any counter-proposal would be due by 10 AM the next day. See Dorsey Ex. K.

Mr. Carter then called me at about 7:30 P.M. that night. 9/11/07 Tr. 32:14-17. I expressed concern about Dorsey's compliance with orders, and the fact that no one assigned to the case was available to speak to me about the case. 9/11/07 Tr. 32:20-33:11. I told Carter that I wanted the transcripts of depositions to be returned by noon the following day, Friday, April 20.[243]   9/11/07 Tr. 33:11-13, 34:9-11, 35:18-25. Carter testified that he considered that to be an order. 9/11/07 Tr. 80:20-22. Carter told me that Dorsey would comply with that deadline. 9/11/07 Tr. 34:6-8.

Mr. Carter then called Ms. Peters in Turkey, where it was approximately 3 A.M., and communicated the contents of our phone call, including my order to return the transcripts by noon the next day. 9/11/07 Tr. 38:7-22. This conversation was heated as

---

[242] Ms. Peters avers that had she been in the United States, or been able to oversee the transcript return, the transcripts would have been returned more promptly. See Peters Decl. ¶ 199 ("[N]ot a single counsel of record was included in the phone call… I expressed my desire to be on the call with Judge Baer and felt that the other attorneys of record should be, too."); id. at ¶ 209 ("It was obviously unfair to Mr. Carter to have been pulled into this issue… had Defendants allowed me to address the issue in an orderly fashion upon my return… a more accurate search could have been done."). Of course, had Mr. Reiner not represented that no Dorsey attorneys were available to speak with the Court, it never would have been necessary to contact the managing partner of Plaintiff's law firm.

[243] Regarding the issue of whether my prior April 16 or April 17 orders to return "all discovery" encompassed transcripts, Carter testified that "Whether or not it was a reinterpretation of an old order or a new order… articulated on the phone on the 19th it was clear at this point [the Court was] demanding return of the transcripts of the depositions…. All of them, correct." 9/11/07 Tr. 36:3-9.

well.[244]  9/11/07 Tr. 40:11-13, 141:10-13.  Ms. Peters initially expressed that this Court's order was not a valid order.  9/11/07 Tr. 38:25-39:1, 40:15-17 (Carter testified, "It was difficult to get Ms. Peters to accept that even if she disagreed with the Court's order, that we had to obey it.").  Ultimately, however, Carter and Peters agreed to return the transcripts the next day, and to draft a letter to the Court to accompany them.  9/11/07 Tr. 39:1-13.  Deidre Sheridan began drafting that letter that night.[245]  9/11/07 Tr. 39:6-13.  Deidre Sheridan also oversaw the collection of transcripts.  9/11/07 Tr. 86:20-87:7.

X.  Dorsey's Representation of the "Return" of Transcripts

At some point on the evening of Thursday, April 19 or the early morning of Friday, April 20, Ms. Peters informed Carter that she had copies of "minuscript" drafts of the transcripts at her home in Connecticut.  9/11/07 Tr. 50:18-23, 51:14-20, 114:13-16, 115:13-25, 166:21-167:17.

At approximately 11:20 AM on Friday, Sheridan informed Brackett that all deposition transcripts needed to be returned to this Court by noon.  Brackett Decl. ¶ 11.  Brackett collected the transcripts from Ms. Peters' office.  Id.  Ms. Peters' secretary attempted to stop Brackett, telling him that Ms. Peters had directed that no transcripts were to leave the firm without her approval, and that if any did, she (Ms. Peters' secretary) would be fired.  Brackett Decl. ¶ 12, 9/12/07 Tr. 405:11-407:20.  Brackett collected the transcripts regardless and deposited them at Sheridan's office.  Brackett Decl. ¶ 13.

Brackett then collected a redweld from his own office containing transcripts, some of which contained highlighting and flags, and also deposited that at Sheridan's office.  Brackett Decl. ¶ 16.

At 11:37 A.M., Sheridan emailed a draft of the letter to the Court to Ms. Peters and Carter.[246]  See Dorsey Ex. LL.  Sheridan's draft contained language that, inter alia, stated that Ms. Peters possessed copies of transcripts at her home, and requested this

---

[244] A later Dorsey internal investigation, commenced after Ms. Peters subsequently filed a formal complaint against Mr. Carter, found that "the circumstances were such that [Mr. Carter's] frustration is understandable, [as] Ms. Peters was apparently resisting complying with the order of a Federal District Court Judge…"  See Ex. KP-64.

[245] Ms. Peters avers that she offered to draft this letter by Blackberry to accompany the transcripts.  Peters Decl. ¶ 198.  Mr. Carter, according to Ms. Peters, offered to supervise its finalization and put it on letterhead.  Id.

[246] Note that Ms. Peters wanted to review this before it went out.  See e.g. 9/11/07 Tr. 99, 113:23-114:5.

Court to be able to use in Massachusetts transcripts attached as exhibits to motions and pleadings filed in this Court. See id.

At about 15 or 20 minutes to noon, before the deadline, Deidre Sheridan, with Jordan Brackett, informed Carter that they had additional copies of transcripts that were marked up with attorney notes.[247] 9/11/07 Tr. 48:18-25, 50:6-23, 59:7-12, 82:22-83:20. Carter indicated to Sheridan to hold those transcripts for review until Ms. Peters returned, rather than returning them to the Court. 9/11/07 Tr. 49:1-8; Brackett Decl. ¶ 16. Presumably, this was because, as later turned out to be the argument, they may have been work product. Of course, even if they were so it would not allow the order that they be delivered to the Court to be disregarded. Brackett, for his part, brought his redweld with the highlighted transcripts back to his office. Brackett Decl. ¶ 16. Brackett then caught a cab and brought the transcripts that did not appear to be highlighted or otherwise marked up to this Court. Brackett Decl. ¶¶ 17-18. Carter, for his part, left shortly thereafter to attend to another unrelated matter in court. 9/11/07 Tr. 55:21-56:3.

Carter testified that, as this was Ms. Peters' case, he assumed Ms. Peters would handle the issue of the transcripts with Deidre Sheridan upon her return. See 9/11/07 Tr. 85:7-12, 106:1-8. Carter did not inform Ms. Peters (or the Court) that these additional transcripts existed, nor direct her to revise the draft of the letter to the Court to reflect that these additional transcripts existed. See 9/11/07 Tr. 96:13-22, 96:23-97:1, 99:23-100:5, 105:18-20, 106:24-107:6, 203:16-18. Nor did Carter instruct Sheridan or Brackett to inform Ms. Peters (or the Court) that these additional transcripts existed, nor direct them to revise or supplement the draft of the letter to the Court to reflect the existence of the additional transcripts. 9/11/07 Tr. 97:24-98:7, 204:20-205:1.

At 12:02 P.M., Ms. Peters emailed Carter and Sheridan regarding Sheridan's draft of the letter to the Court, in which she stated that "this is riddled with factual errors and misstatements," and added that "no submissions should go to the court without my review or the firm will have a malpractice issue." Ex. KP-25; see also 9/11/07 Tr. 186:10-20. Subsequently, in an email to the managing partner of Dorsey's New York

---

[247] It is not clear whether Sheridan, on behalf of Brackett, or Brackett himself, indicated to Carter that Brackett had transcripts that appeared to be work product. See 9/11/07 Tr. 83:12-16, 84:3-7. Neither Sheridan nor Brackett actually showed the transcripts to Carter at this time, nor did Carter at this time ask to see them. 9/11/07 Tr. 83:21-23, 84:18-25, 85:14-17.

office, Ms. Peters clarified which parts of this draft posed, in her opinion, a "malpractice" issue. See Ex. KP-T. Ms. Peters specifically pointed to the part of Sheridan's draft that requested use, in Massachusetts, of transcripts attached as exhibits to motions and pleadings filed in this Court. Id.

Ms. Peters emailed the Court at 12:07 P.M. and stated that "We need another hour to finalize the letter because of the lateness of the Court's order last night." Email of Kristan Peters, Apr. 20, 2007 12:07 P.M. She continued, "In the meantime, an associate working with Zach Carter gathered the transcripts they could find *in the office* and are bringing them down by taxi now." Id. (emphasis added). Notably, Ms. Peters did not mention any transcripts that she had brought to her home.)

At 12:09 P.M., Ms. Peters forwarded a copy of the draft letter to the Court (it is unclear which draft) to Isaacson stating, "Please review." Peters Ex. D.

At 12:31 P.M., Brackett emailed Sheridan and stated, "Everything is delivered." Ex. KP-56. Brackett provided to the Court a bound original copy, marked "original," and a bound copy, marked "copy," of the five substantive depositions of Defendants taken in this action.[248] All copies were stamped "attorneys' eyes only." Generally, the words "attorneys' eyes only" appeared at the top of each page that contained substantive deposition testimony.

Sheridan forwarded Brackett's email to Carter and Ms. Peters at 12:36 P.M. Id. Ms. Peters testified that she thought all the transcripts in Dorsey's possession at that time (aside from the copies at her house) had been returned at this point. 9/11/07 Tr. 202:2-13.

At 1:13 P.M, Ms. Peters emailed a revised draft of the letter to the Court. In that letter, Ms. Peters stated that Mr. Carter "has asked an associate to retrieve all transcripts that could be located relating to the Scivantage matter and has had them provided to the Court."[249] Ms. Peters requested in her letter to use the transcripts in the Massachusetts

---

[248] For the sake of clarification, and risking redundancy, those five substantive depositions were Defendant Gregory Alves, April 2, 2007; Defendant Sanjeev Doss, April 2, 2007, and again on April 9, 2007; Defendant Cameron Routh, April 3, 2007; and Defendant Adnane Charchour, April 11, 2007.

[249] In that same letter of April 20, Ms. Peters quoted verbatim approximately 70 lines from one of the aforementioned deposition transcripts. See Rabin Decl. ¶ 63, Ex. 44. Deidre Sheridan had added in those lines herself from the transcript, before the transcripts were returned to the Court. See Peters Decl. ¶ 202, 204. Subsequently, on Monday, April 23, Defendants alleged that these quotes were evidence that Plaintiffs still kept the transcripts.

litigation. Ms. Peters' letter did not raise any concerns regarding attorney work product. Ms. Peters letter also made no mention of any transcripts that were kept, at her house or otherwise. Ms. Peters' letter also omitted the language in Sheridan's draft that requested permission from this Court to be able to use, in Massachusetts, transcripts attached as exhibits to motions and pleadings filed in this Court. Letter of Kristan Peters, April 20, 2007.

At 3:46 P.M., Isaacson emailed Ms. Peters and stated that he reviewed her letter. Peters Ex. D. Isaacson reminded Ms. Peters that Gold had approved the seeking of an order to assure "preservation of evidence" in the new case, and asked what the "next step" was. Id.

At 3:55 P.M., Ms. Peters proposed an order to this Court that again requested that Defendants' designations of the depositions as "attorneys' eyes only" be deemed "null and void."

Y. Ms. Peters' Ordering of Additional Copies of Transcripts

On Saturday, April 21, 2007, at 1:03 A.M. Eastern time, while Ms. Peters was still in Turkey, she emailed a Veritext court reporter and stated, "We seem to have misplaced the four discs of the four deposition transcripts you did. Can you please send them to my attention by FEDEX ASAP?"[250] Dorsey Ex. H.

Ms. Peters returned to the United States by plane that day. 9/11/07 Tr. 271:17-22. While she was in flight, the Veritext court reporter emailed her back and said that the transcripts would be hand delivered on Monday, April 23.[251] Dorsey Ex. I. Ms. Peters received and read that email Sunday morning. 9/11/07 Tr. 273:1-5. The Dorsey log shows that the transcripts were received on Monday, April 23, at 11:54 A.M.

Ms. Peters avers that she subsequently returned the envelope with the transcripts unopened. 9/11/07 Tr. 172:10-13. Ms. Peters avers that she returned them "probably

---

[250] Ms. Peters did not tell her superiors at Dorsey that after allegedly complying with the Court's order she turned around and ordered additional copies of the transcripts, either before or after the fact. 9/4/07 Tr. 105:18-25 (Silberberg testimony); 9/11/07 Tr. 180:18-181:1 (Peters testimony).

[251] Ms. Peters averred that she was "concerned about the appellate record," and that she "wanted [the court reporter] to send the transcripts to the clerk of court," but that she was "concerned that [the court reporter] wouldn't have put it under seal," so she "asked her to send it to me." See 9/11/07 Tr. 170:17-171:25. Once more I found Ms. Peters' testimony less than credible.

Tuesday," April 24.  9/11/07 Tr. 13-17; <u>see also</u> 9/11/07 Tr. 172:25-175:5.[252]  (It is unclear if she returned them before or after the Court's directives issued on that day, discussed <u>infra</u>.)

Also on Saturday, April 21, Ms. Peters emailed Sheridan and Brackett and asked them to research several issues, stating, <u>inter alia</u>, "…[T]he client has asked whether an *ex parte* communication between a judge and an attorney who has not entered an appearance in the case constitutes an order."  <u>See</u> Brackett Decl. ¶ 19, Exs. 3, 4.[253]  The client did not ask Ms. Peters that question.  <u>See</u> 9/11/07 Tr. 202:14-203:6.

> Z.  <u>Plaintiff's Filing of Transcripts With Her Application For "Emergency" Relief in Massachusetts</u>

On Monday, April 23, at 11:30 A.M., Tom Tinkham, Dorsey's chief administrative partner, emailed Ms. Peters, copying Silberg and Jonathan Herman, and instructed her that before any further action be taken on the Wolters Kluwer case, "it must be reviewed with Jonathan Herman," another partner in Dorsey's New York office. Dorsey Ex. A; 9/12/07 Tr. 341:12-20, 342:6-19.  Tinkham added that "when Rich Silberg returns to New York, he will decide how we best move forward."[254]  Dorsey Ex. A.  (Silberg was returning to the office on Thursday, April 26.  9/4/07 Tr. 86:1-5.)

Around this time, Ms. Peters sought to initiate a motion to be filed in Massachusetts for preservation of evidence in Massachusetts.  Gold Decl. ¶ 12.[255]  Gold

---

[252] Ms. Peters gave evasive answers to direct questions regarding that issue on direct examinations.  Rather than answering direct questions about, for example, the date of her return of the transcripts, Ms. Peters pointed my attention to a declaration submitted by a Veritext representative, who averred, without providing specific dates, that he received the second set of transcripts "a few days" after they were ordered. <u>See</u> Declaration of Dinsdale Benloss, Aug. 31, 2007; <u>see also</u>, <u>e.g.</u>, 9/11/07 Tr. 172:25-173:9-10 (Court: "What date was it that you returned them unopened?" Ms. Peters: "The first time I saw it that week I returned it the same day I saw it."); Tr. 173:16-174:5 (Ms. Peters' counsel: "Is this the declaration of [Dinsdale Benloss] that you were referring to?" Ms. Peters: "Yes…. He says it was returned a few days later."); Tr. 174:20-175:5 (Court: "This is a simple question.  She said she returned them unopened.  I'm just asking for when."  Ms. Peters: "When the first time I saw them that week, I had them returned, and Mr. Dinsdale swears that it was…. That's when he said he got it back…." Court: "I'm not helped….").

[253] Ms. Peters also asked the associates to research, <u>inter alia</u>, whether "Judge Baer's *ex parte* conversation with [Carter] in a matter in which the judge no longer has jurisdiction and which impairs Judge Stearns' ability to administer his case… is any more enforceable than if Judge Castel just started issuing orders in this case just because the matter was momentarily before him in *ex parte* court."  <u>See</u> Brackett Decl., Ex. 3.

[254] Around this time, Isaacson says there was some talk with Peters about using transcripts in MA, and he told her to argue it to the Court and see how it comes out, although it is unclear when this conversation happened.  <u>See</u> 8/15/07 Tr. 43-44.  This is relevant insofar as Wolters Kluwer did not sign off on Peters using transcripts in MA without getting permission first and of course that never happened.

[255] Indeed, it appears that Gold's decision that Plaintiff would file a motion to preserve evidence in

avers, however, that it was "not [her] understanding that outside counsel would file a TRO or other motion for emergency relief." Id.

On Monday, April 23, Defendants' counsel and Mr. Doss' counsel, separately wrote the Court and alleged that Plaintiff, in fact, continued to retain transcripts of depositions taken in this action. See e.g., Letter of George Richardson, Apr. 23, 2007. At some point that Monday, Ms. Peters had a conference call with the Massachusetts Court. See Peters Ex. D. Later Monday, April 23, at 4:49 P.M., Ms. Peters emailed the Court and requested until Wednesday, April 25, to respond to Mr. Doss' submission and "bring to the court's attention certain law" before this Court rendered any decision. Email of Kristan Peters, Apr. 23, 2007, 4:49 P.M.

At 9:36 P.M., Ms. Peters emailed Isaacson and informed him that "we had a conference call with the [Massachusetts] court today." Peters Ex. D. (It is not clear if the conference call occurred before 4:49 P.M.) Ms. Peters informed Isaacson that "the hearing is scheduled to occur in Boston this Wednesday at 11 AM." Id. Ms. Peters asked Isaacson if he could review pleadings on an expedited basis. Id.

On Tuesday, April 24, at 6:03 A.M., Ms. Peters emailed this Court again, expressed her opinion, inter alia, that the Massachusetts action is "not… a new or different matter, but a continuing matter and therefore all confidential materials can be used in this Massachusetts matter," and requested to bring "certain factual misstatements to the Court's attention before it renders a decision." See Email of Kristan Peters, Apr. 24, 2007, 6:03 A.M. At 9:28 A.M., Ms. Peters emailed this Court again and suggested that "it warrants the time to allow this matter to be properly briefed by both parties…. I would suggest that we take the time to get it well briefed now…" See Email of Kristan Peters, Apr. 24, 2007, 9:28 A.M.

At 11:18 A.M., Tuesday, April 24, Dorsey's Massachusetts local counsel emailed Ms. Peters and expressed their concerns about service of the motion papers on Defendants. See Ex. KP-80. Local counsel stated, "The judge is unlikely to look kindly on service very late in the day, given that we are asking for a hearing tomorrow…. [T]he judge is almost sure to ask whether we have sent copies of our motion papers to the

---

Massachusetts was part and parcel of her decision to file a complaint in Massachusetts generally. See Gold Decl. ¶ 12 ("upon the dismissal of the New York case and the filing of a… complaint… in Massachusetts, it was my understanding that outside counsel would file a motion for preservation of evidence.").

defendants' New York counsel, and he will likely be unhappy with us if we have not served them." Ex. KP-80.

At 12:45 P.M., Dorsey partner Jonathan Herman emailed Zachary Carter and asked if filing, in Massachusetts, reply papers from the New York action with deposition transcripts attached would "be a violation of any existing court order of Baer."[256]  Dorsey Ex. M.  Carter emailed back at 1:52 P.M. and stated that using, in Massachusetts, transcripts attached to exhibits would be "fair game."[257]  Dorsey Ex. M.

At 2:41 P.M., Mr. Rabin informed this Court by email that a hearing regarding discovery matters at Plaintiff's request was scheduled in the Massachusetts action, No. 07-cv-10729, for 11 A.M., Wednesday, April 25.  Mr. Rabin alleged that Ms. Peters "has been pressing the Court in Massachusetts for a discovery hearing designed… to try to 'beat' Judge Baer to the punch on these issues," and again requested the return of all discovery, including deposition transcripts.  See Rabin Supp. Decl. Ex. 3.  Ms. Peters responded to Defendants' counsel and the Court, at 2:52 P.M., and stated, "Your statements… attempting to characterize my motives are completely inappropriate. Nothing new is going to be filed *tomorrow* in this Massachusetts matter…" (emphasis added).[258]  Rabin Supp. Decl. Ex. 4.

At 2:44 P.M., Mr. Rabin requested from Ms. Peters a courtesy copy of any papers that were filed in connection with the hearing.  See Rabin Supp. Decl. Ex. 5.  At 2:53 P.M., Ms. Peters refused, as she "could not provide it to anyone other than the parties and their approved counsel."  See Rabin Supp. Decl. Ex. 6.  Ms. Peters stated that "This is not

---

[256] Herman also informed Carter that the papers included a request for expedited discovery, Dorsey Ex. M even though it appears that Plaintiff neither contemplated nor authorized such a request. Gold Decl. ¶ 12. Herman relates that he had not actually seen a copy of the confidentiality order at this point, as he had asked Ms. Peters for a copy, but had not received it.  9/12/07 Tr. 357:17-25.  Herman avers that Ms. Peters' position was that the order did not prohibit such use in Massachusetts, but that he asked Carter for confirmation.  9/12/07 Tr. 358:5-12.

[257] "While there is an outstanding application for an order directing the return of transcript pages attached as exhibits, as far as I know, no such order has been issued to date."  Dorsey Ex. M.  Carter stated that he too had not actually seen the Confidentiality Order at this point.  9/11/07 Tr. 62:20-63:5.

[258] "The Massachusetts case is moving forward as it has been for a week and a half…. [Y]our divinations regarding 'suspicious timing' are so much nonsense…. [Your] casual approach to making serious allegations against counsel without the slightest attempt to verify your allegations before you make them is wholly inappropriate."  See Rabin Supp. Decl. Ex. 4.

Indeed, Ms. Peters reiterated these views in her testimony.  "There was no basis for you to say that…. It was one in a series of email allegations you made that in my mind was false."  9/11/07 Tr. 290:17-291:3. "Why is this new? Did you think we were going to do nothing?"  9/11/07 Tr. 292:6-16.

process. Process has been served." Id. (It appears that process in fact had not been served at that point.) At 2:55 P.M., Ms. Peters informed the individual Defendants that there was a hearing scheduled, but did not attach any papers. See Rabin Supp. Decl. Ex. 9. At 2:59 P.M., Mr. Rabin requested that Ms. Peters provide papers forthwith to the parties, and represented that Charchour had not received anything indicating a hearing. See Rabin Supp. Decl. Ex. 7. At 3:08 P.M., Ms. Peters responded, "Now that you have established that you are no longer their counsel and that we can serve them directly, we will do so. Have a nice day." See Rabin Supp. Decl. Ex. 7. Mr. Rabin reiterated his request at 3:17 P.M.[259] Id. At 4:38 P.M., Ms. Peters emailed local counsel and suggested they serve the motion and order "right away to these defendants electronically." Ex. KP-62.

On Tuesday, April 24, at 4:45 P.M., my law clerk, at my direction, sent an email to Ms. Peters, copying other counsel, that began "The Judge would like to remind the parties…" that my April 16 verbal order "ordered discovery returned to the Court," "with the intention that the parties would not utilize such discovery…." See Email of Mark Noferi, April 24, 2007, 4:45 P.M. Further, my law clerk, at my direction, stated to Plaintiff's lead counsel, as clearly as I knew how, that "The Judge would like you to represent to the Court whether your law firm currently possesses, or has possessed since Friday, April 20, any copies (in any format) of any transcripts of any depositions taken in this action." Id. The email asked Plaintiff's lead counsel to "please identify which copies of which transcripts your law firm possesses, or has possessed, since Friday, April 20." Id. The email continued, "If [Plaintiff's] law firm does currently possess such copies, the Judge directs your firm to return any such copies to this Court by 11 A.M. tomorrow, pending the disposition of the motions currently before the Court."[260] Id.

_____

[259] Ms. Peters testified that "I kept on trying to figure out who I could serve and [Mr. Rabin] wouldn't tell me." 9/11/07 Tr. 286:22-287:1.

[260] Ms. Peters offers a hyper-technical interpretation of this email. She states that the first paragraph, in which the Court refers to "the intention that the parties would not utilize such discovery," refers to only documents; and the second paragraph, asking for factual representations and return of transcripts, refers only to transcripts. Thus, nothing in this email indicated to Ms. Peters that she could not use the transcripts in Massachusetts (leaving aside, of course, the Confidentiality Order, which Defendants (not to mention her own co-counsel) had brought to her attention numerous times). See Peters Decl. ¶ 273, 276 ("At no time did I read this April 24 email from Mr. Noferi or the April 19 'conversation' with Mr. Carter as an 'Order' prohibiting the use of Plaintiff's own pleadings filed under seal in the Massachusetts Action…"); see also 9/11/07 Tr. 303:4-18.

At 5:06 P.M., local counsel filed the motion in Massachusetts. WKFS Ex. 26. These motion papers show that Plaintiff filed several motions in the District of Massachusetts that day, including a motion for "short order of notice," a motion for an "order to show cause," a motion for extensive "emergency discovery," and a motion to exceed page limits.[261] Ms. Peters' name appeared on the various motions. Ms. Peters submitted a declaration, signed by her, and attached prior declarations and exhibits filed in this action, which included 115 pages of the aforementioned "attorneys' eyes only" deposition transcripts from this action. Plaintiff also requested that the Massachusetts Court issue an order returning the deposition transcripts to Plaintiffs "to use in [the Massachusetts] action"; an order that the Massachusetts Court "take custody of the transcripts in this action;" an order that the documents in the custody of this Court "be returned to Plaintiffs;"[262] and an order "requiring Defendants to produce documents previously produced but returned."[263] Plaintiff apparently requested the Massachusetts Court at some point to hold a hearing on the motions *ex parte*.[264]

Despite the Confidentiality Order in place that prohibited use of documents in any other litigation, and my repeated orders of the prior week to return all discovery, including transcripts, Plaintiff's Memorandum of Law stated, "Defendants' counsel… have sought an order from the New York Court that all discovery material – documents, deposition testimony, written responses to discovery – be returned to Defendants or

---

[261] See Supplemental Declaration of Richard J. Rabin, May 9, 2007, at Ex. 13.

[262] Plaintiff stated that "the Judge presiding over the New York action has taken those documents, imaged computers, and… deposition transcripts into its custody." See Memorandum of Law in Support of Order to Show Cause and For Expedited Discovery and Preservation of Documents and Information, April 24, 2007, at 29, No. 07-cv-10729 (D. Ma.), at Rabin Supp. Decl. Ex. 13. This statement is incorrect, insofar as a) this Court never took imaged computers into its custody, and b) as events subsequently showed, Plaintiff still retained transcripts of depositions taken in this action.

[263] See Memorandum of Law in Support of Order to Show Cause and For Expedited Discovery and Preservation of Documents and Information, April 24, 2007, at 29, No. 07-cv-10729 (D. Ma.), at Rabin Supp. Decl. Ex. 13.

Plaintiffs' in-house counsel Gold and Isaacson both aver that they were not provided with a copy of these papers until after they were filed. See Gold Decl. ¶ 12; Isaacson Decl. ¶ 11 (stating that he received notice of motion and proposed order at just before 7:00 P.M. Eastern time on April 24, but not memorandum of law or materials filed in support of motion). Isaacson states, however, that it was his understanding that he did not receive these papers because they contained court filings which contained "attorneys' eyes only" deposition transcripts. See Isaacson Decl. ¶ 11.

[264] See Transcript of April 25, 2007, Wolters Kluwer Financial Services Inc. and CCH Inc. v. Scivantage, Inc. et. al., No. 1:07-cv-10729 (D. Ma.), at 4 (Court: "[H]aving read the papers, I am now baffled by the request to hold this hearing *ex parte*… [G]iven the history between the parties, the request for a secret proceeding has me even more concerned than it did at the time it was made."), at Rabin Supp. Decl. Ex. 14.

destroyed and not used in the ongoing litigation in Massachusetts. No such order has issued from the New York Court and it is difficult to believe that a New York Court would issue such an order…"[265] <u>See</u> Pl. Mem. Law at 7-8, <u>at</u> Rabin Supp Decl., Ex. 13.

The emergency discovery requested by Plaintiffs resembled the extensive emergency discovery originally requested by Plaintiff in this action, large portions of which were provided by Defendants to Plaintiff before, and after, Plaintiff's voluntary dismissal of this action. <u>See</u> "Emergency Discovery Order," April 25, 2007, No. 07-cv-10729 (D. Ma.). Additionally, some of the emergency discovery requested in Massachusetts was discovery that Plaintiff had requested in this action and I had denied to Plaintiff as overbroad or unnecessary.

At 5:31 P.M., we re-sent my 4:45 P.M. directives to counsel, and Mr. Reiner, Mr. Brackett, and Ms. Peters' secretary, in an effort to ensure that Dorsey received these directives "in case lead counsel is traveling." See Rabin Supp. Decl. Ex. 12. Brackett immediately reviewed the transcripts in his office and realized that several of the transcripts he previously thought were "work product" were in fact unmarked. Brackett Decl. ¶¶ 16, 22.[266] Brackett called Ms. Peters and told her that he still had transcripts, some of which were unmarked. Brackett Decl. ¶¶ 22-23; <u>see also</u> 9/11/07 Tr. 162:17-23.[267] Ms. Peters told him that she would stop by his office to look at the transcripts. Brackett Decl. ¶ 23. Also at this time, Ms. Peters avers that Sheridan informed her that she also possessed transcripts. 9/11/07 Tr. 278:8-12.

---

[265] Isaacson stated that he did not review this Memorandum of Law. <u>See</u> 8/15/07 Tr. 42:18-21. He believed generally that the documents could be filed in Massachusetts consistent with Court orders because Ms. Peters told him that it was "under seal," and that "it was a pleading… not covered by the confidentiality order." <u>See</u> 8/15/07 Tr. 43:1-7, 102:14-18. Isaacson did not review the confidentiality order himself, however, to confirm that understanding. <u>See id.</u> at 43:10-13.

[266] Ms. Peters avers that at some point in time, Brackett told her "that on the 20th he knew [that] his transcripts did not have writing on them." 9/11/07 Tr. 164:10-13. At the hearing, Ms. Peters did not cross-examine Brackett about his knowledge regarding the transcripts on April 20th, nor the purported conversation in which Brackett purportedly told her this information. Consequently, I accord Ms. Peters' recollection of this conversation less credence.

[267] Ms. Peters testified that she knew later, on Thursday, April 26, that Brackett had unmarked copies because Brackett had told her at this point in time on Tuesday, April 24, that he had transcripts. <u>See</u> 9/11/07 Tr. 162:17-23 ("I knew at that point in time that he had unmarked copies because on Tuesday night after [the Court's law clerk] sent out his email… the mice came out of the woodwork… Brackett told me he had transcripts…"). It appears then that Ms. Peters knew on Tuesday that Brackett had transcripts (which were in fact unmarked).

Meanwhile, at 5:31 P.M., Plaintiff's Massachusetts local counsel emailed the moving papers to the individual Defendants. See Rabin Supp. Decl. Ex. 13.

At 5:40 P.M., subsequent to its filing, Ms. Peters emailed the Memorandum of Law to Herman. Ex. KP-66.

At 6:56 P.M., after it was filed, Ms. Peters forwarded the motion for emergency discovery to Isaacson. See Ex. KP-55; 9/11/07 Tr. 332:18-334:10, 334:16-24.

At 7:34 P.M., Ms. Peters emailed the Court to "confirm" her *ex parte* conversation with my law clerk.[268] See Peters Ex. U. Ms. Peters represented that "we attempted to get clarification as to whether the court believes that Dorsey needs to go through its pleading files and remove all exhibits from its pleadings in its files in order to be in compliance with the email we received from you." Id. "Moreover… we would have to scrub our firm computers as well to be in compliance with such a directive by 11 a.m. tomorrow." Id. "You told us in our conversation with you tonight that you did not think it was the Court's intention to require the above, but that you would call the judge… We have not heard back from you… Your email was sent so late that it does not give us time to respond other than this brief email, as we will be in court tomorrow."[269] Id.

---

[268] Ms. Peters blind copied Mr. Herman on this email to the Court's law clerk. See Peters Ex. U. Herman testified that he did not particularly "focus on it" at the time, and that he was not aware, notwithstanding this email that contained the Court's directives in the email chain below, of the Court's directives to return transcripts by specific deadlines. 9/12/07 Tr. 348:13-20.

Mr. Herman testified that he also "did not recall" whether he reviewed or played a role in drafting Ms. Peters' response. 9/12/07 Tr. 360:8-361:7. Ms. Peters noted that Mr. Herman's billing records for this day showed that he spent 3.8 hours on the Wolters Kluwer matter, including entries for "review correspondence from Southern District of New York court clerk and related pleadings concerning hearing before Southern District of New York judge," and "telephone conference with K. Peters regarding drafting response to Judge Baer's clerk." See Ex. KP-1 at 23; 9/12/07 Tr. 362:3-14. Mr. Herman averred that he "reviewed all kinds of documents on that day" and he was "just trying to get up to speed." 9/12/07 Tr. 362:18-23.

Additionally, Mr. Herman testified that he had only been informed of the need for his testimony the day before (as Ms. Peters had specifically requested his presence), and that his recollection might have been better had he had more time to review his more contemporaneous records. 9/12/07 Tr. 383:7-12.

[269] Ms. Peters' later testimony on this subject contradicted her own more contemporaneous recounting of this conversation in this email. For example, Ms. Peters testified that she called my law clerk and asked for clarification *before* proceeding in Massachusetts. See 9/11/07 Tr. 206:19-207:4 ("I asked for clarification from [the Court's law clerk]. [The Court's law clerk] said the transcripts attached as exhibits to prior pleadings are not encompassed by [the Court's] return of transcripts order. And then I got an email from [The Court's law clerk]… So, based on that, we proceeded in Massachusetts."). As is evident from the chronology of the evidence, Ms. Peters called my law clerk in a *post hoc* attempt at "clarification" *after* she received the email from my law clerk, and *after* the Massachusetts papers had already been filed that day. Additionally, as noted, Ms. Peters testified that the Court's law clerk said, without qualification, that "the

That evening, April 24, with the help of her babysitter who had placed them into a mail cabinet, Ms. Peters found the minuscript transcripts at her house. 9/11/07 Tr. 167:2-19; see also Declaration of Lisa Buendia, Sept. 9, 2007.

Also that evening, April 24, at some point before 8:29 P.M., Defendants filed their Motion for Sanctions and Contempt.[270] Defendants' motion began, "This action could be the poster child for bad faith litigation, abuse of process, and utter contempt of the judicial process." See Defendants' Consolidated Memorandum of Law…, Apr. 24, 2007 ("Def. Sanctions Mem."), at 1. Defendants moved for sanctions pursuant to Fed. R. Civ. P. 37, Fed. R. Civ. P. 16(f), 28 USC § 1927 and the inherent powers of the court, and for civil contempt. See generally id. Defendants requested sanctions in the form of fees and costs in this litigation, to bar Plaintiff and its counsel from using discovery in this case in the Massachusetts action, to disqualify Plaintiff's counsel from prosecuting the Massachusetts action, and for civil contempt against Plaintiff.[271] See generally id.

At 12:33 A.M., Mr. Rabin informed this Court that Ms. Peters "continues to flout the Court's orders" and did file in Massachusetts a "voluminous set of motion papers attaching deposition transcripts in this action," and "sought to cover her tracks by suggesting some 'clarification' was needed on the clear and direct Orders of this Court…" See Email of Richard Rabin, Apr. 25, 2007 12:33 A.M. Defendants requested that this Court order Plaintiff to withdraw its Massachusetts filing immediately. Id.

AA. District of Massachusetts Hearing on Plaintiff's Emergency Motions

---

transcripts attached as exhibits to prior pleadings are not encompassed by [the Court's] return of transcripts order." However, her more contemporaneous email on the 24th stated that Ms. Peters only "attempted" to get clarification, and that although the Court's law clerk "did not think it was the Court's intention to require the above," the Court's law clerk "would call the judge," and the Court did not subsequently provide clarification. See Peters Ex. U.

Later, Ms. Peters testified that the Court's law clerk sent "on behalf of Judge Baer" that night "an email saying you don't have to return that" [i.e. transcripts attached to pleadings]. 9/11/07 Tr. 300:14-16. There is no record that the Court's law clerk or the Court sent an email that night regarding transcripts after the 5:31 email resending my directives to Dorsey counsel. This is far too long and too detailed a scenario to describe in more detail just one more effort in a saga of obfuscation perpetrated by Plaintiff's counsel, but it provides some broad insights that might otherwise have been overlooked.

[270] For what it is worth, Defendants lead counsel Mr. Rabin avers that this represented the first instance in his thirteen years of practice in which he had filed a motion for sanctions against opposing counsel. See Rabin Decl. ¶ 66.

[271] Defendants, in their motion, stated, inter alia, that "[P]laintiff still does not 'get it.' Rather, plaintiff proceeds at mad-dash speed, ill-gotten discovery under their arm, headed for the state border." Def. Sanctions Mem. at 3.

The hearing in the District of Massachusetts proceeded on Wednesday, April 25 at 11 A.M. At the beginning of the hearing, Judge Stearns stated three concerns. First, he stated "this action looks more like an appeal of Judge Baer's order." Secondly, he stated he was "baffled by the request to hold this hearing *ex parte*… given the history between the parties." Third, he stated that he did not understand "why the papers were not served on the defendants until last night…" See Rabin Supp. Decl., Ex. 14, at 4-5. At the end of the hearing, Judge Stearns stated, "Nothing has changed my initial impression of the case. I regard this motion as simply a collateral attack on Judge Baer's prior order…. I do not believe that the plaintiff is before the Court with clean hands." Id. at 30.

BB.    Subsequent Actions Relating to Dorsey's Return of Transcripts

At some point on April 25, 2007, Plaintiff filed a "motion to remove confidentiality designations" in this Court and again submitted a proposed order that would declare "Defendants' designations of the depositions in their entirety as CONFIDENTIAL and ATTORNEYS' EYES ONLY" as "null and void."

Meanwhile, in the morning of April 25, Brackett had a messenger deliver his transcripts to Ms. Peters' office. Brackett Decl. ¶ 26.

On Thursday, April 26, David Stephens emailed Gold and Isaacson (without cc'g Dorsey counsel), informed them that Charchour and Routh were chairing a "key industry conference" the next week, and stated that "[h]aving a TRO to prevent their presence would be very helpful to our business," but that he had spoken with Ms. Peters and she informed him that Gold and Isaacson wanted to hold off on "any further TRO action."[272] Peters Ex. C.

At some point on the morning of Thursday, April 26, Herman and Ms. Peters discussed the issue of returning transcripts to the Court, and that some of these transcripts may have been work product privileged.[273] 9/12/07 Tr. 343:14-344:6, 347:23-348:9;

---

[272] Gold wrote back on Thursday, April 26 at 5:10 P.M. that the "consensus" was to "stay the course and press forward aggressively on the preliminary injunction but not change direction to seek a TRO…" Peters Ex. C.

[273] It is not clear if Herman was aware which transcripts, exactly, Ms. Peters was referring to at this time – i.e., the additional copies of transcripts that Ms. Peters had ordered from Veritext, the transcripts that Sheridan and Brackett possessed, the transcripts in Ms. Peters' home, or the transcripts that had been previously attached as exhibits to prior motions.

Brackett Decl. ¶ 27.[274]  Ms. Peters communicated to Herman that it was necessary to hold on to the transcripts in order to prosecute the case.  9/12/07 Tr. 345:22-346:3.  According to Herman, notwithstanding the possibility of a privilege, Herman directed her to return the transcripts.[275]  9/12/07 Tr. 345:18-19.

After Ms. Peters' conversation with Herman, Ms. Peters asked Brackett to return to her office so they could review Brackett's deposition transcripts.  Brackett Decl. ¶ 28; see also 9/11/07 Tr. 162:12-19.  Brackett showed Ms. Peters that some of the transcripts did not contain markings.  Id.  Regarding the unmarked transcripts, Ms. Peters instructed Brackett to "scribble all over them" so that they would be considered attorney work product, and thus that Dorsey would not have to return them.[276]  Brackett Decl. ¶ 29.  Ms. Peters then told Brackett that she would leave the office for a few minutes so that Brackett could write on the transcripts without her being present.[277]  Brackett Decl. ¶ 30.

Ms. Peters, when confronted with this testimony, opined that it was all a joke.  Brackett, when asked by the Court how he understood Ms. Peters' direction, made it clear that in his view, Ms. Peters was "not joking."  Brackett Decl. ¶ 31; 9/12/07 Tr. 419:2-5.[278]  Brackett circled or underlined the name of the deponent on the front page of each of the previously unmarked transcripts.[279]  Brackett Decl. ¶¶ 31-32.

---

[274] Herman remembers this conversation as happening on Tuesday, April 24.  9/12/07 Tr. 345:10-14.  Brackett, however, who stated that he was present in Herman's office when Ms. Peters stopped in, remembers this conversation as happening on the morning of Thursday, April 26. Brackett Decl. ¶ 27.  I credit Brackett's recollection of the events of this day (as those events appeared to be more memorable for him).

[275] Herman related that he advised Ms. Peters to contact Bill Wernz, Dorsey's ethics specialist, or Tom Tinkham, Dorsey's chief administrative partner, about the transcript issue if she had remaining concerns, and that Ms. Peters did contact Tinkham, and that Tinkham told Herman that he gave her the same advice—i.e. to return the transcripts.  9/12/07 Tr. 346:11-17, 347:15-18.

[276] Ms. Peters recalled saying to Brackett, "Well hell, if Zach [Carter] said it's work product, let's make it work product."  9/11/07 Tr. 219:4-11.

[277] Regarding Brackett's recounting of this incident, at the hearing, Brackett's counsel on direct simply confirmed that Brackett's Declaration was true and accurate, thus providing Ms. Peters with additional time to cross-examine Brackett on any issues.  9/12/07 Tr. 399:1-12.  Ms. Peters chose not to directly cross-examine Brackett about the incident of Thursday, April 26.

[278] A subsequent Dorsey internal investigation into various allegations by Ms. Peters concluded that "it appears beyond question that Mr. Brackett actually believed Ms. Peters suggested to him that he mark up the transcripts so that they appeared to be work product and would not have to be returned to the court.  It is indisputable that such a suggestion made by a partner to an associate is alarming and unethical."  See Ex. KP-64.

[279] Ms. Peters testified variously that she contemporaneously saw the result of Brackett's marking of the transcripts, see 9/11/07 Tr. 219:17-22 ("I left for two minutes, and I was back. He had circled three little words."), but then, within the same paragraph, that she "had no idea what he'd done."  9/11/07 Tr. 219:17-

Over lunch, Brackett decided to tell Mr. Herman about the incident with Ms. Peters, and did so. Brackett Decl. ¶¶ 33-34.

At some point in the afternoon, Ms. Peters showed Mr. Herman a draft of an email that she was planning to send to the Court. 9/12/07 Tr. 353:20-354:24; 9/11/07 Tr. 247:15-248:5. Herman expressed his disapproval with some of the language in the email. 9/11/07 Tr. 247:23-248:3, 248:6-10; 9/12/07 Tr. 353:20-354:24.

At 3:05 P.M., Ms. Peters emailed the Court and stated that she had "been pulled five different ways today on a variety of matters," and requested another day to respond to my requests for transcripts and factual representations.[280] See Rabin Supp. Decl. Ex. 17.

Shortly before 3:30 P.M., Mr. Herman and David Singer, another Dorsey partner, informed Silberberg that Mr. Brackett had told them about the incident with Ms. Peters, and related Brackett's story to Silberberg. 9/4/07 Tr. 88:17-89:15. Mr. Herman also showed Mr. Silberberg what Herman understood to be a draft of the email that Ms. Peters had proposed to send to the Court. 9/4/07 Tr. 92:3-13; 9/12/07 Tr. 353:20-354:24. Mr. Silberberg expressed his concern about the proposed language. 9/4/07 Tr. 92:10-13.

At approximately 3:30 P.M., Mr. Silberberg met with Mr. Dwyer and Mr. Carter. 9/4/07 Tr. 86:6-87:6, 9/11/07 58:4-15. Silberberg related what he had been told about the Brackett-Peters incident, and the three called Mr. Brackett into the office. 9/4/07 Tr. 92:14-25, 9/11/07 Tr. 60:4-7; Brackett Decl. ¶ 35. Brackett related to the three senior partners his version of events, which was substantively the same as the version of events Herman and Singer had told to Silberberg. 9/4/07 Tr. 92:25-93:10; Brackett Decl. ¶ 35. Brackett also informed Dwyer and Carter that in response to Ms. Peters' direction, he had placed a circle around the names of the parties in the caption of the deposition transcripts. 9/4/07 Tr. 93:9-15; Brackett Decl. ¶ 35. The three senior partners told Brackett that if

22. Later, she testified that she did not learn that Brackett had only lightly marked the transcripts until the following morning. 9/11/07 Tr. 260:22-261:2.

[280] Ms. Peters also stated that she needed to run the letter by "two other partners – one in Minnesota" before submitting it to the Court. See Rabin Supp. Decl. Ex. 17. It is unclear if those partners were Bill Wernz and/or Tom Tinkham. Note, though, that the Court is not the adversary—I ordered the documents to be turned over to the Court precisely because the Court would be able to serve as a neutral custodian while the work product privilege claim was assessed and resolved. Peters' concerns about what might happen if she had to return the documents to Defendants instead are no reason to resist following an order. See infra, note 287.

anything like that happened again, he should immediately inform a partner rather than attempting to deal with the matter himself.  9/4/07 Tr. 93:17-22.

At 4:05 P.M., apparently while this meeting was taking place, I emailed Ms. Peters, reiterated the procedural history of various orders since Plaintiff's dismissal of the case, and once again requested transcripts of any depositions in Plaintiff's possession, this time by 6:15 P.M. that night.[281]

At 4:41 P.M, also apparently while the partner's meeting with Brackett was taking place, Ms. Peters responded by email to me and requested a conference call.[282]  See Rabin Supp. Decl. Ex. 19.  She stated that "in response to the Court's request of April 20," (wherein she appeared to actually be referring to the Court's April 19 order to Carter), that she was not "made aware of any conference call *with the parties present* in which such an order was issued." (emphasis added).  Id.  She added that since she had returned, "like all busy lawyers who are deluged with work once they return from an absence… I have addressed the Court's concerns in many ways in which the Court may not be aware."  Id.  She continued, "The only transcripts I have been able to turn up since

---

[281] My email stated, in full:

"Ms. Peters,

On Monday, April 16, I verbally directed that all discovery be returned to the Court. On Tuesday, April 17, I reiterated that order in writing.  On Friday, April 20, you appeared to represent that all copies of deposition transcripts were returned to the Court that day. On Tuesday, April 24, I conveyed, through my Clerk, my desire for you to represent whether your law firm currently possesses, or has possessed since Friday, April 20, any copies of deposition transcripts.  I directed you to identify those transcripts, if they existed.  I also directed you to return them to the Court by 11 AM, Wednesday, April 25.

The night of Tuesday, April 24, you requested clarification as to whether the Judge's directive to return any transcripts encompassed exhibits to pleadings and motions that included portions of transcripts.  On Wednesday, April 25, I clarified, although hardly necessary in my view, that I did not, at this time, require you to return exhibits attached to pleadings and motions.

It is now Thursday, April 26. Without modifying the previous orders issued by the Court, I once more want any copies of deposition transcripts (excluding exhibits to pleadings and motions that included portions of transcripts), if they do indeed exist in your law firm's possession, returned to the Court by 6:15 P.M. tonight.  If you feel the need to submit factual representations in the form of a letter, that letter may be submitted tomorrow by COB."

Regarding your request to have copies of the deposition transcripts returned to you for the purposes of defending Defendant's Motion for Contempt, I will address that request after you first return any copies of deposition transcripts to the Court.

In closing, let me say your conduct in this matter gives me pause and the day and 6 hours or so beyond the time I set for delivery of any transcripts in your possession accentuates those concerns."

See Rabin Supp. Decl. Ex. 18.

[282] Herman testified that he did not approve this email.  9/12/07 Tr. 355:11-12; see also 9/11/07 Tr. 249:11-14.

my return," aside from transcripts attached as exhibits to pleadings, are "some copies of transcripts that have attorney notes written all over them."[283] Id.; see also 9/11/07 Tr. 257:14-261:10. She added that she had "just learned" that fact "today upon a discussion with that associate."[284] Id.

Ms. Peters continued, "I have asked the Firm about the transcripts with attorney notes on them, and they take the position that it is Attorney Work Product and would be inappropriate to provide to the Court because of various legal and ethical issues." See Rabin Supp. Decl. Ex. 19. She added, "because it appears to be an order that implicates risk management issues, we have been busy assessing the ethical, legal, and appellate issues." Id. Ms. Peters requested the Court's "indulgence" and to be permitted to submit the requested letter the next day. Id.

After their meeting with Brackett, Silberberg, Dwyer, and Carter brought Ms. Peters in and told her of the information Brackett had related to them. 9/4/07 Tr. 93:24-25. Ms. Peters told the three senior partners (despite her prior email to the Court representing that the transcripts had "attorney notes written all over them") that whatever she had said to Brackett was a "joke." 9/4/07 Tr. 94:2-5; 9/11/07 Tr. 130:25-131:5. Silberberg told her that even assuming it were a "joke," a concept Brackett flatly denies, it was highly improper and unacceptable. 9/4/07 Tr. 95:5-7. Silberberg (and Carter) learned that there were still more transcripts that had not been turned over. 9/4/07 Tr. 95:18-96:6, 9/11/07 Tr. 59:1-17. Silberberg learned that Ms. Peters still possessed copies of transcripts at her home, and directed that she bring them in the next morning for delivery to the Court. 9/4/07 Tr. 97:6-16, 9/11/07 59:1-17.

Towards the end of her meeting with Dwyer, Carter, and Silberberg, Ms. Peters provided the three senior partners with what she represented to be a copy of her 4:41 P.M. email to the Court. 9/4/07 Tr. 97:25-98:4, 98:15-99:7, 9/11/07 Tr. 59:20-25. Silberberg expressed his anger, both because Ms. Peters had sent the email without Mr.

---

[283] Ms. Peters added, "Apparently the transcripts have been completely digested and summarized by a junior associate and are now on the hard drive of our computer system." See Rabin Supp. Decl. Ex. 19.

[284] Ms. Peters testified that this email was "true and accurate according to [her] knowledge at the time." 9/11/07 Tr. 250:1-4. Ms. Peters also testified that Herman had told her that the transcripts had been written on, and accordingly, she sent the email to the Court. 9/11/07 Tr. 254:1-261:9. Ms. Peters neglected, in her testimony, to mention that she had the most direct knowledge that the transcripts were written on, as she had given that order. 9/11/07 Tr. 254:1-261:9.

Herman's approval, and because he felt that it contained two inaccurate statements. 9/4/07 Tr. 99:24-100:9. Silberberg felt that the Firm had not expressed the position that it would be inappropriate to provide attorney work product to the Court. See 9/4/07 Tr. 100:16-21, 101:3-8. Silberberg also felt that there was no study of "risk management" issues by the Firm, as Ms. Peters had said. See 9/4/07 Tr. 101:23-102:1.[285]

At some point during this meeting, either Brackett or Peters brought a number of deposition transcripts into Silberberg's office. See 9/4/07 Tr. 102:7-14. Dwyer, Carter, and Silberberg decided that the firm should return all of the transcripts to the Court the next morning, to be accompanied by a cover letter drafted by Ms. Peters and reviewed by Mr. Herman. See 9/4/07 Tr. 109:12-110:8, 9/11/07 Tr. 60:8-15. This directive was memorialized in an email by Mr. Dwyer, sent the next morning, at 9:02 A.M. See Dorsey Ex. D.

Silberberg decided that while supervision of Ms. Peters on the case should continue, he would not remove her from the matter. See 9/4/07 Tr. 102:23-103:5, 104:17-105:7. The three senior partners directed that Ms. Peters provide Mr. Herman with copies of all recent orders or emails and correspondance with the Court and opposing counsel, and that Ms. Peters would clear all future correspondance with Mr. Herman before sending it. See 9/4/07 Tr. 109:12-110:8. These directives were also memorialized in Mr. Dwyer's email the next morning. See Dorsey Ex. D.

At some point after Ms. Peters' meeting with the senior partners, Ms. Peters related her version of events of the Brackett incident to a junior associate, Eric Epstein.[286]

Later that day, at 5:52 P.M., in response to Ms. Peters' 4:40 P.M. email, I emailed and pointed Ms. Peters' attention to two cases that unsurprisingly supported the proposition that an attorney may be ordered to turn over "work product" to the Court.[287]

---

[285] Herman testified that he had previously communicated those concerns to Ms. Peters, and that she had said in essence that it was "only a draft." 9/12/07 Tr. 354:12-23.

[286] Epstein recalled that Ms. Peters told him that her comments were in jest. See 9/12/07 Tr. 394:19-395:11. However, Epstein averred that his only knowledge of the incident came from Ms. Peters. See 9/12/07 Tr. 393:7-8. ("I don't really know what [Brackett] did. I only know what [Ms. Peters] told me in [her] office.").

Epstein also related that Ms. Peters told him that she felt Brackett should be off the team because of his actions. 9/12/07 Tr. 384:6-11.

[287] See In re Murphy, 560 F.2d 326, 336 n. 20 (8th Cir. 1977) (Court, noting that attorney opinion work product is not shielded from "judicial scrutiny," stated, "An attorney may be ordered to deliver his opinion work product to the court for *in camera* inspection."), cited approvingly, In re John Doe Corp., 675 F.2d

At approximately 9:15 or so the next morning, Friday, April 27, Ms. Peters apparently lost her temper and accused Brackett of lying about the incident regarding the transcripts.[288] Brackett Decl. ¶ 36.

At 9:34 AM that morning, April 27, Ms. Peters forwarded to Mr. Herman as per his instructions a copy of my email directives of 4:05 P.M. the day before. See Dorsey Ex. E. Incredibly, the version of my email that Ms. Peters forwarded to Mr. Herman omitted two substantive portions. The first missing portion consists of the sentences summarizing my Tuesday, April 24 directives and requiring her to represent whether her law firm possessed transcripts and if so to return those transcripts to the Court by 11 AM, Wednesday, April 25.[289] The second missing portion consists of the last sentence of those Tuesday, April 24 directives, wherein I noted that Ms. Peters' conduct "[gave] me pause." Compare Dorsey Ex. E with Dorsey Ex. G; see also, e.g., 9/11/07 Tr. 230:7-237:11.[290]

At 9:29 A.M., Ms. Peters provided Herman with a draft of a letter to the Court to accompany the return of transcripts.[291] Dorsey Ex. AA, 9/12/07 Tr. 351:21-352:4. Herman sent back a revised draft at 11:17 A.M. and asked Ms. Peters to "please use" it.[292] Dorsey Ex. BB.

---

482, 493 (2d Cir. 1982).

[288] Ms. Peters averred that Brackett omitted in his Declaration that Ms. Peters had yelled at Brackett about the transcripts before she had directed him to alter them. 9/12/07 Tr. 401:16-19, 402:25-403:5. Brackett, however, testified that Ms. Peters yelled at him only after Brackett had informed senior management what Ms. Peters had done. 9/12/07 Tr. 418:24-419:1. I found Brackett's testimony credible on this score.

[289] As Ms. Peters notes, it appears that she blind copied Mr. Herman on her email to the Court's law clerk of Tuesday, April 24, at 7:34 P.M., which contained below the Court's email of 4:45 P.M. Tuesday, April 24, which contained those directives. See Peters Ex. U. It remains unclear, however, why, when Ms. Peters forwarded Mr. Herman a copy of my emailed directives of 4:05 P.M., Thursday, April 26, the summary sentences were missing.

[290] Herman emailed Dwyer, Silberberg, and Carter at 10:11 AM, forwarding Ms. Peters' truncated version of my directives, and wondered out loud why it had not been mentioned that the Court had ordered the return of transcripts by 6:15 P.M. the previous evening. See Dorsey Ex. E. Silberberg and Carter testified that Ms. Peters had not mentioned any 6:15 P.M. deadline in their meeting with Ms. Peters the day before. 9/4/07 Tr. 116:24-117:1; 9/11/07 Tr. 60:20-25. Ms. Peters averred that she had mentioned the deadline to the three senior partners. 9/11/07 Tr. 238:9-242:6.

[291] This draft provided that "yesterday, we found a couple of transcripts that do not appear to have substantial markings." See Dorsey Ex. AA.

[292] Herman's revised draft stated more simply, "Some of the attached transcripts do not appear to be work product protected." See Dorsey Ex. BB.

On Friday, April 27, at approximately midday, and having failed to make any substantive response to my April 24 order, Ms. Peters delivered in person twenty additional copies of deposition transcripts to the Court. Her final version of the accompanying letter told the Court that her "colleague made an attempt… to locate the transcripts in the office, and missed some." Ms. Peters represented that "most of the transcripts remaining are attorney work product."[293] Ms. Peters now represented that "some of the attached transcripts that were brought to my attention yesterday for the first time do not appear to be work product privileged."[294] Among those transcripts characterized as "not work product privileged" were clean paper copies of the five substantive depositions of Defendants taken in this case. Those copies were all marked "attorneys' eyes only." Some of those copies included circles around the caption on the front page, as Brackett subsequently testified to.

CC.     Conference Call of May 1

On Friday, April 27, at 5:20 P.M, I requested a conference call with counsel for the parties to discuss Plaintiff's request to have the just-delivered copies of transcripts returned so that counsel might use one or more to defend against Defendants' previously-filed motion for contempt and sanctions.[295] I also requested the parties' views regarding

---

[293] Plaintiff's counsel indicated that thirteen hitherto unproduced copies of transcripts were "work product." Those transcripts comprised a bound transcript of Plaintiff's statements on the record on April 6, 2007, marked "original," and a bound copy of that transcript; a bound copy of Doss' deposition of April 2, 2007; a bound copy of Alves' deposition of April 2, 2007; a bound copy of Routh's deposition of April 3, 2007; a bound copy of Doss' deposition of April 9, 2007; and a bound copy of Charchour's deposition of April 11, 2007. Additionally, Plaintiff's counsel provided unbound copies, which she indicated were "work product," of Doss' deposition of April 2, 2007; a rough draft copy of that deposition; Alves' deposition of April 3, 2007, and a duplicate of that copy; Routh's deposition of April 3, 2007; and Doss' deposition of April 9, 2007.

[294] Plaintiff's counsel indicated that seven copies of transcripts were "not work product." Those transcripts comprised unbound paper copies of Doss' April 2, 2007 deposition, and a duplicate copy of that deposition; Alves' April 2, 2007 deposition; Routh's April 3, 2007 deposition, and a second single-sided copy of that deposition; Doss' April 9, 2007 deposition; and Charchour's April 11, 2007 deposition.

[295] In this email, I also stated, "[I]t is my understanding that Ms. Peters' production today of additional transcripts provides me with all sought for materials and Plaintiff (or Plaintiff's counsel) no longer retains in its possession any copies of discovery provided to it by Defendants, including, but not limited to, documents, deposition transcripts, CD-Roms, etc., and including, but not limited to, electronic copies of such discovery (e.g. electronic copies of documents, deposition transcripts, CD-Roms, etc.), but excluding exhibits attached to motions and pleadings filed in this action that contain portions of transcripts. Plaintiff's counsel, please represent to the Court whether that understanding is correct. (A 'yes' or 'no' answer would be appreciated.)"

Later that day, Silberberg directed Ms. Peters and Mr. Herman to contact Dorsey's technology staff to scrub remaining transcripts from their computers. See 9/4/07 Tr. 117:2-23.

"a) the effect of the confidentiality order in this action on Plaintiff's request, b) the effect of the Massachusetts litigation, or c) the interplay between those two issues."

On Tuesday, May 1, because of my increased concern about Ms. Peters', I ordered a court reporter to be present for this telephone conference. Ms. Peters stated, "Your Honor specifically stated to me that in clarifying its order that all exhibits to previous pleadings were something that I could use…" See Transcript of May 1, 2007, at 16. I corrected Ms. Peters and stated, "I never said that you could use them, never…. [U]nder this kind of language [the language of the confidentiality order] that you all agreed to… you can't use them… I said you could keep them because I didn't want them, but I never said you could use them." Id.[296] It continues to confound the Court that the clear language of the agreed-upon confidentiality order was simply overlooked or, worse yet, disregarded.

Ms. Peters also requested that Defendants return to her the 500 pages of "important and valuable" documents that she had produced to Plaintiffs.[297] Id. at 8.

I requested letter-briefs of a "couple of pages" from the parties regarding the use of deposition transcripts in other litigation, one from Plaintiff by Thursday, May 3, and an opposition by Defendants by Monday, May 7. See Transcript of May 1, 2007, at 11.

On Wednesday, May 2, I returned one (original) copy of the deposition transcripts at issue to Plaintiff's counsel for use in defending against Defendants' motion for sanctions and contempt, with the explicit proviso that such deposition transcripts were

---

At 6:23 P.M. that same day, Ms. Peters emailed me back and stated that the answer to my question was "yes." Email of Kristan Peters, April 27, 2007, 6:23 P.M.

[296] See also Transcript of May 1, 2007, at 17-18 ("Plaintiff: "Your Honor, if you look at the email that the Court sent on Friday, April 27, you clearly excluded exhibits attached to the motions and pleadings filed in this action." Court: "That's right. To keep, not to use.")

Ms. Peters also represented that "[T]he Court gave us assurances it would be the custodian of these [documents] until such time as it was transferred to Judge Stearns…" Id. at 10. I corrected Ms. Peters and stated, "I don't even know Judge Stearns, no less am I sending him anything, nor did I order and say I would. I'm keeping them… for the time being." Id.

[297] Ms. Peters averred in her Declaration that "Defendants had still not returned Plaintiff's documents… yet they are seeking a sanction against Plaintiff who returned its documents on the same day it was ordered to do so." See Peters Decl. ¶ 184. That said, Ms. Peters ignores that a) Plaintiff voluntarily dismissed the case before it provided discovery but after it accepted discovery, b) Dorsey made a copy of the discovery when the Court ordered that all copies be returned, c) Dorsey did not return all transcripts when ordered to do so, d) Ms. Peters ordered an additional copy of transcripts after learning of my order to return all transcripts, and e) Dorsey then used transcripts in Massachusetts, despite the Confidentiality Order that prohibited such use.

not to be used in "any other litigation, including but not limited to the new action in Massachusetts," and that such deposition transcripts would be returned to this Court after Plaintiff's opposition to Defendants' motion for contempt and sanctions.

DD.    Dorsey's Withdrawal as Counsel

On Tuesday, May 1, subsequent to the conference call that day, Jenner & Block attorneys noticed their appearance in this action on behalf of Plaintiff.

On Wednesday, May 2, 2007, at approximately 12:43 P.M., Ms. Peters told Doss' counsel Mr. Richardson, that even if Defendants disqualified her as counsel in the action, she would still "help them in the background" because of her "wealth of knowledge" in the case.  Richardson Aff., May 2, 2007 at ¶ 2.

On May 17, 2007, Dorsey & Whitney moved to withdraw as counsel at their client's request.  On May 18, 2007, I granted Dorsey & Whitney's motion to withdraw as counsel.

EE.    Subsequent Motion Practice

Ms. Peters, on behalf of Plaintiff, submitted a thirteen-page "Motion to Release Transcripts for Use in Continuing Cases" on May 3, in which she moved this Court to allow the use of the deposition transcripts at issue in the Massachusetts Action, No. 07-cv-10729 (D. Ma.), and the New York action filed by Defendants, No. 07-cv-3329 (S.D.N.Y.).  Defendants submitted their opposition on May 7.  Having requested a letter-brief of a "couple of pages," I denied Plaintiff's request to reply.

On May 23, 2007, I denied Plaintiff's motion to use the deposition transcripts in the Massachusetts action, holding that the Confidentiality Order barred such use.  See Wolters Kluwer Fin. Servs. v. Scivantage, 2007 U.S. Dist. LEXIS 37306 (S.D.N.Y. May 23, 2007).  I left in place the sanction that Plaintiff's counsel shall return to the Court the deposition transcripts after its defense of the sanctions motion.  I advised Ms. Peters to attend a  program at the New York County Lawyers Association entitled "Ethical Bounds of Aggressive Litigation," on June 19. Otherwise, I provided that further sanctions, if any, would await a ruling on Defendants' motion of April 24.

FF.    Defendants' Instant Motion and Subsequent Procedural History

On April 24, 2007, as noted, Defendants submitted their motion for sanctions pursuant to Fed. R. Civ. P. 37, Fed. R. Civ. P. 16(f), 28 USC § 1927 and the inherent powers of the court, and for civil contempt. On May 9, 2007, Defendants submitted supplemental declarations in support of their motion that detailed Plaintiff's actions in connection with the use of transcripts in Massachusetts. On May 10, Ms. Peters, on behalf of Plaintiff, requested more time to respond. That day, I responded to Ms. Peters' request and extended the date for fully briefed motions to May 30. (I subsequently extended that date to May 31.) On May 16, I also allowed Plaintiff Wolters Kluwer to submit a separate brief.

On May 21, 2007, Ms. Peters, on behalf of Dorsey, submitted a motion for extension of page limits to file a fifty-page opposition brief. "In an abundance of caution," on May 23, I extended the page limit from 35 pages to 39. Again on May 23, I granted Ms. Peters' request for an extra day to file her opposition, until May 24. Also on May 23, Plaintiff, now represented by Jenner & Block, submitted an opposition.

On May 23, as noted, in my opinion that denied Plaintiff's motion to use the deposition transcripts in the Massachusetts action, I noted that I would reserve decision on the sanctions requested by Defendants, and that such sanctions would "abide the fully briefed motion and any hearings that are warranted." See Wolters Kluwer Fin. Servs. v. Scivantage, 2007 U.S. Dist. LEXIS 37306, at *37.

At 12:19 A.M. on May 25, Ms. Peters, on behalf of Dorsey, served her opposition on Defendants with an unfinished version of her Declaration. Rabin Reply Decl. ¶ 4. At 4:45 P.M., May 25, (the Friday before Memorial Day weekend), Ms. Peters served the final version of her Declaration upon Defendants.

Ms. Peters' opposition brief is 39 pages long. Additionally, she submits a 72-page, 283-paragraph Declaration. Several arguments in her brief incorporated by reference wholesale sections of her Declaration. Including those sections, her brief would be 53 pages long.[298]

Defendants replied on May 31, 2007.

---

[298] Additionally, Ms. Peters attached the entire transcripts of the depositions taken in this action to her opposition, despite attaching substantial excerpts of the transcripts to other parts of her opposition. It might be inferred that if one lacked deference to the letter and spirit of court orders, this was Ms. Peters' effort to secure a copy of the transcripts under my Orders.

On June 5, counsel Charles Stillman noticed his appearance on behalf of Ms. Peters individually. On May 31, 2007, Ms. Peters, through her counsel, requested oral argument.[299] On June 11, I wrote the parties and stated that I believed "the fairest course to all involved" would be to hold an evidentiary hearing, and scheduled that hearing for Monday, June 25. I stated that "the scope of the hearing will encompass the relief requested by Defendants in their motion for contempt, sanctions, and fees." I asked the parties to exchange witness lists by June 15.

On June 12, 2007, Frank Wohl of Lankler, Siffert and Wohl noticed his appearance on behalf of Dorsey & Whitney.

On June 14, 2007, Ms. Peters returned to the Court the original transcript of her statement to the court reporter on April 6, 2007 regarding Charchour's deposition.[300]

On June 15, the parties exchanged witness lists per my direction. Ms. Peters, through her counsel, stated that she was prepared to "stand on the averments in her declaration," albeit with several reservations.[301] See Letter of Charles Stillman, June 15, 2007. The other parties named many (but not all) of the heretofore-named primary actors on their lists.[302] Defendants, in their letter, requested guidance on "topics on which [the Court] would like further elucidation." See Letter of Richard J. Rabin, June 15, 2007.

---

[299] On June 7, Ms. Peters, through her counsel, submitted a formal motion requesting, inter alia, oral argument.

[300] Herman testified that Ms. Peters had informed him that she had found this transcript. See 9/12/07 Tr. 356:17-357:4. Herman testified that he initially told Ms. Peters that he didn't think it needed to be produced, but that Ms. Peters then informed him that it was an original. See id. Herman then told Ms. Peters that if it was a copy, to destroy it like the other copies that had been destroyed, but if it was an original, to return it to the Court. See id.

Ms. Peters provided a different retelling. In her words, "…I called Mr. Herman up, because he was now the supervising attorney, and I really couldn't do anything without his approval, and I told him that I had located [the transcript], and he lowered his voice and said 'Destroy it.'" And I said, 'Well, as you recall, I told you that this is the transcript that [the Court's law clerk] told me I had to return.' And he said 'Destroy it.'" See 9/11/07 Tr. 155:3-22.

I found Mr. Herman's testimony more credible than Ms. Peters' on this score.

[301] Ms. Peters reserved the right to put questions to any witnesses called by other parties or the Court, to call other lawyers with knowledge of the facts and circumstances at issue (specifically including Defendants' lawyers), and reserved her "right" to elicit testimony from all participants in oral communications of this Court or the Part I Judge (Castel) to the extent the Court would consider basing sanctions on non-written directives of the Court. See Letter of Charles Stillman, June 15, 2007.

[302] Previously, on June 11, I had requested David Stephens and Charles Ross of Plaintiff Wolters Kluwer to be present. Wolters Kluwer represented that Stephens and Ross would be available, reserved the right to call the four individual Defendants and Defendants' lawyers from Akin Gump, and reserved the right to call witnesses after Defendants presented their case. Letter of Harry Sandick, June 15, 2007. Defendant Scivantage Parties listed Kristan Peters, Zachary Carter, and Marc Reiner from Dorsey (as well as a person

On June 19, 2007, I faxed a reply to Defendants, cc'g other counsel, wherein I stated that "[t]opics of interest to the Court include, but are not limited to, 1) Plaintiff Wolters Kluwer's knowledge, involvement, or direction of the litigation decisions made in this case, including but not limited to the filing of the Complaint, the negotiation of the Confidentiality Order, and the decision to pursue emergency relief in Massachusetts; 2) "Attorneys' eyes only" information disclosed to Plaintiff Wolters Kluwer, if any; 3) [t]he circumstances surrounding the canceling of depositions on April 12 and April 13; 4) [t]he circumstances surrounding Plaintiff's voluntary dismissal of Friday, April 13, and the canceling of scheduled depositions; 5) [t]he circumstances of Defendant's delivery of documents to Plaintiff's counsel on Friday, April 13, and the subsequent copying of said documents by Plaintiff's counsel, the return of documents and transcripts, as well as the role played by lawyers, if any, in this event; and 6) [t]he circumstances surrounding Plaintiff's application for emergency relief in Massachusetts." <u>See</u> Letter of Hon. Harold Baer, Jr., June 19, 2007.[303]

On Friday, June 22, 2007, the parties requested an adjournment of the hearing scheduled for Monday, June 25 in light of settlement discussions among the parties that the parties "hope[d] [would] obviate the need for a hearing." <u>See</u> Letter of Richard J. Rabin, June 22, 2007.[304]

On June 25, 2007, I met with the parties in Chambers and explained that notwithstanding their settlement discussions, Defendants' motion for sanctions and contempt raised continuing concerns about the ethical conduct of the parties. I further stated that I felt that in the interests of justice an evidentiary hearing was required to explore the issues raised by Defendants' motion.[305] Ms. Peters' counsel inquired as to the

---

with personal knowledge of the copying of CDs), Brian Longe, Deidra Gold, and Steven Isaacson from Wolters Kluwer, and Defendants' counsel Richard Rabin. Letter of Richard Rabin, June 15, 2007. Dorsey listed Carter and Reiner. Letter of Frank Wohl, June 15, 2007. Sanjeev Doss and the Scivantage Defendants also expressed their intention to call witnesses to authenticate billing records.

[303] This letter is misdated June 11, 2007.

[304] On Saturday, June 23, 2007, Ms. Peters apparently resigned from Dorsey. <u>See</u> Transcript of June 25, 2007 ("6/25/07 Tr.") at 72:14-15.

[305] <u>See</u> Transcript of June 25, 2007, at 74-75 (Court, speaking to counsel for Ms. Peters and Dorsey: "I think [the] role [of the lawyers involved] impacts on not just the judiciary, they have pretty hard backs and spines, but I think it reflects pretty much on the court system in a broader way, [and] that I suppose I'm the only champion of…. I don't know whether it's possible to have this kind of activity… without somebody standing up for – I mean, I hate to sound too corny, but somebody has to stand up for civility and

issues that concerned the Court, and I reiterated that those issues included, but were not limited to, the six areas of concern I laid out in my June 19 letter. <u>See generally</u> Transcript of June 25, 2007 ("6/25/07 Tr.") at 78-81. I made clear that it was up to the parties as to whether to proceed with their settlement in light of the planned hearing.[306] I requested that Defendants' counsel be present at the hearing to call witnesses in connection with their motion. <u>See</u> Transcript of June 25, 2007, at 88-89. At the parties' request, however, and with that caveat, I granted their request for adjournment until July 23, 2007, after some accommodation amongst the various counsel as to their availability on that date.

On June 26, 2007, I requested by letter from Wolters Kluwer a declaration from Deidre Gold, in-house counsel for Wolters Kluwer. Ms. Gold and Steven Isaacson both provided a declaration on July 10.

Also on June 26, 2007, according to Ms. Peters, Mr. Stillman informed her of his intention to withdraw from her representation, because of disputes over payment, stemming from disputes over indemnification between Ms. Peters and Dorsey. "Motion for a Continuance and for Disqualification of Judge Baer Pursuant to 28 USC 455 Because of Peters' Right to the Testimony of Judge Baer Concerning His Oral Orders," July 20, 2007 ("Peters Mot. For Cont."), <u>see also</u> Affirmation of Charles Stillman, July 9, 2007, at ¶ 3-4. On July 9, Mr. Stillman submitted a formal motion to withdraw. On July 10, I held a conference call with Ms. Peters and Mr. Stillman at which Ms. Peters requested to adjourn the hearing, or alternatively, to allow her to testify at a later date, as she might be placed in the situation of objecting to her own testimony. On July 11, I emailed the parties and granted Ms. Peters' request insofar as allowing her to testify on August 15, but expressed my intention to continue with the hearing on July 23 regarding other witnesses. Mr. Stillman emailed on July 11 that his understanding was that Ms.

---

appropriate conduct and truth telling… I think the problem is whether we can just forget about those things or if we don't have a higher and different job here… And that's why… I had decided that a hearing was the way to go, because I thought it would give [Ms. Peters] the opportunity to right some of the wrongs [alleged]…")

[306] <u>See</u> Transcript of June 25, 2007, at 86 (Court: "I'm disposed to buy whatever it is that you all have come up with in terms of resolution… subject to the understanding, preferably written in the settlement agreement, that the witnesses that any of us think would be valuable to this hearing are going to be available."); <u>see also</u> <u>id.</u> at 91 (Court: "At the moment, as far as I'm concerned, we're going ahead with the hearing.[…]You don't want to settle the case until it's over[?] That's a wonderful thing.").

Peters' sought-for new counsel, Mr. Engel, would submit his notice of appearance the next day, July 12. Mr. Engel did not do so.

On July 13, I held another conference call with Mr. Stillman and Ms. Peters and reiterated my intention to hold the hearing on July 23.

On July 16, I wrote the parties and, <u>inter</u> <u>alia</u>, reiterated that an evidentiary hearing would proceed on July 23, 2007, as previously scheduled, and that I "continue[d] to believe that providing the parties an opportunity to present testimony at a hearing is the fairest way to proceed for all." Letter of Hon. Harold Baer, Jr., July 16, 2007.

Also on July 16, Dorsey, by letter from its counsel, noticed the Court and the parties of its intention to call Richard Silberberg.

On Friday, July 20, Defendant Scivantage informed the Court by letter that it had reached a settlement with all parties (Plaintiff Wolters Kluwer, Dorsey, and Ms. Peters) and requested to adjourn the hearing. Wolters Kluwer seconded that request that day.

Also on Friday, July 20, Ms. Peters submitted a motion to again request to adjourn the hearing, based on the argument that she was not put on notice of the allegations raised against her by Defendants' April 24 motion, as well as the argument that she was forced to proceed at the hearing without counsel. <u>See</u> Peters Mot. For Cont. at 1-3. Ms. Peters averred that she had retained new counsel, Michael Ross. <u>See</u> Declaration of Kristan Peters, July 20, 2007, at ¶ 12. However, Mr. Ross averred in a Declaration that per the terms of his retainer, he was retained to begin his engagement <u>after</u> the hearing on July 23. <u>See</u> Declaration of Michael Ross, July 19, 2007, at ¶ 2. Ms. Peters also requested a trial by jury.

Ms. Peters in this motion also moved for my recusal, based on her averred "right" to call as a witness myself, and the Court's law clerk, as witnesses to my oral orders and untranscribed telephone calls. <u>See</u> Peters Mot. For Cont. at 3-4, <u>citing</u> 28 U.S.C. § 455(b)(1), (b)(5)(iv).[307]

Also on Friday, July 20, Dorsey submitted a pre-hearing memorandum. <u>See</u> Dorsey & Whitney LLP's Pre-Hearing Memorandum, July 20, 2007. Dorsey's memorandum contained further detail regarding allegations against Ms. Peters

---

[307] Although 28 U.S.C. § 455(b)(1) alternatively may be grounds for disqualification in situations where "personal bias or prejudice" exists, Ms. Peters did not raise allegations of bias or prejudice in this motion before this Court.

(specifically, inter alia, that Ms. Peters directed Reiner not to inform opposing counsel or the Court of the voluntary dismissal, and directed copying of documents after my April 16 order to return documents), and also volunteered admissions of involvement on the part of Dorsey partners (specifically, inter alia, that Carter approved submission of transcripts to the Massachusetts Court). Dorsey requested, inter alia, to seal the hearings because of the danger to lawyers' reputations, analogizing to the long-standing practice of maintaining as confidential lawyer disciplinary hearings. See id. at 12, citing, e.g., Johnson Newspaper Corp. v. Melino, 77 N.Y.2d 1, 7-8 (N.Y. 1990).[308]

GG.    Hearing of July 23, 2007 and Subsequent Procedural History

The hearing began on July 23, 2007, nearly three months after Defendants' motion for contempt and sanctions of April 24, 2007.[309] At the beginning of the hearing, I briefly recounted the procedural history of the case since Defendants' motion. See Transcript of July 23, 2007 ("7/23/07 Tr.") at 3-7.

I reiterated that "the issues that will be explored at this hearing will be as I explained on June 11 and again on June 25 the issues raised by defendants motion for sanctions and contempt and the inherent powers of the Court and for civil contempt." 7/23/07 Tr. at 7:15-18.[310] I further noted that I had reiterated those issues in my May 23 opinion, and articulated specific issues in my June 19 letter.[311] Id. at 8:8-11. I stated that "[a]ny sanctions or contempt imposed… will be based solely on the conduct of this

---

[308] Dorsey also argued that the jurisdiction of the district court was limited. See Agee v. Paramount Communications, Inc., 114 F.3d 395 (2d Cir. 1997) (holding that appellate jurisdiction was lacking after party voluntarily settled obligation to pay sanctions after district court judgment had been entered) (emphasis added). Dorsey argued as well that criminal due process protections were appropriate. See Mackler Productions, Inc. v. Cohen, 225 F.3d 136 (2d Cir. 2000).

[309] Obviously, issues of due process are raised whenever sanctions are being considered, but what particular processes a court uses will vary depending upon the circumstances and might be less than in other cases. See Joseph SANCTIONS TREATISE at 462-65. Because of the gravity of the behavior in this case, and because certain of the bases for sanctions raised by Defendants' motion require a finding of bad faith, I felt that a full hearing would provide those potentially facing sanctions with the most complete and effective opportunity to be heard. See id. 465.

[310] I noted that "if sanctions are warranted pursuant to [Fed. R. Civ. P.] 41(d) I may impose those as well." 7/23/07 Tr. at 7:18-20.

[311] Regarding Ms. Peters' characterization of my mention of misrepresentations at the June 25 conference as "new" allegations requiring separate notice, see 6/25/07 Tr. at 75, I stated that "[m]y mention of those misrepresentations was merely descriptive. They are not new." 7/23/07 Tr. at 8:13-14. I noted that Ms. Peters addressed Defendants' allegations of misrepresentations at length in her 70-odd page May 24 Declaration that accompanied her opposition to Defendants' sanctions motion. See, e.g., 5/24/07 Peters Decl. ¶¶ 11-25.

matter…" Id. at 7:25-8:1.[312]  I stated that "[n]o criminal contempt is contemplated at this time, nor has it been….  [I]f evidence received in this hearing leads me to believe that criminal contempt may be warranted, I will provide full notice and opportunity to respond to the parties."  7/23/07 Tr. at 7:21-24.

I denied Ms. Peters' request to adjourn the hearing once again owing to her averred inability to secure representation.[313]  I declined to grant Ms. Peters' request to have myself or my law clerk testify.  I noted that "legal and policy considerations prevent a judge who is presiding over a trial from being called as a witness or subjected to discovery, and this applies to evidentiary hearings as well."[314]  See 7/23/07 Tr. at 9:18-10:11, citing In re Evergreen Security, 2006 Bankr. Lexis 3727 (Bankr. M.D. Fla. 2006); Cheeves v. Southern Clays, Inc., 797 F. Supp. 1570 (M.D. Ga. 1992); United States v. Elmardoudi, 2007 U.S. Dist Lexis 47123 (N.D. Iowa 2007), citing United States v. Iannello, 740 F.Supp. 171, 189 (S.D.N.Y. 1990).  I noted, moreover, that "Ms. Peters' motion for recusal further undercut[] her efforts to obtain the testimony of my law clerk… which is equally protected."  7/23/07 Tr. at 10:21-24, citing United States v. Iannello, 740 F.Supp. at 187.[315]  "Where a litigant has sought to depose a law clerk in a case where a recusal motion is pending, courts have typically denied the testimony, as

---

[312] I added, however, that "knowledge by plaintiffs of any prior improprieties of Ms. Peters at the time it engaged her and initiated this lawsuit may be pertinent."  7/23/07 Tr. at 8:2-4.

[313] I stated that "… this is not a criminal proceeding, and even if it were, Ms. Peters made no averment that she is indigent and should have a CJA panelist appointed for her…. There's no civil right to counsel that I know of on the books."  7/23/07 Tr. at 8:17-22.  I noted that nearly three months had passed since Defendants filed their motion for sanctions, and nearly four weeks had passed since her counsel Mr. Stillman informed her of his intent to withdraw, and during which Ms. Peters "had opportunity to seek counsel."  Id. at 8:22-25.  I noted that "…I continued Ms. Peters' testimony to August 15 to address her concerns that without counsel at the hearing, she might be placed in a situation of testifying and objecting at the same time…"  Id. at 8:25-9:3.  I further noted that "…Ms. Peters will, if she chooses, be able to object and cross-examine the witnesses," and that "[a]lthough Ms. Peters is representing herself, I think she is, of course, an experienced lawyer and in a far better position than the great majority of pro se parties."  Id. at 9:6-10.  I noted as well that "[t]here is an interest in accommodating the other counsel who have arranged their schedules to be here today and to not delay these proceedings further, although I am not sure that Ms. Peters shares that interest."  Id. at 9:11-14.  I added that "Mr. Ross's declaration that he was specifically retained to begin after this hearing gives me some pause, but essentially, it's of no matter."  Id. at 9:14-17.

[314] "The legal obstacle is Rule 605 of the Federal Rules of Evidence."  In re Evergreen Security, 2006 Bankr. Lexis 3727, at *6. "The judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point."  Fed. R. Evid. 605.  "Trial" as used in Rule 605 encompasses any evidentiary hearing.  Cheeves v. Southern Clays, Inc., 797 F. Supp. at 1582.

[315] "Oral examination of a judicial or quasi-judicial officer as to matters within the scope of his adjudicative duties should be permitted only upon a strong showing of bad faith or improper behavior."  7/23/07 Tr. at 10:24-11:2, citing United States v. Iannello, 740 F. Supp. at 187.

allowing the law clerk to testify would in most cases dictate recusal." 7/23/07 Tr. at 11:2-6, citing Terrazas v. Slagle, 142 F.R.D. 136, 139 (W.D. Tex. 1992).[316] I declined to grant Ms. Peters' request for recusal.[317] 7/23/07 Tr. at 11:8-18.

I granted Dorsey's request to seal the proceedings, owing to the concerns of the danger to lawyers' reputations (albeit with the proviso that I might unseal them at a later time). See 7/23/07 Tr. at 12:5-18.[318] Ms. Peters orally requested, inter alia, a stay to appeal to the Second Circuit, which I denied. See 7/23/07 Tr. at 16:4-10, 18.

At the hearing that day, July 23, Deidra Gold and Chip Zyvoloski, in-house counsel for Wolters Kluwer, testified.

On July 27, Michael Ross and Robert Katzberg entered appearances on behalf of Ms. Peters. On July 30, I granted Mr. Stillman's motion to withdraw as counsel.

On August 9, Ms. Peters appealed my decision not to grant her motion for recusal to the Second Circuit, moved the Circuit to stay the sanctions proceedings, moved for an expedited briefing schedule, and moved for permission to file a petition for writ of mandamus. On August 14, the Circuit held that my decision was not appealable as a final order, and denied Ms. Peters' motions. See Order of Aug. 14, 2007, No. 07-3410 (2d Cir. 2007).

On August 10, Akin Gump had moved to withdraw as counsel for Scivantage, Charchour, Routh, and Alves, because Ms. Peters had threatened legal action against those parties if their counsel continued to examine witnesses.[319] See Affirmation of Richard J. Rabin, Aug. 10, 2007. I granted Akin Gump's motion on August 15.

---

[316] The Terrazas v. Slagle Court counseled against granting motions to subpoena law clerks that would essentially allow the movant to win a concomitantly pending motion for recusal through the "back door." See, Terrazas v. Slagle, 142 F.R.D. at 139 ("…[T]his Court has no doubt the real purpose of the Defendants is simply to disqualify the judges, something their motions to recuse have not been able to accomplish… [P]ublic inquiries by the litigants as to the internal operations and communications of the Court will, not may, destroy the integrity of our present legal system.")

[317] I also noted that "efforts to accommodate Ms. Peters" were "myriad," "going back [to] the very beginning when she came into Chambers for a TRO… on March 21," and "there has been adjournment after adjournment to accommodate her vacation schedule, and for a variety of other reasons." 7/23/07 Tr. at 11:13-17. This, of course, all after her original need for speed to protect her client.

[318] I rejected Dorsey's argument that the district court lacked jurisdiction. "Generally, a district court retains jurisdiction to address collateral issues such as sanctions or contempt." See 7/23/07 Tr. at 12:1-3, citing Cooter & Gell v. Hartmarx Corp., 496 U.S. 384 (1990). I noted that Agee v. Paramount Communications, Inc., 114 F.3d 395, addressed issues of appellate jurisdiction, and was inappropriate here. See 7/23/07 Tr. at 11:23-12:1.

[319] Mr. Rabin, of Akin Gump, had asked me to confirm at the July 23 hearing that he was present as an

On August 13, Ms. Peters' new counsel informed me by letter that Ms. Peters would continue to examine or cross-examine witnesses herself (despite her representations of prejudice owing to her lack of counsel at the July 23 hearing). <u>See</u> Letter of Michael Ross and Robert Katzberg, Aug. 13, 2007.

HH. <u>August 15 Hearing and Subsequent Procedural History</u>

The hearing continued on August 15, 2007.[320] Steve Isaacson, in-house counsel for Wolters Kluwer, and David Stephens, Charles Ross, and Joseph Honor, employees of Wolters Kluwer, testified. Most notably, Mr. Honor testified that Ms. Peters disclosed information from the "attorneys' eyes only" depositions to him. <u>See</u>, <u>e.g.</u>, 8/15/07 Tr. 207:1-7, 208:6-12.

On August 22, 2007, Ms. Peters wrote an apology of sorts to the Court, without admitting violations of Court orders.[321] On August 28, 2007, Ms. Peters' counsel informed the court that Ms. Peters had enrolled in a continuing legal education class called "Hot Topics in Legal Ethics." Letter of Robert F. Katzberg, Aug. 28, 2007.

II. <u>September 4 Hearing and Subsequent Procedural History</u>

The hearing continued on September 4, 2007. Joseph Honor completed his testimony, and Brian Longe (of Wolters Kluwer), and Richard Silberberg, Jeffrey Loop, and Marc Reiner of Dorsey & Whitney testified. Most notably, Mr. Silberberg testified regarding the allegations that Ms. Peters directed Jordan Brackett to alter transcripts

---

officer of the Court at the request of the Court, which I did. <u>See</u> 7/23/07 Tr. at 13:7-25.

[320] On August 14, my law clerk (at my direction) emailed the parties and expressed my view that the hearing should begin as previously scheduled with Ms. Peters' testimony. Email of Mark Noferi, Aug. 14, 2007, 11:45 A.M. Akin Gump expressed that they had planned to call other witnesses first, and Ms. Peters' counsel expressed that he had not planned to call Ms. Peters at all. I emailed Ms. Peters' counsel Michael Ross and stated that "I scheduled these hearings as I have mentioned before… in an effort to provide Ms. Peters primarily and perhaps others with the opportunity to rebut the various allegations which are or will be on the record." Email of Harold Baer, Aug. 14, 2007 2:57 P.M. "If your [Mr. Ross'] email reflects your client's intention to rest on the record, including her declaration, and waive that opportunity, I will not call her as a court witness. Consequently, if no other party sees fit to call her then she will not have to testify. Not hearing from you to the contrary I will assume that you have consulted with your client and that this is her decision." <u>Id</u>. At 5:33 P.M., Mr. Ross emailed back and stated "In response to the Court's request, presently it is our intent not to call any witnesses." Email of Michael Ross, Aug. 14, 2007 5:33 P.M. At 6:58 P.M., however, Ms. Peters emailed (after, she averred, consulting with counsel) and reserved the right to call herself, as well as Jon Herman, as rebuttal witnesses. Email of Kristan Peters, Aug. 14, 2007, 6:58 P.M.

Ultimately, at the hearing on September 4, Ms. Peters expressed her desire to testify. 9/4/07 Tr. 4:22-5:1.

[321] Because Ms. Peters requested to keep that letter "personal and confidential," I will not disclose the details of it here.

before their return to the Court.  See, e.g., 9/4/07 Tr. 88:22-89:15.  Dorsey also proffered exhibits showing that Ms. Peters sought an additional set of transcripts on April 21, subsequent to my April 19 order to Mr. Carter to return all transcripts.  See Dorsey Ex. H, I, J.

On September 5, I directed Mr. Brackett by letter to provide a Declaration to the court by September 10.  Mr. Brackett did so.  See Declaration of Jordan Brackett, September 9, 2007.

On September 10, Ms. Peters wrote the Court and requested to cross-examine Mr. Brackett and Mr. Herman, and to call Eric Epstein.[322]  Although it was late in the game and out of turn, I permitted the examinations by Ms. Peters of Brackett, Herman, and Epstein.

JJ.  Hearings of September 11 and 12

The hearing continued on September 11, 2007.  Zachary Carter testified, and Ms. Peters cross-examined him at length.[323]  Ms. Peters chose to testify, and testified and was cross-examined at length.[324]

The next day, September 12, the hearing continued.  Jonathan Herman, Eric Epstein, Jordan Brackett, and Eve Morris, all of Dorsey & Whitney, testified.  After the testimony, counsel for Wolters Kluwer reached a stipulation with counsel for the three primary individual Defendants that the Defendants had, indeed, taken some confidential and proprietary documents with them from Wolters Kluwer (without specifying which ones).[325]  The hearing concluded.[326]

---

[322] Ms. Peters also requested to recall Richard Silberberg and to examine the Akin Gump lawyers.  Akin Gump wrote the court and opposed Ms. Peters' request, averring that "[a]t this stage, with ten witnesses having testified and at least two additional witnesses to be called, it is highly unlikely that [the Akin Gump lawyers] possess first-hand information that is otherwise unknown to the Court."  Letter of Richard Rabin, Sept. 10, 2007.  I denied Ms. Peters' requests at the Sept. 11 hearing.

[323] See 9/11/07 Tr. at 9-64 (Carter direct); 9/11/07 Tr. at 64-147 (Ms. Peters cross).

[324] See 9/11/07 Tr. at 150-229 (Peters direct); 9/11/07 Tr. at 229-314 (cross by various counsel).

[325] See 9/12/07 Tr. 428:13-18.  This stipulation, by its terms, was limited to these sanctions proceedings and was not for use in other proceedings.  See id. at 428:7-12.

[326] At the end of the hearing, I stated on the record:

"I can't thank all of you enough for having spent all this time on what I know is not a labor of love.  I know, too, that you rather I never held this hearing, and certainly believe that if I had to hold one, that it would have been a lot shorter.

It's worth mentioning that I too had just a few other responsibilities and obligations, and I understand that the legal profession would have just as well not had any of this conduct displayed, to say nothing of the

KK.    Post-Hearing Procedural History

Following the hearing, I provided the parties the opportunity to submit post-hearing Memoranda of Law.  As a result, I received briefs from Dorsey & Whitney, Plaintiff Walters Kluwer, and Kristan Peters.[327]

## III.    DISCUSSION

As noted above, the Code of Conduct for U.S. Judges provides that when presented with "reliable evidence indicating the likelihood of unprofessional conduct by a…lawyer" a judge should initiate "appropriate action."  The lengthy and detailed facts outlined above, all of which occurred over a brief span of less than three months, provide a vacuum-packed picture not only of unprofessional conduct by lawyers but also of a desire to shield one another, their peers, and the public from such disclosures.  The next question then is what constitutes appropriate action.  As the 2nd Circuit has noted, "[t]o deal effectively, fairly, and efficiently with sanction claims, district courts have a difficult task, but wide discretion." Oliveri v. Thompson, 803 F.2d 1265, 1280 (2d Cir. 1986).  Of

---

time spent.  So I want to thank you for having been here and having done this job so assiduously so that we got as much information as we got.

In an effort to keep… privacy… I have, as you know, sealed the courtroom throughout the course of this hearing, to say nothing of most all of the written material.  You should also know that the length of time I allowed was due to the fact that in my view these are serious issues, and Ms. Peters deserved to have an opportunity to defend herself with respect to her own testimony, to say nothing of her right to examine the witnesses.  I've also allowed her last minute decisions to include witnesses who were never on the witness list, and I understand there were objections to that.  I'm glad nobody made more of it than they did, to say nothing of the order that sometimes makes lawyers a little jumpy, and I allowed her to take witnesses essentially in more than one instance in the order she chose rather than the order that had been prepared…

…I am confident that you share my view that the justice system in the United States is an example for all other nations, and that the preservation of that system frequently falls to the judiciary.  The allegations that were made in this matter against Ms. Peters were such in that in my view, a hearing was necessary and was the fairest way to go about the problem, and it was my hope, which I think was vindicated, that it would shed light on all of the allegations, as well as give her an opportunity to rebut them.

This, in my view, is the way in which our justice system should operate, and the results or conclusions should not be secret.  While settlements in cases such as this are sometimes the way in which the matter is resolved, and sometimes settlements are the answer to lawsuits, whereas here there are significant ethical concerns, I think… this hearing is the better way to go about it and, of course, [that] played a role in my decision to have one.

…[T]he Court has an obligation to make sure that if the conduct is found to be reprehensible and mocks the justice system or worse, something is done about it.  And if the conduct is found not to be reprehensible, that result too should be given exposure.

I want to thank you all again for all your efforts in connection with this hearing, and the hearing is adjourned *sine die*."

9/12/07 Tr. 443-445.

[327] These memoranda were filed under seal.

course, the predicate to the question of what *should* be done is what *can* be done.[328] Therefore, I will begin by briefly discussing various bases for sanctioning power before setting out the sanctionable conduct in this case.

A.      Bases for Sanctions

Because I limited the scope of the hearing to those issues raised in Defendant's original sanctions motion, I will here discuss only those relevant sources of the Court's power to impose sanctions—28 U.S.C. § 1927, the inherent powers of the Court, and Fed. R. Civ. P. 37 and 16(f) for violations committed during the discovery process.[329]

a.   *28 U.S.C. § 1927*

28 U.S.C. § 1927 provides that "any attorney or other person admitted to conduct cases in any court" who "so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.

---

[328] Beyond grounding in proper authority, the imposition of sanctions obviously implicates the due process concerns of adequate notice that sanctions are being considered, as well as an opportunity for those potentially facing sanctions to be heard. In the present case, these procedural safeguards were amply provided. The parties involved were put on notice with Defendants' motion for sanctions. See Gregory P. Joseph, SANCTIONS—THE FEDERAL LAW OF LITIGATION ABUSE 417 (Matthew Bender 2000) (noting that a sanctions motion by the opposition will typically provide the required notice) [hereinafter "SANCTIONS TREATISE"]. Moreover, as previously explained, prior to the hearing I expressly stated to the parties that the hearing would consider the same issues raised in the sanctions motion. Thus, any suggestion that the withdrawal of the sanctions motion somehow "erased" notice to the parties is unconvincing. While Rule 11 sanctions require an order to show cause before they can be imposed, the bases for those sanctions considered here do not. See Joseph, SANCTIONS TREATISE at 417-419. (noting that, with regard to § 1927, adequate notice and opportunity to be heard will vary depending upon the circumstances, but that explicit warning from the court or from a sanctions motion by opposing counsel will certainly suffice as to notice, as will a hearing on the record for purposes of an opportunity to be heard). Additionally, the hearing on the record as well as the opportunity to submit post-hearing memoranda certainly provided the parties with adequate opportunity to be heard. See Joseph, SANCTIONS TREATISE at 420, 465 (noting that a formal hearing is not invariably required before imposing sanctions, but rather up to the discretion of the judge in light of the particular circumstances). See also, United States v. Nesglo, Inc., 744 F.2d 887, 890-91 (1st Cir. 1984)(finding a hearing before imposing sanctions in that case was not required because of the District Judge's extensive familiarity with the entire course of the litigation and parties' conduct).

[329] It should be noted that sanctions will not be imposed here under Fed. R. Civ. P. 11. Generally, because of the "safe harbor" provisions of Rule 11 that provide a party with the opportunity to cure a defective paper or pleading within 20 days, a voluntary dismissal within that "safe harbor" time serves to immunize a party or counsel from Rule 11 sanctions. See Gregory P. Joseph, SANCTIONS—THE FEDERAL LAW OF LITIGATION ABUSE 330 (Matthew Bender 2000) [hereinafter "SANCTIONS TREATISE"].

Additionally, Rule 11 provides a party or counsel with specific procedural protections before sanctions may be imposed – namely, that *sua sponte* sanctions must be issued pursuant to an Order to Show Cause. See Joseph, SANCTIONS TREATISE at 343. Accordingly, monetary sanctions pursuant to Rule 11 may not be awarded unless a show cause order is issued prior to a voluntary dismissal. Id. at 331. That said, however, the requirement of an Order to Show Cause does not apply to sanctions imposed under 28 U.S.C. § 1927 or the inherent powers of the Court. See Joseph, SANCTIONS TREATISE at 417-419.

The purpose of the statute is "to deter unnecessary delays in litigation." Oliveri v. Thompson, 803 F.2d 1265, 1273 (2d Cir. 1986), citing H.R. Conf. Rep. No. 1234, 96th Cong., 2d Sess. 8. "An award under § 1927 is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose," such as delay. Oliveri v. Thompson, 803 F.2d at 1273, citing Acevedo v. Immigration and Naturalization Service, 538 F.2d 918, 920 (2d Cir. 1976). See also, Malhiot v. Southern California Retail Clerks Union, 735 F.2d 1133 (9th Cir. 1984) (awarding sanctions under § 1927 for misleading statements); Penthouse International, Ltd. v. Playboy Enterprises, Inc., 663 F.2d 371 (2nd Cir. 1981) (affirming district court dismissal of action for prolonged obstruction of discovery and misleading statements by counsel); Unique Concepts, Inc. v. Brown, 115 F.R.D. 292 (S.D.N.Y. 1987).

Because of the importance of legitimate zealous advocacy, and because § 1927 sanctions are punitive in nature, courts should strictly construe the statute. See, e.g., Braley v. Campbell, 832 F.2d 1504, 1512 (10th Cir. 1987) (en banc). Moreover, a finding of bad faith is a prerequisite to sanctions under 28 U.S.C. § 1927. Oliveri v. Thompson, 803 F.2d 1265, 1273. It should also be noted that sanctions imposed under 28 U.S.C. § 1927 may only be imposed on counsel, not the client. See Oliveri v. Thompson, 803 F.2d at 1273. In addition, "[b]ecause the statute is penal in nature…and is to be strictly construed, no vicarious liability should be imposed on third parties, such as uninvolved partners of violators or law firms. To extend liability beyond violators would not conform with the punitive nature of the statute." Joseph, SANCTIONS TREATISE at 380. Importantly, sanctions pursuant to § 1927 may be imposed after the underlying action has been dismissed or judgment entered. Id. at 414. Finally, the statute leaves the decision of whether to impose sanctions within the discretion of the court, and the court will typically consider equitable factors in deciding whether sanctions are warranted. Id. at 411.

   b.  *Inherent Powers of the Court*

 Federal courts necessarily have the power to "protect the administration of justice by levying sanctions in response to abusive litigation practices." Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 11 (1st Cir. 1985) (internal citation omitted). See also Link v. Wabash R.R., 370 U.S. 626, 632 (1962) (noting that inherent powers of

a court to impose sanctions is "well-acknowledged"); Chambers v. NASCO, Inc., 501 U.S. 32 (1991) (statutes and Federal Rules of Civil Procedure in no way limit inherent powers, but rather expand upon them).   Under the inherent power of the court to supervise and control its own proceedings, a court may award a reasonable attorneys' fee to the prevailing party when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  Oliveri v. Thompson, 803 F.2d at 1272, citing F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc., 417 U.S. 116, 129 (1974).[330]

In order to impose sanctions pursuant to its inherent power, a finding of bad faith is necessary.  See id. ("'Bad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation."), citing Hall v. Cole, 412 U.S. 1, 15 (1973).[331]  Awards should be imposed based on clear evidence that the challenged actions are entirely without color, and are taken for reasons of harassment or delay or for other improper purposes, and such sanctions require "a high degree of specificity in factual findings."  See id. (citations omitted).

As the Supreme Court has recognized, "[b]ecause inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980).  Nonetheless, courts have wide discretion in fashioning inherent power sanctions, and "their compensatory aspect is only incidental." Joseph, SANCTIONS TREATISE at 450.[332]

Sanctions imposed under the inherent powers of the Court may be imposed against either counsel or the client.   "Indeed, the only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is… that awards under § 1927 are made only against attorneys or other persons authorized to

---

[330] Importantly, inherent power sanctions can be imposed in a wide variety of circumstances—indeed, at any point during a litigation—and for a wide variety of misconduct, including discovery abuse not covered by the applicable Federal Rules of Civil Procedure.  Joseph, SANCTIONS TREATISE at 438.

[331] Note, though, that a finding of bad faith is personal to the offender and thus cannot be attributed to another, such as an offending attorney's client or law firm, through such legal doctrines as vicarious liability.  Joseph, SANCTIONS TREATISE at 446.

[332] Such sanctions might include monetary penalties such as imposition of fines, attorneys' fees, or expenses, and might also include non-monetary penalties up to and including suspension or disbarment of counsel.  See Joseph, SANCTIONS TREATISE at 450-52.  See also, In re Snyder, 472 U.S. 634, 643 ("Courts have long recognized an inherent authority to suspend or disbar lawyers").

practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." <u>Oliveri v. Thompson</u>, 803 F.2d at 1273.

### c. *Discovery Sanctions Pursuant to Fed. R. Civ. P. 37 and 16(f)*

Rule 37 promotes "strict adherence to the responsibilities counsel owe to the Court and to their opponents." <u>Blauinsel Stiftung v. Sumitomo Corp.</u>, 2001 U.S. Dist. LEXIS 20746, at *17-18 (S.D.N.Y. 2001), <u>citing</u>, <u>e.g.</u>, <u>Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.</u>, 602 F.2d 1062, 1067 (2d Cir. 1979). Rule 37 sanctions "must be applied diligently both to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such deterrent." <u>Id.</u>, <u>citing</u> <u>Roadway Express, Inc. v. Piper</u>, 447 U.S. 752, 763-64 (1980); <u>Update Art, Inc. v. Modiin Publishing, Ltd.</u>, 843 F.2d 67, 71 (2d Cir. 1988).

Specifically, Rule 37(d) mandates the imposition of sanctions on a party, or "the attorney advising that party," who "fails to appear" for a deposition "after being served with proper notice." <u>See</u> Fed. R. Civ. P. 37(d). Additionally, Rule 37(b)(2) provides that if a party fails to obey an order to provide or permit discovery, that party, or the attorney advising it, may be liable for expenses including attorneys' fees. <u>See</u> Fed. R. Civ. P. 37(b)(2).

Additionally, Fed. R. Civ. P. 16(f) provides, <u>inter</u> <u>alia</u>, that a party or party's attorney who fails to obey a pretrial or scheduling order or fails to participate in a scheduling or pretrial conference in good faith may be liable for sanctions as set out in Rule 37(b)(2), including attorneys' fees.[333] <u>See</u> Fed. R. Civ. P. 16(f). Sanctions may be imposed under 16(f) to punish for improper conduct, <u>United States v. Samaniego</u>, 345 F.3d 1280, 1284 (11th Cir. 2003), and without a finding of bad faith. <u>Rice v. Barnes</u>, 201 F.R.D. 549, 551 (M.D.Ala. 2001) (violation need not be willful to be sanctionable).

---

[333] Fed. R. Civ. P. 16(f) provides in full:

"If a party or party's attorney fails to obey a scheduling or pretrial order, or if no appearance is made on behalf of a party at a scheduling or pretrial conference, or if a party or party's attorney is substantially unprepared to participate in the conference, or if a party or party's attorney fails to participate in good faith, the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D). In lieu of or in addition to any other sanction, the judge shall require the party or the attorney representing the party or both to pay the reasonable expenses incurred because of any noncompliance with this rule, including attorney's fees, unless the judge finds that the noncompliance was substantially justified or that other circumstances make an award of expenses unjust."

B.  Sanctionable Conduct

Commonly, as reflected in the discussion of the various sources of sanctioning power above, sanctions are financial in nature—be they attorneys' fees, costs of excess litigation, or even fines.  All that having been said—and with ample cause and authority to impose sanctions—after much consideration I have decided not to impose financial sanctions.  As explained above, the sanctions motion was withdrawn after the parties negotiated a settlement amongst themselves.  While the terms of the settlement are confidential and I see no reason to delve into them further, suffice it to say that I am satisfied that the costs incurred by the parties—both financial and emotional—in this case have been significant and sufficient under the circumstances.  This does not, however, include the time and effort expended by Akin Gump in connection with the five days of hearings and I will entertain an application for those fees.  If they choose to make such an application, it should be provided on notice to Dorsey & Whitney within ten days from the date of this Opinion, with any response due ten days thereafter.

However, monetary sanctions are not the only, or even the primary, concern here.  If among the basic goals of our profession are "protection of the public" and "preservation of confidence by the public," then misconduct such as that on display here deserves to see the light of day.[334] As the lengthy recitation of facts above makes clear, there has been no shortage of deplorable behavior here that, without question, rises to the level of sanctionable conduct.  Therefore, I impose public reprimand for each instance of such conduct, as I have spelled them out in the following sections.  In addition, I will forward a copy of this decision to the Grievance Committee for the Southern District of New York and to the Attorney Disciplinary Committee in the First Department.

a.  *Plaintiff's Initiation of Action*

Plaintiff's Complaint, supported by its moving papers, contained the following sentence:  "Defendants have been able to jump start their further penetration of the market by using plaintiff's… software code…"  Pl. Compl. ¶ 39.  I find that this statement in Paragraph 39, in conjunction with Plaintiff's supporting moving papers, was

---

[334] Leslie C. Levin, The Emperor's Clothes and Other Tales About the Standards for Imposing Lawyer Discipline Sanctions, 49 AM. U. L. REV. 1, 6(1998-1999).  However, as Professor Lavin points out, "the tendency to impose non-public sanctions on lawyers [and] the failure to publicize the 'public' sanctions" raise "serious doubts" about whether these goals are being met.  Id. at 5-6.

not well grounded in fact, and made in bad faith in an attempt to mislead this Court into granting expedited relief based on the misperceived fact that Defendants had stolen and were at that time currently using Plaintiff's software code. Furthermore, although Wolters Kluwer expressed their concerns to Ms. Peters about this paragraph, in the end, Wolters Kluwer approved its submission.[335]

Accordingly, under the inherent powers of the Court I reprimand both Ms. Peters and Wolters Kluwer for the misleading statement in Paragraph 39 of the Complaint.[336]

### b. *TRO Hearing*

Following the submission of Plaintiff's moving papers to this Court that stated that Defendants were "using plaintiff's software code," Ms. Peters gave shifting and evasive answers at the hearing as to whether Defendants had stolen code. She then averred, "Mr. Doss does write code." Given Plaintiff's prior submission to the Court with the intention to secure expedient relief based upon an impression that Defendants had stolen and were using code, I find that Ms. Peters' statement that "Mr. Doss does write code," at a hearing to determine whether that expedient relief should continue, was made in bad faith in an attempt to mislead the Court.

Additionally, at the TRO hearing, Ms. Peters repeatedly mischaracterized my March 22 verbal order, memorialized in writing in my March 23 order, that "beginning Monday, March 26, 2007, Defendants [would] arrange for… imaging" as an Order that Defendants would provide imaging to Plaintiff on Monday, March 26, 2007.[337]

---

[335] Although Ms. Peters averred at the time that this paragraph was "advocacy," "the creativity of an attorney may not transcend the facts of a given case." See Levine v. FDIC, 2 F.3d 476, 479 (2d Cir. 1993) ("counsel in his attempts at creativity concocted 'facts' that were not well grounded, and therefore exceeded the bounds of conduct acceptable of members of the bar of this court…"); see also In re Kelly, 808 F.2d 549, 551 (7th Cir. 1986) (Posner, J.) (when an attorney "chose to state as a fact what was at the best a guess and a hope, he engaged in misrepresentation.").

[336] I decline to impose sanctions on Plaintiff Wolters Kluwer or Dorsey or Ms. Peters for bringing this action with the illegitimate purpose of disrupting Defendants' business. The direct evidence adduced during these hearings did not support such a finding of such purpose at the beginning of this litigation. I note, however, that Mr. Stephens April 26 email to in-house counsel that Defendants were appearing at an industry conference, and that "having a TRO to prevent their presence would be very helpful to our business," gives me some pause.

[337] The repetitive presentation of previously rejected positions generally constitutes an "improper purpose," as it is harassment. See Zaldivar v. Los Angeles, 780 F.2d 823, 832 (9th Cir. 1986) (filing of successive complaints based upon proposition of law previously rejected constitutes harassment); Robinson v. National Cash Register Co., 808 F.2d 1119, 1130 (5th Cir. 1987) ("the filing of successive motions…" could "constitute an improper purpose under Rule 11 such as harassment or delay").

I find that Ms. Peters' statements were made in bad faith for an improper purpose. Accordingly, under 28 U.S.C. § 1927 and the inherent power of the Court, I hereby reprimand Ms. Peters for those statements.

### c. *Defendants' Discovery Objections and Requests*

On March 29, Ms. Peters requested that I immediately provide dates for production of discovery, despite my admonition to the parties to meet and confer and provide me with a schedule; she requested that I provide a deadline for Defendants' discovery, despite the fact that I had just provided one; she stated that Defendants had violated a Court order by not providing imaging, even though I had just extended Defendants' deadline to do so; and she requested an immediate conference to address her other discovery requests, despite the fact that no outstanding objections existed.

I find that Ms. Peters' March 29 letter was made in bad faith, and for the purposes of harassment (in forcing Defendants to expend time, money, and effort to respond to frivolous arguments and to provide immediate discovery, not to mention forcing the Court to respond to frivolous arguments). Accordingly, under 28 U.S.C. § 1927 and the inherent power of the Court I hereby reprimand Ms. Peters for this March 29 letter.

### d. *Plaintiff's Motion to the Part I Emergency Motions Judge to Compel Depositions*

I decline to sanction Ms. Peters for her motion to the Part I emergency motions judge, Judge Castel, in part because Ms. Peters has put in issue *ex parte* and/or untranscribed conversations with Judge Castel by requesting his testimony, and I have not relied on any recollection by Judge Castel as to that conversation here.

I do find sanctionable, however, the portion of Ms. Peters' Declaration in which she contradicted her contemporaneous March 30 email by adding a semicolon that subtly or not so subtly changed Judge Castel's order to imply that it only applied to the depositions scheduled for Monday. See Peters Decl. ¶ 79 ("Judge Castel ordered that the deposition of the four witnesses Monday; and Tuesday will be on an attorneys' eyes only basis…"). As noted supra, there is a strong inference that Ms. Peters planned to circulate the depositions and knew, too, that her disclosure of questions asked to and answered by Mr. Honor at the Tuesday depositions was witnessed by others, and might come to light, and that her use of the semi-colon to provide a misleading interpretation of Judge Castel's

order was made in bad faith. Consequently, under the inherent power of the Court I hereby reprimand Ms. Peters for this statement.

### e. *Alves' Deposition*

Ms. Peters' attempted to create a false record that Alves took unduly long breaks, and then mischaracterizing those breaks on the record as "15 minutes" and "10 minutes," when the record belies her contentions. I find that Ms. Peters' actions were made in bad faith, and under the inherent power of the Court I hereby reprimand Ms. Peters for those actions.

Ms. Peters' contention on the record that the Federal Rules of Evidence provide (without leave) for a deposition of seven hours on more than one day is wholly meritless. I find that this contention was made in bad faith, for the purposes of harassment. Under 28 U.S.C. § 1927 and the inherent power of the Court I hereby reprimand Ms. Peters for this contention.

### f. *Routh's Deposition*

Mr. Honor testified that at Routh's deposition, Ms. Peters disclosed to him questions asked, and answers given, in the deposition. Specifically, Honor recalled that Ms. Peters told him that she had asked a question to Routh about a customer list, and that Routh had answered that he couldn't remember. There is no other source from which Honor could have received this information from what was, and still is, an "attorneys' eyes only" deposition unless he received it from Ms. Peters.

Accordingly, I hereby find that Ms. Peters, in bad faith, disclosed information from an "attorneys' eyes only" deposition to an employee of her client, and thus violated a Court order—the very confidentiality order to which she herself had subscribed—with the knowledge and intention to violate such Court order.[338] Under Fed. R. Civ. P. 16(f) and the inherent power of the CourtI hereby reprimand Ms. Peters for this action.

### g. *Charchour's Deposition*

At the end of Charchour's deposition, Ms. Peters again contended on the record that Charchour should be deposed again, despite my now-explicit admonition of April 6

---

[338] I decline to sanction Mr. Honor for his role in these actions. There is no evidence that Mr. Honor, on his own initiative, sought information from the depositions in bad faith. Indeed, Honor thought that the "attorneys' eyes only" order only meant that he couldn't be in the room, not that he couldn't discuss the testimony. It was Ms. Peters' role to advise Mr. Honor of the meaning of the order, and she apparently failed in her responsibility to do so.

that depositions were limited to one day and seven hours, in accordance with Fed. R. Civ. P. 30(d)(2). Ms. Peters then threatened defense counsel with further sanctions and contempt motions if Defendants did not comply. The fact that her threats were made in bad faith, for the improper purpose of harassing Defendants by forcing them to respond to unnecessary motions, provide additional discovery, and by driving up their legal fees, is evident from the face of her statements.[339]

Accordingly, under 28 U.S.C. § 1927 and the inherent power of the Court, I hereby reprimand Ms. Peters for these statements on the record.

### h. *Ms. Peters' Conduct at Depositions, Generally*

At various times in these depositions, Ms. Peters refused to show witnesses documents from which she quoted, showed documents to witnesses from across the table, refused to provide copies of documents to counsel, refused to allow witnesses to take breaks, and threatened to call security when opposing counsel stated his intention to approach a Magistrate with a discovery dispute.

Under the inherent power of the Court I hereby reprimand Ms. Peters for these actions.

### i. *Plaintiff's April 6 Motion for Contempt and Sanctions*

Ms. Peters premised her motion on the argument that Defendants failed to move for a protective order by the previous April 5 deadline. This argument was meritless on its face. Further, as all discovery at this point was "attorneys' eyes only" per my Order, I had addressed Defendants' concerns, and Ms. Peters had no basis to move for contempt and sanctions owing to lack of its production. All Ms. Peters needed to do was accept the discovery under that basis once Defendants offered it to her, which Defendants subsequently and promptly did following my April 6 directives.

Accordingly, I find that Ms. Peters' motion was meritless, made in bad faith, and designed to harass Defendants by forcing them to respond to a meritless contempt

---

[339] Indeed, the assertion of sanctions motions at every turn is in itself sanctionable. See <u>Townsend v. Holman Consulting Corp.</u>, 881 F.2d 788, 797 (9th Cir. 1989) ("All concerned: trial courts, appellate courts, attorneys, and most important the litigants themselves… suffer from the overlitigation of sanctions questions."). In the context of Rule 11, the <u>Townsend</u> Court stated, "[one party's attorneys] moved for sanctions with each motion filed in this case…. We do not think that Rule 11 is properly used when used out of habit or as a standard device to burden an adversary with responses on issues collateral to the merits of a claim." <u>Townsend v. Holman Consulting Corp.</u>, 881 F.2d 788, 797.

motion. Under 28 U.S.C. § 1927 and the inherent power of the Court I hereby reprimand Ms. Peters for these actions.

### j. *Confidentiality Order*

On April 9, Ms. Peters emailed a proposed Confidentiality Order to her adversary for the first time, on the day it was due. Less than an hour later, Ms. Peters emailed her proposed Confidentiality Order to the Court. The next day, April 10, Ms. Peters stated that Defendants submitted their "own version with no effort at negotiation." I find that these actions were made in bad faith, and intended to mislead the Court by implying that Defendants instead acted in bad faith, and thus that this Court should adopt Plaintiff's Confidentiality Order rather than Defendants.

Under the inherent power of the Court I hereby reprimand Ms. Peters for her presentation of the Confidentiality Order to this Court.

### k. *Defendants' April 11 Production of Documents*

Despite several representations by Ms. Peters that Defendants had failed to produce documents, the evidence shows that Defendants' counsel had proffered the documents and that Ms. Peters had refused to accept it, instead choosing later to make statements to the Court that Defendants had failed to comply with their obligations.

Accordingly, I find that Ms. Peters' above statements were misleading and inaccurate, and made in bad faith, with the improper purpose of harassing Defendants by forcing them to respond to Ms. Peters' inaccurate arguments, and for the improper purpose of inaccurately implying to the Court that Defendants failed to comply with Court orders. Under the inherent power of the Court I hereby reprimand Ms. Peters for the above statements.

### l. *Ms. Peters' Statements Regarding Plaintiffs' Production of Discovery*

Ms. Peters repeatedly made inaccurate statements about the production of Plaintiff's documents, without any basis for doing so, in an attempt to force Defendants into producing their discovery more quickly. In fact, Ms. Peters only had the 500 pages of generally publicly available documents, and had not discussed with Mr. Loop whether substantive documents were accessible, let alone ready, for production.

Accordingly, I find that Ms. Peters' statements to opposing counsel and the Court were misleading and inaccurate, and made in bad faith, for the improper purpose of

gaining an advantage by procuring Defendants' discovery before Plaintiff provided meaningful discovery of its own. Under the inherent power of the Court I hereby reprimand Ms. Peters for these statements.

m. *Ms. Peters' and Dorsey's Statements and Actions Regarding Court-Ordered Depositions*

The evidence shows that on April 2, when presented with Defendants' notices of depositions, Ms. Peters made scant (if any) effort to produce witnesses for those dates. Ms. Peters also emailed to the Court her proposed schedule without providing Defendants an opportunity to respond. Ms. Peters' proposed schedule directly conflicted with Defendants' noticed depositions. Despite my instructions to do so, Ms. Peters made no effort to confer with Defendants to work out a mutually agreeable solution. Subsequently, I ordered several depositions of Plaintiff's witnesses on April 11.

Regarding David Stephens' deposition, I decline to impose sanctions for the fact that Mr. Stephens was not produced as ordered on April 12.[340]

Regarding Michael Wiatrak's deposition, despite Ms. Peters' averment the night before that she would take the deposition, no one from Dorsey appeared to take it. Under Fed. R. Civ. P. 37 and the inherent power of the Court I hereby reprimand Ms. Peters for their failure to appear.

Furthermore, I find Ms. Peters' false statements to Defendants' counsel that Ross had a vacation on April 13 and thus could not appear for the full time to be made in bad faith, in an apparent attempt not to produce Ross until she had examined Defendants' witnesses. Under the inherent power of the Court, I hereby reprimand Ms. Peters for these false statements.

Regarding Bill Wagner's deposition, under Fed. R. Civ. P. 37 and the inherent power of the Court I hereby reprimand Ms. Peters for her failure to appear.

---

[340] That said, I hereby reprimand Ms. Peters for her statement to the Court on April 12 at 8:02 P.M. that Stephens was not available the next week (the same week as her vacation). Stephens was available, and had informed Ms. Peters of that fact. Ms. Peters' statement was misleading, inaccurate, and made in bad faith, in an attempt to gain an advantage by rescheduling the deposition at a time when she could personally defend it, rather than an associate in her law firm (despite her initial lack of effort to produce Stephens at a time not during her vacation).

Additionally, Ms. Peters' statement in Paragraph 149 of her Declaration in opposition to this Sanctions motion that Defendants' counsel "flatly refused to proceed" with Stephens' deposition is inaccurate, misleading, and plainly belied by the evidentiary record. Ms. Peters is hereby reprimanded for this statement.

Additionally, under the inherent power of the Court I hereby reprimand Mr. Reiner for his emailed statement to Defendants' counsel that the deposition would be cancelled because Dorsey "had not heard" from Defendants. In fact, Dorsey had heard, and Mr. Reiner's email was simply a bad faith subterfuge to allow the deposition to be cancelled without making Defendants' counsel aware of the real reason of which he was well-aware at the time, i.e. that the case was being dismissed.

### n. *Plaintiff's Voluntary Dismissal of Action*

It appears clear now that Dorsey's decision to dismiss was driven in large measure by their desire to "judge-shop," stemming primarily from the fact that I had noted deficiencies in counsel's advocacy, which primarily related to Ms. Peters.[341] However, the ultimate decision to voluntarily dismiss was one recommended by Dorsey *writ large* (including Ms. Peters), and made by the client, Wolters Kluwer. Three Dorsey partners – Ms. Peters, Mr. Reiner, and Mr. Carter – were involved with the decision to recommend dismissal.

Fed. R. Civ. P. 41 does not exist to allow a plaintiff to commence in one court, secure extensive emergency discovery, fail to provide discovery itself, and then "judge-shop" to seek expedient relief in a new Court after the original when this Court notes deficiencies in plaintiff's counsel's advocacy. Nor does Rule 41 exist to allow plaintiff's counsel to rearrange the case schedule to its liking. See Blauinsel Stiftung v. Sumitomo Corp., 2001 U.S. Dist. LEXIS 20746 (S.D.N.Y. 2001).

Indeed, Rule 41(d) exists to deter "forum shopping and vexatious litigation" by preventing a plaintiff from dismissing in one court and re-filing the same claim against the same defendant in a new court, as happened here.[342] See Blauinsel Stiftung v. Sumitomo Corp., 2001 U.S. Dist. LEXIS 20746, at *26-27, citing Simeone v. First Bank N.A., 971 F.2d 103, 108 (8th Cir. 1992). Accordingly, I reprimand Dorsey for their voluntary dismissal.

---

[341] Insofar as Ms. Peters or Dorsey has argued that the decision to "judge-shop" was motivated by a concern for the client because of "adverse orders," rather than a concern that the client might become aware of Dorsey's deficiencies in advocacy, that contention is belied by the record.

[342] Fed. R. Civ. P. 41(d) provides: "If a plaintiff who has once dismissed an action in any court commences an action based upon or including the same claim against the same defendant, the court may make such order for the payment of costs of the action previously dismissed as it may deem proper and may stay the proceedings in the action until the plaintiff has complied with the order."

### o. *April 13 Conference Call with Court and Method of Voluntary Dismissal*

After the client had made its decision to voluntarily dismiss the case and re-file in Massachusetts, Ms. Peters engaged in a conference call with the Court to address her motions to adjourn the TRO hearing and adjourn depositions. During this call, the subject of scheduling future depositions was discussed. This conference call was a fraud on the Court and on the Defendant, as Ms. Peters knew at that point that those depositions would never happen.

Accordingly, under 28 U.S.C. § 1927 and the inherent powers of the Court I hereby reprimand Ms. Peters for taking part in this call insofar as the scheduling of depositions was concerned rather than telling the true state of affairs to the Court and the Defendants, as Ms. Peters' discussion of depositions was made in bad faith and for the improper purpose of misleading this Court and Defendants.[343]

Additionally, under the inherent power of the Court I hereby reprimand Mr. Reiner for his decision to file the voluntary dismissal without immediately notifying the other side, as evidenced by his crossing out of the portion of the certificate of service that provided for service by e-mail. That action was also made in bad faith and for the improper purpose of misleading this Court and Defendants. Although Reiner's actions were at Ms. Peters' direction, there is no evidence that Ms. Peters specifically directed Mr. Reiner to cross out those words on that certificate of service. Mr. Reiner apparently took that action on his own initiative.

### p. *Defendants' Delivery of Documents, and Subsequent Copying of Documents*

Dorsey accepted discovery materials after the action here had been dismissed. It strains credulity to suggest that Dorsey did not know the discovery was coming. Even taking Ms. Peters' and Mr. Reiner's averments in their best light, when the discovery was delivered Friday night, Dorsey had no valid basis to accept it, and Dorsey should have left word for it to be returned immediately. Subsequently, I ordered the return of the

---

[343] I decline to impose any sanctions stemming from Ms. Peters' conduct on this call, as, taking Ms. Peters' arguments in their best light, genuine issues of fact exist, and I am not relying on my independent recollection of this call (or that of my law clerk). The sanctions here stem from the fact that depositions were discussed during this call, which Ms. Peters avers to in her own Declaration. See Peters Decl. ¶¶ 154-158.

discovery to this Court to serve as a neutral custodian while the parties worked out their disagreements.  Ms. Peters went ahead and had the documents copied, apparently fearful that she might lose her arguments to this Court to keep the documents.

Accordingly, under Fed. R. Civ. P. 16(f) and the inherent power of the Court I hereby sanction Ms. Peters for the copying of documents, in violation of this Court's April 16 order, in bad faith, with the improper purpose of the intention to use them in Massachusetts.[344]

### q.  *Plaintiff's Return of Transcripts*

On Thursday, April 19, I ordered the return of transcripts by noon the following day.  At some point, it became clear that Ms. Peters possessed additional transcripts at her home.  Sheridan, overseen by Carter, prepared a draft of a letter to the Court that mentioned these additional transcripts.  Ms. Peters literally removed that reference in her final letter to the Court, and instead inserted a more vague reference to Mr. Carter asking "an associate to retrieve all transcripts that could be located."  Ms. Peters' letter was at best misleading as to her knowledge of the state of the transcripts at the time.

I reprimand Ms. Peters for her failure to mention these transcripts in her letter to the Court, and find bad faith from the totality of the circumstances in this litigation, and Ms. Peters' repeated refusals to return any and all documents and transcripts to the Court when ordered to do so.

Just before the transcripts were due, Carter was informed that additional transcripts existed that he believed were work product.  Carter made the decision not to immediately return these additional transcripts, nor to inform the Court about them.  That decision not to inform the Court, although not made in bad faith, was an error in judgment.  Carter then compounded that error by not informing Ms. Peters of the existence of these transcripts, or directing the junior associates to inform Ms. Peters, or ensuring in some way that these transcripts were returned, or that the letter subsequently sent to this Court reflected the true whereabouts of the transcripts at this time.

---

[344] Carter and Reiner's overly technical interpretation of my order – i.e., that my order only concerned the return of documents, and that I would not be concerned if Plaintiff made a copy for itself, so long as it returned that copy as well – is, needless to say, rejected.

Indeed, such a contention is implausible.  As is clear, the purpose of the copying was to use the discovery in Massachusetts whether or not (but particularly in case) I ordered its return to this Court.

At this point, and considering the prior conversations he had had with Ms. Peters where she averred her intentions not to comply with Court orders, Mr. Carter as head of litigation should have provided more supervision, or the firm should have, at his behest. In any event, he should not have relied on Ms. Peters to responsibly handle the issue upon her return. All that said, I decline to sanction Mr. Carter because of the lack of evidence of bad faith on his part.

### r. *Ms. Peters' Ordering of Additional Transcripts*

After I ordered Carter to return all transcripts to this Court, Ms. Peters had the audacity to order additional copies from the court reporter. This action was in blatant and intentional disregard of this Court's order. There is no legitimate justification under which Ms. Peters could have ordered these additional copies. Ms. Peters' bad faith is evidenced by her direction to a junior associate to research whether my order to Carter, in essence, "really constituted an order." Ms. Peters' bad faith is evidenced further by the fact that she informed no one at her law firm of her actions.

Ms. Peters is reprimanded for ordering additional copies of transcripts, in bad faith, in violation of this Court's order to return all the transcripts, for safe keeping, to the Court and in light of the language that the confidentiality agreement to the effect that the transcripts were not usable in other litigation. To the extent that state disciplinary authorities may review Ms. Peters' actions in this litigation, they may among other areas want to further review Ms. Peters' actions in connection with the ordering of these transcripts.

### s. *Use of Transcripts in Massachusetts*

As set out in detail in my opinion of May 23, 2007, <u>see</u> <u>Wolters Kluwer Fin. Servs. v. Scivantage</u>, 2007 U.S. Dist. LEXIS 37306, Plaintiff used transcripts in Massachusetts in contravention of the Confidentiality Order that prohibited use of transcripts in "any other litigation."[345]

---

[345] Mr. Carter opined at the time that while there was an order to return all transcripts, there was no order to return transcripts attached as exhibits to pleadings or motions. Mr. Carter's argument is deficient in two respects. First, regarding the Court's order to return transcripts, Mr. Carter's argument is overly technical, and given the history of the case, Mr. Carter would have been better served to seek this Court's permission before using these transcripts (as, indeed, Ms. Peters had already done in her letter of April 20, and effectively done in her applications to this Court to "de-designate" the transcripts). Second, and more importantly, notwithstanding my order to return transcripts, Mr. Carter was not aware of the provisions of the Confidentiality Order that prohibited use of transcripts in another Court.

Ms. Peters used the transcripts in a bad-faith effort for the improper purpose of gaining advantage (and expedient relief) in a new court after she had "judge-shopped," and after she had gained extensive discovery without providing any discovery of her own, and in an effort to have that Court eviscerate the Confidentiality Order that this Court had entered to govern discovery produced in this litigation (which remained in force after this litigation).

The blame does not fall only upon Ms. Peters' shoulders, however. Dorsey senior partners (i.e. Carter and Herman) signed off on her use of the transcripts in Massachusetts. Unfortunately, these partners were unfamiliar with the Confidentiality Order—another failure to provide sufficient supervision—and Ms. Peters was less than forthcoming about presenting its terms to them. Still, at the end of the day, the decision to forward Southern District transcripts to Massachusetts was Dorsey's decision, not just Ms. Peters' decision.

Accordingly, under the inherent power of the Court I hereby sanction Dorsey and Ms. Peters, jointly and severally, for the use of the transcripts in Massachusetts in contravention of this Court's Confidentiality Order.

t. *Associated Actions to Use of Transcripts in Massachusetts*

Over the course of April 23 and 24, Ms. Peters emailed this Court three separate times and requested that this Court wait until Wednesday, April 25 before rendering any decision regarding transcripts that Dorsey might still possess. In retrospect, it is clear that these emails were a transparent attempt to convince this Court to wait on any ruling until, Ms. Peters hoped, the Massachusetts Court might eviscerate the Confidentiality Order (without, of course, Ms. Peters' informing this Court that such relief was sought in Massachusetts, and while Ms. Peters approached the Massachusetts Court *ex parte* and misled the Massachusetts Court as to the nature of the orders that had been issued in this Court).

Accordingly, I find that these emails were misleading, and sent in bad faith, for the improper purpose of making an *ex parte* "end run" around this Court's orders, on a matter over which this Court retained jurisdiction. Under Fed. R. Civ. P. 16(f) and the inherent powers of the Court I hereby reprimand Ms. Peters for these statements designed to mislead this Court and evade this Court's orders.

### u.  Filings and Statements Made In Massachusetts Court

Ms. Peters refused to serve Defendants' New York counsel with the moving papers in Massachusetts on April 24, despite her own local counsel's admonition to do so.  Most notably, when Defendants' counsel informed Ms. Peters that he had been authorized to accept service, Ms. Peters still refused to provide them, noting a grammatical error in Defendants' counsel's email.  Ms. Peters' explanation for her refusal to provide service, given the history of this litigation, defies credulity.  In any event, though, I do not believe that I possess the power to impose sanctions in connection with Plaintiff's filings in the Massachusetts Court.[346]  I will, however, transmit a copy of this Opinion to Judge Stearns in Massachusetts in the case that he sees fit to take action there.

Also, to the extent that Plaintiff's motions in Massachusetts constituted a bad-faith attempt at vexatious and harassatory litigation via an attempt to gain improper advantage in Massachusetts through a voluntary dismissal, and to re-litigate this Court's orders already rendered, I will transmit a copy of this Opinion to Judge Stearns for whatever action, if any, he sees fit.

### v.  Ms. Peters' Order to an Associate to Alter Transcripts

From the evidence, it is clear that Ms. Peters ordered a junior associate to alter transcripts that had been ordered returned to this Court by "scribbling all over them," so that the transcripts might be considered "work product" and thus arguably not returnable.  Nonetheless, Ms. Peters, after her direction to the associate concocted a *post hoc* explanation that she was "joking" when she gave that order.  The evidence supports the clear finding that she was not.

That representation was false.  More to the point, Ms. Peters' order to an associate to alter evidence that a Court ordered returned is disturbing to say the least.  It evinces a blatant disregard for Court orders, and a willingness to take any action necessary towards

---

[346]  Additionally, Ms. Peters made several statements, both in written pleadings and orally, to the Massachusetts Court that appear to be misleading, given the evidence adduced in this litigation.  Most notably, Ms. Peters stated in her Memorandum of Law that "no such order" providing for the return of all discovery had issued from this Court, when of course, such Orders had been issued (at the very least, on April 17, and reiterated on April 19 to include transcripts, in case that was not previously clear).  Further, during oral argument in Massachusetts, Ms. Peters implied that my Orders had given her permission to use transcripts in Massachusetts, and characterized my April 24 directive to again return transcripts as "just an email from a clerk."  Again, though, as I do not believe that I possess the power to impose sanctions in connection with these statement, I will transmit a copy of this Opinion to Judge Stearns for whatever action, if any, he sees fit.

the desired end, including ordering subordinates to commit misdeeds that, apparently, she felt uncomfortable committing herself.[347]

In certain situations where violations of Court orders also comprise ethical violations, it is appropriate to refer the matter to the state disciplinary authorities in case they may want to take action. Indeed, matters have been referred to disciplinary committees for lesser infractions, such as Rule 11 violations. See Steinle v. Warren, 765 F.2d 95 (7th Cir. 1985) (referring matter to state disciplinary committee for pursing frivolous claims). Although this Court possesses the power to suspend attorneys from practicing law,[348] it is more appropriate to refer the matter to our Southern District of New York disciplinary committee and to the Appellate Division First Department because of the procedural protections inherent to that process. See Thornton v. GMC, 136 F.3d 450, 455 (5th Cir. 1998) (reversing district court's suspension of attorney and instead referring to state disciplinary committee).

## IV. CONCLUSION

Although not all of the sanctions imposed here fall squarely on Ms. Peters' shoulders, it is fair to say that most likely, none would have been imposed on any parties had a different lawyer been the lead litigator for Plaintiff.[349] Ms. Peters was the driving force behind most of the decisions made by Wolters Kluwer and Dorsey in this litigation. Sadly, Ms. Peters' actions in this litigation show a studied disregard for the sanctity of Court orders. In addition, Ms. Peters' proclivity for misrepresentation is disturbing.

---

[347] I decline to sanction Mr. Brackett for his actions. Mr. Brackett, a first-year associate, was put into a very difficult situation when he received a direct order from the lead partner on his case to take inappropriate action. Mr. Brackett, the same day, reported that partner to more senior authorities at his firm, which takes some amount of courage. I would give Mr. Brackett the same advice as the Dorsey senior partners did – i.e., that in the future, he immediately report such matters rather than taking any action on his own part. It is my belief that Mr. Brackett was forthright with this Court about his actions, and my hope that this Opinion will not affect his future career.

[348] See, e.g., Donaldson v. Clark, 819 F.2d 1551, 1557 n.7 (11th Cir. 1987); In re Disciplinary Action Boucher, 837 F.2d 869 (9th Cir. 1988) (suspending attorney from practice of law before that Court for six months for misrepresentations).

[349] Dorsey and Whitney's culpability stems not only from Ms. Peters, but also from the firm's inability— even after senior management at Dorsey had been alerted to Ms. Peters' disregard for Court orders—to adequately supervise its attorneys, as well as its decision to leave Ms. Peters in charge of the litigation while she was on vacation. While Wolters Kluwer was not kept fully informed about various procedural motions that Ms. Peters brought or comments that this Court made, and it is likely that certain actions would not have happened were they informed, a sophisticated client such as Wolters Kluwer (with experienced in-house counsel) nevertheless has some responsibility to ensure that litigation proceeds within acceptable bounds.

Indeed, at various points in this litigation, Ms. Peters misrepresented facts or was less than forthcoming regarding her actions to this Court, her fellow lawyers at Dorsey, and her own client. Even conduct that I did not find to be sanctionable showed dismaying incivility to the others involved in this case, the Court included.

While I am dismayed at the way in which many law firms today approach the practice of law, I realize that for the most part it is none of my business and indeed not the business of the judiciary in general. The fact that partners are at times made and retained for their rainmaking skills and not for their legal skill, that the number of billable hours is not only the alpha and omega of bonuses but that these hours— or at least the ones that count—often exclude pro bono hours, or that who gets credit for originating a piece of business can throw a firm into turmoil and prompt major internecine struggles, or that the bottom line has eclipsed most everything else for which the practice of law stands or stood to the extent that the practice of law is now frequently described as a business rather than a profession. While decriable these are as I said really not my concern. Rather, it is the fallout from such conduct, some of which we witnessed here, that ineluctably drives some lawyers and some law firms to the kind of conduct that played out before me at this hearing and that then becomes the business of the courts.

On a final note, the reader should be clear that I firmly believe the sentiment expressed in the Craco Report that "the actual level of professionalism brought to bear...by thousands of lawyers across the state, in court and office, day in and day out, is extraordinarily high."[350] I am hopeful that by casting a ray of light on this anomalous and sanctionable behavior the public and the profession will be better served.

Reprimands are hereby imposed in accordance with the foregoing findings. The Clerk of the Court is instructed to close this matter and remove it from my docket.

**SO ORDERED.**
**November 9, 2007**
**New York, New York**

U.S.D.J.

---

[350] Craco Report at 3.

129